

THE WILLIAM DAVIDSON INSTITUTE
AT THE UNIVERSITY OF MICHIGAN

# Sovereign Wealth Fund Issues and The National Fund(s) of Kazakhstan

*By: David Kemme*

William Davidson Institute Working Paper Number 1036
August 2012

Sovereign Wealth Fund Issues

and

The National Fund(s) of Kazakhstan

David M. Kemme[*]
Professor and Morris Chair
Department of Economics
University of Memphis
dmkemme@memphis.edu

Abstract:  This paper first describes the major concerns associated with SWFs, mainly revolving around state ownership and lack of transparency. It then focuses on the National Fund for the Future of Kazakhstan (the "oil fund", or NOF) and Samruk Kazyna (SK), the holding company for state owned enterprises. The NOF is funded predominately by corporate income taxes and royalties on natural resource production and is an instrument to provide financial stability and intergenerational equity.  SK includes most large public monopolies and state owned enterprises not privatized in the 1990s with all of the accompanying issues related to state ownership and control of productive activities.

August 29, 2012

[*] This project was funded in part through a grant provided by the United States Department of State's Title VIII Program and administered by the University of Delaware.

JEL Code:  F33, G20, O53, P33

Key Words:  Sovereign Wealth Funds, Kazakhstan, Oil Fund

## Summary

While Sovereign Wealth Funds (SWFs) have existed for nearly six decades, only in the last decade, because of their rapid increase in size and activities, have they attracted the attention of policy makers.  The IMF has identified five types of funds based on their main objective:[1]  1) *stabilization funds*, 2) *savings funds,* 3) *reserve investment corporations*, 4) *development funds*, and 5) *pension reserve funds*.   While these functions are typically and purposefully separated in unique free standing legal entities, many countries' funds may have single or multiple functions with ambiguous missions and ambiguous lines of authority.  Kazakhstan has two that play a critical role in the economy. The National Fund for the Future of Kazakhstan (NOF, the "national oil fund") serves as a stabilization fund and a savings fund.   Samruk Kazyna (SK, the "sovereign welfare fund"), a government owned holding company, acts as a development fund focusing on economic development objectives of the government. The National Bank of Kazakhstan (NBK) also manages the foreign exchange reserves as a separate fund in the Bank.

This paper identifies the major concerns associated with SWFs, mainly revolving around state ownership and lack of transparency. These include 1) commercial advantages that private companies do not enjoy, 2) SWF objectives that may reflect government foreign policy objectives, 3) activities which may disrupt global or individual country capital markets, 4) ownership in particular industries as a vehicle for the transfer of sensitive technologies, and 5) coordinated actions of a group of SWFs that may lead to global control of particular resources.

Most SWFs convert natural resource wealth into more "spendable" financial assets.  Access to financial resources enables the acceleration of development programs, but also may enable the continuation of undesirable macroeconomic policies.  Market discipline may be lost and economic policy decisions may be highly politicized. Many SWFs lack clarity in their organizational structure, have ill defined governance mechanisms, lack accountability and transparency and suffer from poorly designed or non-existent financial management policies. The lack of independent auditors or published annual reports and opaque balance sheets leaves room for questionable behavior.  Critics claim that they are a major source of graft and corruption. These concerns can be addressed if the SWFs individually provide greater transparency in their strategy and objectives, management and accounting practices and individual transactions. The IMF Working Group on Sovereign Wealth Funds has proposed a set of "best practice" guidelines, *The Santiago Prinicples*, for the activities of SWFs. To date Kazakhstan is not a signatory, however.

The NOF is not a legal entity, but instead a fund at the NBK established by Presidential decree, owned by the Ministry of Finance, overseen by a Management Council appointed by the President and managed by the Treasury Department of the NBK.  The Council sets governance and investment policies and the portfolio is managed by the NBK.  Receipts consist of direct budget transfers (the initial endowment), direct taxes other oil sector receipts, revenues from privatization and sales of land, and investment income.  Assets have grown steadily from just over US$8 billion in 2005 to US$41.6 billion in 2010.  Uses of funds are: 1) "guaranteed transfers" to the government, which grew from US$2.1 billion in 2002 to US$8.1 billion in 2010, now limited by the "New Concept" to about US$8 billion annually, 2) "targeted transfers," direct transfers to SK in response to the financial crisis in 2008 and 2009, and 3) management expenses.  The NOF has accumulated assets every year since its inception, with taxes from production sharing and royalties accounting for about two thirds of revenues, oil and gas lease payments accounting for another 20% and excess profits taxes and corporate income taxes accounting for about 9%.

The NOF is designed to provide economic stability and savings for future generations.  There are three distinct portfolios or funds within the NOF, each with unique investment criteria:  a dollar denominated stability fund and savings fund, both managed by the NBK, and a smaller tenge denominated fund managed by the Ministry

---

[1] IMF (2008). "Sovereign Wealth Funds—A Work Agenda," February 29, 2008, available at
http://www.imf.org/external/np/pp/eng/2008/022908.pdf

of Finance.  Investment guidelines for the Stability Fund require high liquidity with the 6 month US T-bill as benchmark, and US$ as base currency.  The Savings Fund as of February 2011, consists of 20% equities, 80% fixed income investments.  Managers appear conservative and were less affected by the global financial crisis; overall performance was -2.5% vs -23% (or so) for the Norwegian SWF.  The fixed income portfolio is managed by the Treasury Department staff.  The equities portfolio is still externally managed.   External managers are selected on the basis of historic results, experience, stability of the management team, fee levels and credit worthiness.  Presently there are no investments in private capital, but discussions with the management council will begin this year.  Investment grade corporate and emerging market global bonds will be added to the bond portfolio and the share of the equity portfolio managed internally will be increased.  The NOF produces quarterly reports that are approved by the Management Council, the Ministry of Finance and the government administration.  These are not published, but may be excerpted in the Annual Report of the NBK.  Thus, transparency remains an issue.

The Sovereign Wealth Fund Samruk Kazyna, a joint stock company with the Ministry of Finance as the sole shareholder, is much larger and more important than the NOF. The assets of SK are estimated to be from 50-80% of GDP, and revenues of the companies around 20-30% of total GDP, perhaps higher.  SK was created by merging two existing Joint Stock Companies, JSC Kazakhstan Holding for the Management of State Assets Samruk and JSC Kazyna Sustainable Development Fund, under the guidance of the State Property and Privatization Committee of the Ministry of Finance. Samruk was a holding company of the five large state monopolies, KazTelecom, KazRail, Kazmunigas, KazPost and KeGok.   Kazyna consisted mainly of regional Social-Entrepreneurship Companies focused on economic development, many initially funded with resources from the NOF.  Entities held by SK, range from Air Astana, to real estate ventures and newly acquired commercial banks.  Many of these companies have multiple subsidiaries so the total number of companies held is difficult to estimate.  Recently ownership of several of the companies was transferred from SK to other Ministries.

Recent transactions with Samruk Kazyna are seen as one-time events.  About $5 billion in SK bonds were purchased by the NOF and there was a $5 billion direct transfer from the NOF to SK.  The direct transfer came in part from the tenge "Domestic" Account of the NOF managed by the Ministry of Finance and $2-3 billion from the Stability Fund of the NOF. The "New Concept" for the NOF now emphasizes the savings function, increasing until 2020 with a goal of approximately 30% of GDP.

The use of the resources of the NOF and transactions with SK during the global crisis illustrates how closely the government administration, the Ministry of Finance and the Ministry of Economic Development and Trade, the NOF, and SK are intertwined. SK will serve as the primary means of achieving the 2020 Strategic Plan.  Companies held by SK are called on to implement about half (in number and value) of the projects for accelerated industrialization and innovation.  Presently it is unlikely that NOF resources will be called upon to support these efforts, but both political discipline and economic circumstances remain determining factors.

Critical issues regarding SK range from corporate governance and transparency, to ownership rights and claims on these assets and the income they produce, to the legitimate roles of the state in directing economic development.  The (draft) March/April government's strategic plan identifies three broad objectives for SK.  First, it must play a leading role in the diversification of the economy, second, it must increase the efficiency and performance of companies it holds, and third the government will finalize and then lessen SKs role in the anti-crisis measures.

With regard to policy there are both institutional and longer term policy issues that should be resolved.  It is clear that the institutional structure of the economy is still evolving.  Samruk-Kazyna's influence on the economy is too large and the tolerance for less than optimal economic performance and lack of competition distorts the competitive allocation of resources away from their highest and best use.  Policies to promote and assist in the privatization of commercially viable entities and the dissolution of non-viable entities should be clearly supported.  These should first include efforts to increase transparency in accounting and governance of the operations of both

Samruk-Kayna and the individual entities it holds.  Then, specific programs of privatization should be encouraged, from voucher systems to distribute ownership to tax payers at large, to initial public offerings, to sale to foreign entities. In each case the disposition of revenues from privatization should be clearly articulated and monitored. These range from shares or direct payments to taxpayers, as in many East European countries, contributions or transfers to the pension system, as in Norway, direct flows to the government budget, as in Hungary, or contributions to the National Oil Fund to lessen the immediate macroeconomic impact.  While it is clear that Samruk-Kazyna, the National Oil Fund and the government's development program are closely entwined, projections of growth in NOF assets do not appear to be explicitly linked to the volume of oil or natural resource exports, world demand or prices of these exports.  Revenues of the National Oil Fund are best seen as a residual, that amount of net foreign inflows remaining after non-inflationary government and development expenditures are made. Given inflation appears persistently high the amount of foreign revenues hitting the domestic economy is apparently too large and should be reduced.  The links between domestic development needs, performance of the global economy and growth in assets of the NOF should be clearly delineated in policy discussions, then monitored and managed within the context of domestic macroeconomic policy objectives and global economic performance.

# Contents

Summary

I.   Introduction

II.  Setting the Stage:  Overview of Sovereign Wealth Funds – Definitions, Issues and
        Concerns
        *Defining Sovereign Wealth Funds*
        *Size*
        *Should we be concerned? – State ownership and lack of transparency*
        *Concerns: economic and national security threats*
        *SWF home country concerns*
        *Policy responses*
        *Transparency and governance*
        *Greater recipient country regulation and oversight*
        *Investment Protectionism*

III. The Funds of Kazakhstan
        *An aside on the pension system*
        *The National Fund of Kazakhstan*
        *Details of the management of the National Fund portfolio*
        *Samruk Kazyna*

IV. Summary and Conclusions
V.  References
VI. Appendix:  Tables and figures to be inserted in the text

VII.

I.   Introduction

     The first sovereign wealth fund, now called the Kuwait Investment Authority, was founded in 1953 with little notice. In the last decade however, the number of sovereign wealth funds and the assets under management have grown to such an extent that they may be considered a "systemic" concern.  Kazakhstan, following the lead of most resource based economies, created the National Oil Fund in 2000.  This entity has no legal standing but is simply a government-owned fund at the National Bank of the Republic of Kazakhstan, and is funded primarily through the various taxes and royalties on oil production.  A second entity, Samruk Kazyna, was created in 2008 as a joint stock company with a single shareholder, the Kazakhstan government, with the Ministry of Finance as founding body. This entity also meets the definition of a sovereign wealth fund.  Both have proven to be of critical importance to the Kazakhstan economy and the management of the recent financial crisis.

     Despite their size and importance there is virtually no discussion of these two sovereign wealth funds in the economics, legal studies or political science or law literature on sovereign wealth funds – perhaps a mention of the National Oil Fund in general studies of sovereign wealth funds, but nothing on Samruk Kazyna.  There is virtually no description, analysis, or evaluation of their activities and performance.  In fact, while there is now a substantial literature on the general nature of sovereign wealth funds, it lacks specificity in part because the data is sketchy and difficult to compare from fund to fund.  The issues concerning sovereign wealth funds, from corporate governance and transparency to investment policies and implications, are very contentious and many are unresolved.

     This paper provides an initial examination of the National Oil Fund and Samruk Kazyna. The next section provides a brief review of issues and concerns relating to sovereign wealth funds in general.  Section III then discusses the National Oil Fund and Samruk Kazyna in particular. For readers well versed in the issues regarding sovereign wealth funds section II may be skipped.

II .  Setting the Stage:  Overview of Sovereign Wealth Funds – Definitions, Issues and
       Concerns[2]

*Defining Sovereign Funds*

     "Sovereign Wealth Funds (SWFs) are pools of assets owned and managed directly or indirectly by governments to achieve national objectives." [3]  Typically they are funded by foreign

---

[2]  Truman (2007, 2008, 2010), *inter alia*, provide very comprehensive descriptions and analyses of sovereign wealth funds.  This section provides only a brief overview of the essentials.

[3] Blundell-Wignall, Hu and Yermo (2008). A more elaborate definition, by the International Working Group on Sovereign Wealth Funds is:  SWFs are defined as special purpose investment funds or arrangements, owned by the general government. Created by the general government for macroeconomic purposes, SWFs hold, manage, or administer assets to achieve financial objectives, and employ a set of investment strategies which include investing in foreign financial assets. The SWFs are commonly established out of balance of payments surpluses, official foreign

exchange reserves, royalties on the sale of natural resources, or general tax revenues.  The IMF has identified five types of funds based on their main objective:[4]  1) *stabilization funds*, designed to insulate the national budget and domestic economy from commodity price swings, usually oil, 2) *savings funds,* designed to realize and convert natural resource wealth into more diversified assets for future generations and mitigate the effects of Dutch disease, 3) *reserve investment corporations*, designed to increase the return on foreign reserve assets (which otherwise are typically invested in very short term assets to be available for currency exchange rate management purposes), 4) *development funds*, designed to support socio-economic projects, promote industrial policies or overall development objectives, and  5) *pension reserve funds*, which fund national pension systems (from sources independent of individual contributions) or provide for unspecified contingent liabilities.[5] The funds often have multiple, overlapping and evolving objectives.  In addition, their purpose has often been broadened.  E.g., as a result of the financial crisis these funds have been tapped to stabilize the economy or recapitalize the banking and financial systems.  In Kazakhstan four banks, several construction/real estate ventures and a major agricultural enterprise were fully or partially nationalized and/or recapitalized (the operations resulted in a transfer of funds of about US$5 billion in 2008, US$1.8 billion in 2009 and the purchase of about US$4 billion in Samruk Kazyna bonds by the National Oil Fund).

*Size*[6]

Regardless of the origin of their revenues or their specific purpose SWFs have become large enough to be systemically important.  Truman (2010) estimates total assets of sovereign wealth funds to be about US$3.5 trillion, excluding pension funds, or US$5.9 trillion including those designated as pension funds (e.g., Japan, Norway and others).  And, of those assets, US$3.7 trillion are foreign assets.[7]  Tables 1 and 2 (all tables referred to in this section are in Appendix 1), from Beck and Fidora (2008), provide data on the largest SWFs and the largest cross border transactions in 2007-2008. They estimate the total assets of these SWFs to be about US$5 trillion. Several independent estimates suggest total assets of SWFs were growing at about US$1 trillion

currency operations, the proceeds of privatizations, fiscal surpluses, and/or receipts resulting from commodity exports. IWG (2008)

[4] IMF (2008).

[5] For the most part, funds which strictly finance national pension systems, Public Pension Reserve Funds (PPRFs) like Social Security Reserve Funds (SSRFs) funded by contributions in excess of current payouts, such as the US Social Security Trust Fund, or Sovereign Pension Reserve Funds (SPRFs) like the Australian Future Fund, funded by direct government transfers, are not of concern in this paper even though they are often  referred to as SWFs. Kimmitt (2008) offers a simpler categorization of sovereign investment:  international reserves, public pension funds, state-owned enterprises, and SWFs which may be further disaggregated by source of funds, resource revenues, balance of payments surpluses, etc..

[6]  It is very difficult to construct comparative data for the SWFs.  Reporting is voluntary, there are no uniform reporting standards, and different authors have compiled data at different points in time, for different measures of assets and  in different currencies (or in US$ at different exchange rates).  Truman (various) and Beck and Fidora(2008) appear to have the most consistent measures, but at different points in time, mostly prior to the global financial crisis. Even though these may be considered the best estimates, they often do not agree.

[7]  Truman (2010) Table 2.1, pp. 12-15. Note though that most data mentioned here are estimates.  Many sovereign wealth funds do not reveal the size of the fund.

per year prior to the global financial crisis and would have easily reached the US$10-15 trillion range by 2015 on that trajectory.  Post-crisis estimates, taking into account substantial losses or expenditures from the funds, are much less, in the US$5 trillion to US$10 trillion range. Table 3a compiled by the Sovereign Wealth Fund Institute estimates SWF total assets to be about US$4.7 trillion in 2011.  The first sovereign wealth fund was the Kuwait Investment Agency originally founded as the Kuwait Investment Office in London in 1953, before Kuwait was a sovereign country.  In 2011 the Kuwait Investment Agency had US$296 billion in assets.  The largest SWF, however, is the Abu Dhabi Investment Authority, with an estimated US$627 billion under management.  SWF assets of Gulf Cooperation Council[8] countries are estimated at US$1.5 trillion, nearly half the world wide total.[9]  Note though that many SWFs do not report their assets *at all* and throughout the discussion we can only discuss estimates and these vary significantly, sometimes as much as 500%. Further, while many do not report their assets often they report virtually nothing about their organization.  As indicated in Table 3a the two most common measures of transparency, the Linaburg-Maduell transparency index (LMTI) and the Truman score (TS), vary considerably across funds and frequently do not agree.  For example Bahrain's fund has an LMTI of 9 (out of a possible 10) and a TS of 30 (out of a possible 100).  (Transparency issues are discussed further below).

Kimmitt ( 2008) provides some perspective by noting relative to other types of participants in the financial markets that SWF assets are small compared to total global assets of about US$190 trillion, hedge fund assets of about US$1.5 trillion and pension funds and endowments of US$53 trillion (all in 2008).  But the number of individual hedge funds and pension funds is much, much larger than the number of SWFs and the concentration of assets in a handful of SWFs is much greater.  It is doubtful that any one hedge fund or pension fund could substantially and permanently move a market.  For SWFs it is not so clear. More recent data comparing SWF assets and stock and bond market capitalizations are reported in Tables 3b, 3c and 3d.  The largest SWF, Abu Dhabi, the National Fund of Kazakhstan and the average of the 10 largest SWFs relative to the world total stock market capitalization and the stock market capitalization of 29 countries is reported.  While the assets of the Abu Dhabi fund are small compared to the major stock markets (and the Kazakhstan Fund even smaller) they amount to nearly 20% of the capitalization of the Italian stock market and 63% of the Finnish stock market.  The assets of the Abu Dhabi fund relative to various measures of debt are much larger.  E.g., Abu Dhabi SWF assets are about 2.5% of total US debt issued, 20% of Italian debt issued and 228% of Greek debt issued.  It is clear that SWFs could be significant players – able to move markets – in selected equity and debt markets.   It is also clear that the global financial order is undergoing a radical restructuring (even before the global financial crisis) and Lee (2009) argues that in fact

---

[8]  More formally the Cooperation Council for the Arab States of the Gulf, which consists of the Arab monarchies of Bahrain, Kuwait, Oman, Qatar, Saudi Arabia, and the United Arab Emirates. Jordan, Morocco and Yemen are in varying stages of discussion with respect to membership.
[9]  Winder (2010).

there is a reversal of neo-colonialism, with capital-dependent developed economies falling prey to newly rich, capital abundant resource based economies.[10]

*Should we be concerned? -- State ownership and lack of transparency*

Underlying the U.S. economy is free enterprise and the efficiency of markets in allocating goods, services and factor inputs, including capital.  The belief that markets can allocate resources more efficiently than governments is rarely debated.  By endowing states with the financial power embodied in sovereign wealth funds, these foreign governments then have the power to reduce free enterprise or bypass the competitive allocation of resources to their best uses.  Thus, the most basic assumptions about the functioning of western economies and the international financial system are called into question.[11]  The inherent dangers of state organizations acting without transparency in the capital market of free enterprise market economies relate both to economic activities with potential anticompetitive or outright political goals as well as more narrow, specific national security issues.  Now, must we be concerned with a new "balance of financial terror?"

*Concerns:  economic and national security threats*

There is a wide range of potential economic threats, some even from the most well-managed most transparent sovereign wealth funds.  For example, Backer (2009, p.  1272) argues " . . Norway is consciously pursuing state policy indirectly through its funds.  Investment is clearly meant to project Norway's political power by other means, and to move policy in particular directions . . ."  The Norwegian funds seek to maximize wealth, but rather than investing in benchmark indices dictated by the efficient markets hypothesis they look for market aberrations and seek 'excess returns' subject to strong explicit 'ethical guidelines.'[12]  As a result the Norwegian Funds have, like private funds, become entangled with movements advocating corporate social responsibility guidelines, sanctions against Israel, and prohibitions against investment in Burma, to name a few.  The Norwegian model is often considered among the best, one in which the ownership interests of the government are separated from the economic activities of the fund, i.e., "public ownership, but effectively privately operated."  Then, at best we would expect the funds to be influenced in ways similar to ways in which private funds are influenced and act accordingly, i.e., the route of traditional shareholder activism.  There has been no shortage of public interest groups advocating for the US or other developed countries to use their financial muscle to alter the behavior of foreign governments.

Direct commercial advantages for individual portfolio companies may also arise.  There is the potential for a perceived or actual unfair competitive advantage relative to the private sector.  With a sovereign guarantee, explicit or implicit, portfolio firms may be able to obtain financing

---

[10]  Also see Truman (2010), Chapter 1.
[11]   See Kimmitt (2008) and Slawotsky (2009).
[12]  These guidelines are overseen by a Council of Ethics established by Royal Decree in 2004 and revised in 2005. See Backer (2009) p. 1277.

rates (or bailouts) not available in the private market. Further, access to foreign exchange may be facilitated or may actually be funneled through domestic enterprises which then invest abroad.[13] Or, perhaps more dramatically, a portfolio company may benefit from business information gained by the intelligence services of the home country.

Concerns though, reach far beyond traditional public interest group or shareholder activism and commercial advantages for individual firms.  Foreign governments, via sovereign wealth funds, could employ large pools of capital in non-commercial ways that are politically sensitive, to promote a foreign policy objective, even if not a national security threat.  They may act in ways more directly aligned with the national interests of their government or even with the assistance of other government agencies.  For example, a simple case would be for the SWF to pressure a portfolio company to open a production facility in the home country to create jobs. Slawotsky (2009) argues that SWFs will no longer be passive investors, but are becoming more active owners of large "flagship" international companies that will "allow them to influence corporate boards in dramatic ways, radically transforming corporate governance".[14]  It is not necessary for a SWF to actively take control of a company, but a Board seat or outsized voting rights could provide leverage to influence firm activities.  While the potential for takeover of specific firms and potential market disruptions – for the products or resources that these firms produce - are very real, the influence of SWFs and their home country governments may be much more subtle.  Just the threat of withdrawal, explicit or implicit, could be sufficient to cause a portfolio firm or the firm's government to alter its behavior.

Added to this threat is the potential for SWF activities to disrupt national capital markets or more readily, the value of an individual stock.  Sudden changes in portfolios by a major SWF or a group of aligned SWFs may disrupt the market with consequent real economic effects that may also have political effects, such as changing election outcomes.  However, Kimmitt (2008) argues that to date SWFs have been long term investors, who haven't deviated from their long term strategies despite short term volatility and as a result may be seen as reducing market volatility. They provide liquidity, raise asset prices, and lower borrowing costs, thus contributing to financial market stability. During the global financial crisis SWFs made large investments in soon to be distressed financial institutions, stabilizing some of the firms, but taking large reductions in their portfolios just as other participants did. Nonetheless, if they take large, opaque positions and markets are illiquid then their actions, or even rumors of their actions, can increase volatility.  There is little evidence that this has happened in any significant way, however.  Beck and Fidora (2008) examine major portfolio changes of the Norwegian SWF and find no evidence

---

[13] This is potentially the case for some activities of Samruk Kazyna in Kazakhstan.
[14]   Slawotski (2009), p1241.

"for a stock price impact of non-commercially motivated stock sales by the Norwegian Government Pension Fund".[15]   Rose (2008a) also argues that they are generally passive investors.

There are a host of national security issues that also arise.  One set of issues involve the transfer of science and technology via Board actions.  For example, transferring engineering studies and blue prints from a portfolio company to a domestic one as part of a joint venture or production agreement is a much more direct transfer than the reverse engineering required by the purchase of goods and services subject to the Wassenaar Agreement (successor to COCOM) review as in the past. A second issue involves international strategic objectives. Even if not overt, Slawotsky (2009) notes that international antagonisms may lie dormant during times of prosperity, but economic stress brings them to the surface and purposeful actions of SWFs may damage the interests of an antagonist.  Examples include the dispute between Russia and the Ukraine over natural gas and the sudden reduction in energy supplies to the Czech Republic when the Czechs agreed to host anti-missile radar facilities.  While these actions were by Gazprom, a Russian firm[16], sovereign wealth funds can easily exert similar pressures via the portfolio firms in which they have influence.  Drezner (2008) offers two examples of political and economic turmoil resulting from SWF actions. E.g., the Norwegian Government Pension Fund shorted several financial sector stocks in Iceland, which then affected the entire economy.[17]   The purchase of a company connected with the Prime Minister of Thailand by Singapore's Temasek was a key trigger of the coup in 2006.[18]   A third issue concerns the actions of the portfolio (or recipient) country's government.  For political reasons it may take actions that favorably affect the holdings of a foreign SWF and benefit the foreign government.[19]   Drezner (2008) though, also clearly distinguishes between SWFs of democratic governments, which are more transparent and likely to act in a slower, predictable fashion, and those of authoritarian governments, which may act quickly and without recourse of the electorate.

Finally, as emerging economies develop control of global resources is of ever more importance.  The incentives to use SWF resources to advance national interests or direct supplies and knowledge of resources back to the home country will increase. Given that most sovereign wealth fund resources are in developing or resource-based economies, the position of developed economies may be challenged.

---

[15] Beck and Fidora (2008) modestly claim their estimates are "back of the envelope", but in fact the methodology is clear and well documented. Truman (2010), pp 46-52 discusses market turmoil and uncertainty.  Kotter and Lel (2008) find a positive announcement effect on the share price of recipient firms when a SWF invests in them, with the more transparent the SWF is the greater the effect, yet that over all SWFs are passive investors that invest in under-valued securities.  Sun and Hesse (2009), however, find no effect on equity markets due to SWF investing.

[16] Of course one might argue that it was simply a firm exercising monopoly power over the natural gas transmission lines that it controls and timing was just coincidental as Epstein and Rose (2009) seem to imply.

[17] This is in contrast to Beck and Fidora (2008).

[18] Drezner (2008), p 118.  He provides a broad survey of economic and security concerns.

[19] Slawotsky (2009) seems to suggest that the terms of the bailout of FNMA and GNMA favored China, which had very large positions in each.  However, there is little evidence of clear political bias in terms of the political regimes of countries in which SWFs invest.  Avendano and Santiso (2009) find that SWFs invest essentially the same as a group of mutual funds, and primarily for financial purposes.

*SWF home country concerns*

It should be added that potential detrimental effects of SWF actions are not limited to recipient countries; they may also affect the home country.  Commodity based SWFs simply convert wealth in the form of natural resources in the ground into wealth held in more traditional financial assets. The new, more "spendable" form of wealth may generate increases in spending and GDP, generally a positive outcome, but the now realized wealth of the SWF may enable the continuation of undesirable macroeconomic and financial policies to the long run detriment of the country.  Governments must still provide sound macroeconomic policies: fiscal, monetary and exchange rate management.[20]  Market discipline could be lost and governments could make political decisions with adverse long run consequences because of the easy financing available if they can tap the SWF resources.  The economic benefits may also be lost, if they existed at all.  In fact Aslund (2007) claims "sovereign wealth funds are often a lousy bargain for the countries that have them" and in democracies there is no justification for their existence.[21]  It seems they are most prevalent in authoritarian, less developed countries where citizens cannot demand smarter economic policies.  But, there is a clear trade-off as the benefits of a well managed SWF with long run economic development objectives as a goal may prove beneficial in economies with no or underdeveloped capital markets.

To extend the argument, the existence of SWFs may hinder US policy goals abroad, like the process of democratization.  They create and empower a *rentier* class of political elites independent of the population and with no interest in economic growth or capital market development, *per se*. The government survives without the need for taxes upon the population to finance its activities, and therefore has no need to provide accountability of its actions.  The sometimes destabilizing movements of free markets are of no concern as SWF wealth can smooth domestic fluctuations and pacify restless populations. On the other hand, given the anti-American attitudes of some countries' populations the US may be less inclined to promote democracy in authoritarian states if the state is friendly and has the financial wherewithal to continue in power.

While macroeconomic policies may be altered by the existence of SWFs, the management of the SWF in and of itself may cause even more serious issues regarding the efficiency with which resources are used, the pattern of economic development, and social and economic disruptions, legal or otherwise.  Many SWFs lack clarity in their organizational structure, have ill defined governance mechanisms, lack accountability and transparency and suffer from poorly designed or non-existent financial management policies. The lack of independent auditors or published annual reports and therefore very opaque balance sheets leaves room for behavior that may be questionable.  As a result, in some cases neither the domestic population nor international partners or foreign governments trust the actions of SWFs.[22]  Critics claim that they are a major

---

[20]  For further discussion of a general nature see Lu, et al. (2010).
[21]  See Aslund (2007).
[22]   The survey of perceptions of SWFs by Hill & Knowlton Penn Schoen Berland (2010) attempts to address this issue.  It is noted that "At a time of great volatility and uncertainty, sovereign wealth funds represent an extremely

source or even the principle source of graft and corruption in their respective economies. The claims that SWFs lead to an inefficient distribution of financial assets and therefore lower rates of growth in GDP or other measures of economic well-being must be taken seriously, until evidence of their behavior indicates otherwise.

*Policy responses*

There is often a clear conflict between investment policies and national security issues, and as a result there have been three general responses on the part of recipients of SWF investments.  First, there is a general call by recipient countries[23] for greater transparency of activities, clearly defined and monitored corporate governance, and better measures of the impact of their behavior at a minimum as if the SWF were a private sector firm (an investment company or mutual fund company).[24]  Second, is a call for improved regulation and greater scrutiny of SWF activities in the recipient countries, again, at least as if it were a privately held firm. And third, there has been a re-examination of existing national security mechanisms bringing greater awareness to potential SWF actions. All assume that the accumulation of assets by sovereign wealth funds is appropriate to begin with, which is debatable in itself, particularly in democratic, developed market economies.

*Transparency and Governance*

To address the first issue, there have been several attempts to evaluate or "score" SWFs (the "TS" below).  The most notable and best documented measure of overall SWF behavior is that developed by Edwin Truman at the Peterson Institute.[25]  In addition, Hill & Knolton and Penn Schoen Berland (2010) examine the "attitudes of national elites [in seven countries] toward [19] Sovereign funds and their countries" including Kazakhstan, and Standard and Poor's provides a very comprehensive measure of the quality of corporate governance for selected clients, including an evaluation of firms in Kazakhstan for the Kazakhstan government.[26]  While the Standard and Poor's Governance measure is very comprehensive, it focuses only on a subset of the activities evaluated in Truman's scoreboard.  A second comprehensive measure of

---

important source of capital for the global economy. Despite this importance, many nations appear to view these funds with caution, and  no matter how large the pool of funds on offer, some SWFs could find their path to the most attractive investments blocked."

[23] Interestingly, in many home countries the lack of transparency is not considered an issue, perhaps because of the lack of democratic political systems

[24]  Given the appropriate transparency and disclosures OECD guidelines then argue that recipient countries should treat SWFs just as any other domestic firm, the "principle of regulatory proportionality," discussed below.

[25]  His efforts have gone through several iterations, the most recent reported in detail in Truman (2010). He also compares the 33 components of his index to the Santiago Principles, discussed below, and looks at correlation with other indicators such as the Heritage Index of Economic Freedom, the World Economic Forum Global Competitiveness index, *inter alia*. Also the Sovereign Wealth Fund Institute prepares the Linaburg-Maduell Transparency Index.  However, ironically, the methodology is not clearly documented, making the Sovereign Wealth Fund Institute itself not very transparent.  Truman discusses the Linaburg-Maduell Transparency Index and makes comparisons to his own work.  While Truman's scoring may be subjective, it is transparent.

[26] Hill and Knowlton Penn Schoen Berland (2010) and Pastoukova, et al (2009).

transparency is the Linaburg-Maduell transparency index (LMTI). The scoring methodology is not clear, but the coverage of funds is quite large.  Both the LMTI and the TS are reported in Table 3a.  These measures, while they often do not agree, clearly illustrate the highly diverse nature of the management of SWFs. The details of the Truman Score are further revealing.

The overall score that Truman calculates is based upon 33 individual criteria grouped into indicators evaluating the structure (including fiscal treatment), governance, transparency and accountability (which includes investment strategy implementation, investment activities, reporting, audits) and behavior.[27]  For 53 sovereign wealth funds of 37 countries each of 33 criteria are scored and the total score in percent of the maximum possible is reported. The scores range from 11 to 97. The highest score is for Norway's Government Pension Fund – Global, at 97.  Most of the SWFs with scores above 80 are from developed economies such as Norway, the US, New Zealand, Canada, France, Ireland, Netherlands, Japan and Australia. However, Timor-Leste and Trinidad and Tobago are also included in that range.  The lowest scores, less than 20, include SWFs from the United Arab Emirates, Sudan and Qatar.  Kazakhstan's National Oil Fund is in the middle of the pack with a score of 65.  Samruk Kazyna is not scored.  However, it is difficult to compare SWF scores, especially for those in the middle of the range, since the scores for the individual components vary widely, and their relative importance varies.  Nonetheless, the scoring provides a basis for discussions of specific problematic issues and concerns, and some general conclusions emerged.  Specifically, 1)  pension SWFs score higher than non-pension SWFs; 2) for non-pension SWFs, those that are members of the IFSWF (International Forum of Sovereign Wealth Funds, formerly the IMF Working Group on Sovereign Wealth Funds, which drafted the Santiago Principles) score higher than non-members; 3) for non-pension SWFs, those from OECD countries score much higher than non-OECD countries; 4) of non-OECD SWFs the non-Middle East SWFs score higher than the Middle East SWFs; 5) of the non-OECD SWFs Asian SWFs score higher than non-Asian SWFs.[28]

Many of the issues found in Truman's scoreboard have been discussed by individual countries and international organizations (the OECD and IMF in particular) for years.  Due to the wide divergence of interests and contentious nature of the issues such as the tension between market liberalism and state directed actions and nationalism in the SWF home country and the conflict between foreign investment policies and national security issues in recipient countries,  a formal treaty, law or organization has not emerged. Instead, a voluntary set of best practices, the Santiago Principles, has emerged from the long discussions of the IMF Working Group (IWG) on Sovereign Wealth Funds.[29]  Table 4 provides these principles. There are 24 specific principles (some disaggregated further) to which the international working group agreed and which address many of the issues raised regarding the management of sovereign wealth funds.  The signatories

---

[27]   See Truman (2010), Chapter 5 for details of the latest scorings.
[28]   See Truman (2010), Table 5.2.  All of these differences are statistically significant at least at the 5% level except item 5).
[29]   See IMF (2008), IWG (2008) OECD (2008, 2009a, 2009b).  Gray (2010) provides an overview of the OECD perspective and a good source of relevant OECD documents.

either already adhere to these guidelines or agree to implement them.  Kazakhstan is neither a member nor an observer of the IWG. In addition, a new organization, the International Forum for Sovereign Wealth Funds, was created to continue discussion.  However, the Principles, are voluntary and there is no means of external monitoring for compliance, evaluation or enforcement. Truman (2010, Appendix 6A) compares these principles point by point with his scoreboard criteria, noting extensive overlap, which suggests that Truman's scorecard is close to a measurable benchmark for the Santiago Principles. If so, it is then obvious that the degree of compliance varies widely.  And of course, what score may be considered satisfactory in any sense?

The Santiago Principles, while a useful first step, are not considered sufficient to address all of the issues raised above and not without critics, especially due to their voluntary nature (Signatories agree to abide by them; until they decide not to do so).  Transparency and better governance is essential for both host and recipient country governments.  But recipient country governments are still left to address concerns of anti-competitiveness, market disruptions, political influence and national security issues on their own. "Because sovereign wealth funds are owned by and ultimately controlled by governments, it is naïve to believe that they can or should be treated as apolitical.  The standards applied to sovereign wealth funds should be higher than those applied to private sector institutions precisely because they are governmental institutions that are not subject to the discipline of the market and ultimately are accountable to the citizens of their countries."[30]

Lee (2009) calls the Santiago Principles a 'thin' financial rule of law, noting they and the OECD Declaration on SWFs cannot even be labeled "soft law" because they were issued by specific interest groups of states.  The language, terms like 'principles' and 'practices,' suggest informality and flexibility, not 'code' or 'regulations' which suggest hard rules or law.  They form a 'soft and unenforceable framework' for the 'facilitation of the understanding and implementation of the principles,' absent a central regulator or enforcer.  They form only a broad framework and process for recipient and home country to reach a common understanding and practice. Still, the Principles may form the basis of global cooperation or governance supplementing domestic regulation until a consensus for international law emerges.  But, what incentive do the governments of major SWFs have to subject themselves to additional international law?  Individual governments must respond in their own interest while international discussions continue.[31]

*Greater recipient country regulation and oversight*

The response of each of the many recipient countries has varied, but the US framework on investment policies and national security issues and the OECD guidelines for treatment of SWFs

---

[30] Truman (2008).

[31]   The OECD Guidelines, however, may provide a framework for all.

by recipient countries may both be representative.  In the US framework there are two distinct areas of concern:  1) the size of ownership in publicly owned firms and 2) national security issues. Regarding size of investments, there is a long standing body of law relating to the size of ownership of public firms that must be publicly acknowledged.  Currently an acquisition of more than 5% of a publicly owned corporation requires a 13(d) of the Securities and Exchange Act of 1934 filing.  However, SWFs do not have to meet the more stringent requirements of registered investment companies. Investment disclosure then is up to the individual SWF and these policies vary considerably, as Truman's scoring clearly indicates. In addition, multiple aligned SWFs may own just less than 5% ownership and thus avoid the filing requirement.  Slawotsky (2009) argues that the inherent dangers of sovereign ownership of domestic firms should require that all holdings of SWFs from the same country, and all holdings of SWFs of aligned (explicit or tacit) countries (e.g., OPEC or GCC countries), should be aggregated and treated as one and new thresholds applied.[32]  The number of distinct SWFs varies by country.  The UAE and sub-national government units have 9 SWFs, Singapore has two.[33]  There is great variation in the investment strategy of SWFs as well.  China's Chinese Investment Corporation has almost $300 billion in assets, investing about one third abroad.  The Government of Singapore Investment Corporation GSIC), does not own any assets, but manages $248 billion for the Singapore government and invests 100% abroad, while Temasek Holdings, which does own assets and focuses on investing in emerging Asia, has about $120 billion and about two thirds is invested abroad.[34]  (See Table 1for approximate shares of investments made abroad). The varying  number of SWFs in different countries, diverse investment strategies and legal ownership status complicate a recipient country's perceptions and response to SWF investments.

Another related concern apparently not yet acknowledged or addressed should be the actions of agents of sovereign wealth funds.  For example, in February of 2011 it was reported that the China Investment Corporation and the State Administration of Foreign Exchange employed a company called "SSBT OD05 Omnibus Account Treaty Clients" to invest US$19.4 billion in seven major Japanese companies.  This obscure company is now listed as one of the top ten holders of each of the Japanese companies.[35]  A similar "distant owner" transaction may involve a company that is a joint venture outside the boundaries of one of the joint venture partners that may be providing advanced technology. The joint venture itself then may receive SWF investments that could influence the activities of the joint venture with regard to technology transfer, production decisions and so forth.  When the joint venture's host country has weak

---

[32]   See the many references to Slawotsky (2009) for examples.

[33]   Truman (2010), p. 16.

[34]   (Assets as if March 2008) Singapore's set up with the GISC managing government assets, but not owning them, and Temasek, owning assets and managing them, seems to be the model Kazakhstan is following.  Both are private companies incorporated under Singapore's Companies Act (Cap. 50 Rev. Ed  2006), Lee (2009).  Kazakhstan seems to be following this model with the National Oil Fund not owning, but managing assets of the government and Samruk Kazyna, a holding company, owned by the government, owning and managing individual companies.

[35]   See "China Makes Stealth Investments in Japan," *The Wall Street Journal* February 25-27, 2011.

monitoring practices and the technology provider's home country is too far removed to effectively monitor the use of the technology, sensitive transactions may take place unnoticed.

Despite the conflict between welcoming investment policies and national security issues and the lack of transparency and potential political behavior, Epstein and Rose (2009) argue that new regulation is not necessary at this time.  The "nightmare scenarios" that critics of SWFs warn against are unlikely and if they occur will be identified by existing laws-either existing business regulation of securities and antitrust or national security laws.  The Foreign Sovereign Immunities Act or any existing international law does not provide immunity from existing US law. Specific national security concerns are addressed in several ways:[36]  The Exon-Florio Amendment to the Defense Production Act of 1950, as amended, restricts potential investments on the basis of National Security.  The more recent Foreign Investment and National Security Act of 2007 (FINSA) requires additional scrutiny and higher level clearances for transactions that may result in a foreign entity controlling a company engaged in interstate commerce.[37] These investments are reviewed by the interagency Committee on Foreign Investment in the US, CFIUS, which is designed to review investments in a way that assures national security issues are addressed without hindering participation in US capital markets.[38]  The CFIUS may block a transaction or require mitigation, for example, require that the SWF remain passive or the recipient company withhold sensitive information from the SWF investor.  But what type of transactions should be scrutinized?   Moran (2009) identifies three distinct threats that the CFIUS must, in his view, focus upon: 1) any acquisition that would lead to US dependency on a foreign supplier of  goods or services who may delay, deny or place conditions upon the provision of  those goods, 2) any proposed acquisition that would transfer technology or expertise to a foreign government that may then use it to harm the US, 3) any acquisition that would insert a means for infiltration, surveillance or sabotage (human or otherwise)  in goods and services crucial to the functioning of the economy.[39]  He concludes that while the vast majority of foreign transactions pose no risk, cases on the margin are likely to remain problematic.[40]  Epstein and Rose (2009) still argue that SWFs, with few exceptions, have been model investors, and thus there is already sufficient regulatory authority in place.  Additional regulation may lead to investment protectionism and a reduction in the efficiency of global capital markets.  As a result, recipient country regulation varies from country to country and this remains an unsettled question for ongoing discussion.

*Investment Protectionism*

---

[36]  See Lee (2009).
[37]  See Bahgat  (2010) p. 235, and Epstein and Rose (2009)  p. 118, and Rose (2008) for additional details.

[38]  For an extensive review and critique of the CFIUS process see Moran (2009).
[39]  This, of course, presupposes that the appropriate licensing  or regulatory agencies have already screened the investments to comply with other US industry specific requirements.
[40]  Note from Table 2 in the Appendix, the UAE owns 8% of Advanced Micro Devices.  Is this a problem?

There is a clear dichotomy between national security policy and investment policy of open, market-oriented economies. While recipient country national security concerns are legitimate, most argue that there are sufficient legal tools to address these issues without intruding into investment policy issues.  The OECD initiated a lengthy review of issues under the Freedom of Investment Process in 2006 and issued several reports including the *OECD Guidelines for Recipient Country Investment Policies Relating to National Security* approved by the governments in 2008, designed to prevent investment protectionism, and ensure that SWF investments are received in a non-discriminatory fashion. The OECD framework for host country treatment of SWFs argues that SWFs should be regarded just as other institutional investors, complying with *OECD Investment Guidelines* requiring adherence to the principles of transparency, non-discrimination, liberalization and standstills.[41]  In addition, transparency/predictability, regulatory proportionality and accountability of recipient country treatment of SWF activities are also emphasized.  Here, recipient country transparency/predictability requires "codification and publication of laws regarding investment, prior notification to interested parties about plans to modify investment strategies, consultation of these strategies with other counterparts and the disclosure of investment policy actions."  The regulatory proportionality principle requires that recipient country restrictions on investment should not be greater than is needed to ensure national security.[42]  And, the accountability principle is a mechanism to guarantee periodic regulatory impact assessments, parliamentary oversight and other supervisory activities.[43]   OECD countries, including the US, readily meet nearly all aspects of these principles in general, but take widely varying routes to do so.

In summary, most issues regarding sovereign wealth fund activities are well understood but SWF home country as well as recipient country policies vary substantially.  Further, it is difficult to generalize the conduct of individual sovereign wealth funds because the objectives, governance, performance and transparency of each vary widely.  Nonetheless, it is possible to apply this background knowledge to the funds of Kazakhstan.

III.    The Funds of Kazakhstan[44]

---

[41]  See OECD (2008c)

[42]  Further, "they should be avoided when other existing measures are adequate and appropriate to address national security concerns. Most countries assign little or no role for investment policy in managing the national security risks. Among those countries that do use investment policy for protecting national security, risks to be addressed through investment reviews included: infiltration of the national economy by organized crime or terrorists; loss of control of key resources needed for national defense, impeding law enforcement, and loss of control of border or security sensitive geographic locations." Other threats that several countries explicitly state as concerns warranting legal restraints include  threats related to:  money laundering ; protection of state secrets; diversion of strategic capabilities for military purposes; investments which might hinder efforts of international organizations to maintain international peace and security. OECD (2008b).

[43] See OECD (2008c) for a more detailed description of the policies for Sovereign Wealth Funds and recipient country policies, OECD (2008b) for the OECD declaration on Sovereign Wealth Funds, the Freedom of Investment Process and the OECD General Investment Policy Principles.

[44] Much of the content of this section is derived from interviews in Almaty and Astana.

In Kazakhstan there are four distinct funds or organizations that may be of interest:  the pension fund, the NBK foreign currency reserves portfolio, and the two funds that are the focus of this report:  the National Fund for the Future of Kazakhstan, sometimes simply called the national fund or the oil fund, which contains assets owned by the Ministry of Finance and managed by the National Bank of Kazakhstan; and Samruk Kazyna, the Sovereign Wealth Fund, a joint stock company owned by the Ministry of Finance.  The national pension fund does not fall under the jurisdiction of the National Bank or Samruk Kazyna and the management of foreign currency reserves is the responsibility of the Treasury Department of the NBK, along with the management of the National Fund. The pension fund and foreign currency reserve management are not the main focus of this paper, but are tangentially related.

*An aside on the pension system.*

As mentioned among the types of funds categorized in the previous section, many SWFs explicitly or partially serve as pension reserve funds (e.g., Norway).  In Kazakhstan this is not the case.  The pension system is not funded and there are no assets to manage at the aggregate level. There are three components to the pension system: 1) the basic plan which provides minimal (anti-poverty) benefits to everyone with a work history.  2) The "Solidarity" system provides benefits for everyone with a work history prior to January 1, 1998.  Benefits are paid directly from the national budget and there is no explicit payment or contribution by individuals or firms toward this system.  (Note that firms pay a social tax for each employee, but these payments go to local budgets).  Benefits for both of these have occasionally been adjusted in discrete steps for changes in the cost of living, but benefit payments come directly from the national budget.  3) The post-transition private "Accumulation" accounts for all individuals with work experience after January 1, 1998.  Individuals contribute 10% of earnings to a private account managed by various financial institutions or insurance companies.  Individuals have a choice among several investment options.  The principle contribution, plus an allowance for inflation, is guaranteed by the government, but the earnings of the investment options are not.  The moral hazard problems are obvious and a reform of the Accumulation Account system is expected.  Under the proposed new framework investment options within the accounts will be classified as conservative, moderate and aggressive.  Only the conservative options will be insured by the government.

*The National Fund of Kazakhstan*

The National Fund of Kazakhstan is not a legal entity, but literally a fund of assets created by Decree of the President of the Republic of Kazakhstan  (# 42 "On National Fund of the Republic of Kazakhstan" August 23, 2000), essentially owned by the Ministry of Finance, overseen by a Management Council, and managed by the National Bank of Kazakhstan (NBK). The Council members, appointed by the President of Kazakhstan, are the President, the Prime Minister, the Chairman of the Senate, the Chairman of the Majilis (the lower house), the Chairman of the National Bank, the Deputy Prime Minister, the Minister of Finance, and the Chairman of the Accounting Committee for the Control of the Execution of the National Budget

(See Table 5 below).  The Management Council sets the general governance policies and general investment strategy.[45]  Typically, the overall investment strategy is evaluated and modified once per year. While the overall investment parameters are set by the Council, with advice from the National Bank, the portfolio is managed by the Treasury Department of the NBK.  The Treasury Department also manages the foreign currency reserves of the NBK independent of the National Fund.

The Fund's dollar foreign currency assets are accumulated on the account of the Government of the Republic of Kazakhstan with the National Bank of the Republic of Kazakhstan. The total market value of the National Fund assets as of December 31, 2001, stood at US$ 1,240,372,900 and they were allocated roughly US$900 million to the savings portfolio (or fund) and just over US$300 million to the stability portfolio (or fund).  There were three Presidential decrees clarifying the purpose and operations of the National Fund through the 2000s.  The latest decree, " On the concept of formation and use of the National Fund of Kazakhstan," by the President of the Republic of Kazakhstan on April 2, 2010 № 962, the so called "New Concept," abrogated the earlier decrees and  provided much more specific guidelines for the use of funds.[46]

The assets of the fund have grown steadily from just over US$8 billion in 2005 to US$41.6 billion in 2010 (See figure 1 below).  Revenues, or receipts, of the Fund have grown steadily from 2005 to 2008, and then were relatively flat in 2008-2010.  Receipts consist of direct budget transfers (the initial endowment of the fund), direct taxes (of several types, detailed below) other oil sector receipts, revenues from privatization, and sales of land and investment income. After the initial establishment of the fund, direct taxes and investment income are the major sources of revenues, and as illustrated in Figure 3, these have varied over the 2005-2010 period. Direct taxes, a function of overall economic activity and the world price of oil, have varied significantly with a steep increase in 2008, a fall in 2009 and recovery in 2010. Investment income has also varied with a dramatic increase in 2009 and fall in 2010.  The uses of the funds are limited to three categories  (See figure 2). Guaranteed transfers to the government are a primary source of funding for the government budget and grew from US$2.1 billion in 2002 to

[45]   The Council also approves, at least nominally, the uses of the fund, investment strategy proposals made by the Treasury Department of the NBK, the quarterly reports of the Fund, and the auditors, currently Ernst and Young Kazakhstan, Ltd..  Neither the quarterly reports nor the audit is published.  The annual report/audit of Samruk-Kazyna is published.

[46]   CPGA of the Republic of Kazakhstan, 2010, № 27, Art. 203 and the following earlier decrees, 1) President of the Republic of Kazakhstan dated September 1, 2005 № 1641 "On the Concept of formation and use of the National Fund of the Republic of Kazakhstan for the medium term" (CPGA of the Republic of Kazakhstan, 2005, № 35, Art. 480, 2007, № 17 , Art. 186, 2009, № 1-2, Art. 1);   2) President of the Republic of Kazakhstan dated May 29, 2007 № 336 "On amending the Decree of the President of the Republic of Kazakhstan dated September 1, 2005 № 1641" (CPGA of the Republic of Kazakhstan, 2007, № 17, Art. 186); 3) President of the Republic of Kazakhstan dated January 19, 2009 № 725 "On Amending the Decree of the President of the Republic of Kazakhstan dated September 1, 2005 № 1641" (CPGA of the Republic of Kazakhstan, 2009, № 1-2, Art. 1),  have been abrogated.

US$8.1 billion in 2010.  The "New Concept" now limits these transfers to approximately US$8 billion. So called "targeted transfers" are those direct transfers to Samruk Kazyna as part of the response to the financial crisis and were limited to 2008 and 2009.[47]  The remaining category, relatively small, is management and external audit expenses.  In the aggregate the Fund has accumulated assets every year since its inception, as illustrated in Figure 4.  For 2010 revenues from direct taxes have recovered while investment income has fallen significantly (Figures 3 and 5).  Figure 6 illustrates the composition of the direct taxes received in 2010.  Taxes arising from production sharing and royalties account for about two thirds of revenues, with oil and gas lease payments accounting for another 20%. Excess profits taxes and corporate income taxes account for about 9%.

The revenues and earnings are predominately in foreign currency and initially allocated to the stability portfolio. Some portions are then transferred to the savings portfolio or disbursed to the national government. There is a small portion of revenues denominated in Tenge and these are maintained in the "Domestic Account" of the Fund and managed and controlled directly by the Ministry of Finance.  Prior to the 2010 Decree disbursements were determined by a formula, the parameters of which were subject to the annual approval of Parliament. This method, however, was subject to political manipulation by potential recipients and led to rather large variability in disbursements to the budget.  The National Oil Fund management had requested changes in the calculations of disbursements as early as 2004.  The financial crisis and the sudden increase in requests for resources from the Fund revealed the weaknesses of the system and led to the implementation of "fiscal responsibility legislation," the so called "New Concept."[48]

As a result of the global financial crisis the latest decree provided a one-time massive transfer of assets (partially a capital grant or direct transfer, partially the purchase of long term bonds of Samruk-Kazyna) equivalent to over 10% of GDP, and a change in the future use of National Fund revenues.[49]  While the previous mechanism allowed year-to-year fluctuations in transfers from the National Fund, limited to one third of the Fund's assets, the current mechanism sets the guaranteed transfer to the national budget at $US8 billion and restricts its use to supporting the industrialization program detailed in the Strategic Plan for 2020.[50]   There are two goals, one regarding the assets of the fund and one regarding the government deficit.  The 2020 goal for the Fund is that the assets reach no less than 30% of GDP, or $US90 billion (projected). While 30% of GDP by 2020 is a goal, the minimum balance of the Fund, for savings purposes, for this period was set at no less than 20% of forecasted GDP.  Thus, the broad goals of the Fund,

---

[47]  The bailout included the purchase of bonds and direct transfers.  The data in the table accompanying Figure 2 do not include purchases of bonds since those are simply a change in the portfolio and remain in the fund itself.

[48] See Ossowski, et al. (2008), pp. 12-14 for a discussion of fiscal responsibility legislation.  Note their characterizations of the Kazakhstan National Fund in Table  A3.2 on p.30 are now out of date.

[49]   Note that there was a concerted effort by authorities of Samruk Kazyna to take complete control of the National Fund, using its assets for anti-crisis needs and accelerated infrastructure development, but those efforts failed. However, there is still a powerful group that continues to argue for the merger of the National Fund and Samruk Kazyna.

[50]   See Strategic Plan (2011).

stabilization and savings, have not changed.  However, the New Concept places more responsibility for a balanced government budget upon the Parliament, eventually restricting the use of Fund disbursements to finance the development budget rather than current expenditures.  In addition, the New Concept stipulates that there will be no further loans from the Fund to the government.  Budget policies then will require a reduction in the non-oil deficit to meet the second 2020 goal of a non-oil deficit of 3% of GDP, down from the current 9%. [51]

*Details of Management of National Fund Portfolio*[52]

The National Fund is unrelated to Samruk Kazyna (which is called the Sovereign Wealth, or Welfare, Fund, and was created in 2008).  There are two main functions of the National Fund: 1) to provide economic stability and 2) to accumulate savings for future generations.  There are three distinct portfolios:  a dollar denominated stability fund, a dollar denominated savings fund, both managed by the NBK, and a smaller tenge denominated fund managed by the Ministry of Finance.  The latter is not managed by the NBK and is much smaller.  The National Fund is simply an account of the government at the NBK, with the Ministry of Finance as the responsible governing body.  The initial market value was $1.2 billion, with 900 million in the savings fund and 300 million in the stabilization fund.  The Treasury Dept of the NBK wrote the initial investment guidelines, closely following those of the Norwegian SWF.[53]  The same portfolio management team manages the foreign reserves of the NBK and the National Fund.  They are clearly distinct however, with different accounts and custodians, and different objectives.

The investment guidelines for the stability fund call for a high degree of liquidity with the 6 month US T-bill as the benchmark and US$ as the base currency.  The savings fund was initially 40% global equities and 60% global fixed income.  There were two changes in portfolio allocation from 40-60 to 25-75 and again to 20-80 in 2007 and 2008.  Note that this allocation may be quite different than some analysts assume for the typical SWF allocations.  For example, Jen (2007, 2011) assumes the typical allocation is 45% equities, 25% bonds and 30% alternative investments, but to make such generalizations about the "typical" SWF portfolio allocations is not very useful as the objectives, investment horizon, risk tolerance, risk management strategy and preference for liquidity varies widely across SWFs.[54]  The managers of the Kazakhstan National Fund currently appear much more conservative and as a result were less affected by the crash in equity prices during the global financial crisis. In fact, the changed allocations greatly improved

---

[51]  The New Concept does not completely break the link between the government budget and the National Fund since government debt financing maximums are linked to Fund revenues. It proposes that the annual cost of servicing government debt should not exceed the annual conditional fixed investment income of the National Fund of 4.5%, and the annual average cost of repayment and servicing government debt should not exceed 15% of revenues, including transfers from the National Fund. See Ministry of Foreign Affairs (March 3, 2010.)

[52] From interview.

[53]  The Norwegian fund also shared their experiences, RFPs and other technical materials to assist the Kazakhstan NOF.

[54]  Trueman (2010), p. 18.  He argues "[t]he result can be a near infinite number of possible portfolio allocations for a particular fund or across funds."  Also see Preqin Sovereign Wealth Fund Review (2010).

performance during the financial crisis, -2.5% vs -23% (or so) for the Norwegian SWF.  The changes in overall portfolio allocations are made by the NOF management committee and then the specific benchmarks are chosen by the NBK team. These have varied and  include MSCI benchmark, ex-energy, and CitiGroup World Govt Bond Index, then customized  90% CitiGroup WGBI ex-Japan plus 10% Japan.  All have a tracking error limit of 2%.  The portfolio for the savings fund as described in Table 1 appears to be a textbook "conservative allocation" of investment resources, and this allocation has performed very well during the financial crisis.

The fixed income portfolio is managed internally, with 80% in the index with a tracking error of 2%, and 20% active.  Originally it was split between the NBK team and external managers, but the three year moving average returns favored the NBK team so they fired two external managers and moved the entire portfolio to the NBK.  External managers now provide expertise in new asset classes and allow the NBK team to gain experience.

The equities portfolio is still externally managed.  The original portfolio was $200 million, but it is now much larger and fully managed by external firms.  The NBK team  used the request for proposals of the Norwegian SWF as a basis for their own solicitation of  proposals.  Managers were selected on the basis of historic results, experience, and stability of the management team in the last 5-7 years, fee levels and credit worthiness of the company.  There are now 14 firms that are evaluated on "results and readiness."  At the moment there are no investments in private capital, but discussions with the NOF management committee concerning this option will begin this year.  The trading and management team of the NBK Treasury realize that they are not yet ready as they don't have the expertise for such investments.  However, they are planning and preparing to add investment grade corporate and emerging market global bonds to the bond portfolio and also to increase the share of the equity portfolio.  These changes have been under consideration for some time, because the management committee generally considers changes in strategy once per year, upon the recommendation of the NBK team.

Table 1:  Current Portfolio Allocation of Savings Fund (February 15, 2011)

| 80% Government Bonds | 20% Global Equities |
|---|---|
| 40%  US$ | 40%  S&P 500 |
| 35%   € | 35%  Dow Jones Stocks |
| 10%  £ | 10%  FTSE 100 |
| 10%  ¥ | 10%  NKY 225 |
| 5%  Aus$ | 5%   S&P 200 Aus$ |

_____
Notes:  Duration on the government bond portfolio was lowered from 1-10 years to 1-5 years.
Benchmark for equities portfolio is MSCI.

The "New Concept" for the NOF emphasizes the savings function and this fund will be increased until 2020 with a goal of approximately 30% of GDP.[55]  Funds received first flow into the stabilization fund, and then are later reallocated to the savings fund.  All receipts and expenditures are from the stability fund, leaving the savings fund untouched.

The recent transactions with Samruk Kazyna are seen as one-time events. (See figure 2).  About $10 billion was involved in the transactions, with $5 billion in bonds purchased by the National Oil Fund and $5 billion in a direct transfer from the NOF to SK.  The direct transfer came in part from the tenge "domestic" account of the National Fund managed by the Ministry of Finance and $2-3 billion from the Stability Fund of the NOF.  Note the domestic part of the NOF is the result of tenge denominated taxes that flow into the fund (others are dollar denominated and flow to the stability and savings funds of the NOF, managed by the NBK).  While 90% of the funds went to acquire ownership and recapitalize banks,[56] real estate and construction firms, US$1 billion went to KazAgro, a joint stock company wholly owned by the Ministry of Agriculture.  According to the "New Concept," future transfers will be no more than "budgetary needs," currently set at $8 billion per year, until 2020.

While "one time events" like the use of NOF assets during the financial crisis were the subject of intense discussion and explained to the public, regular changes in performance may be ascertained by examining the balance sheet reports (on-line and with no discussion of operations).  The National Oil Fund produces quarterly reports that are approved by the Management Board, Ministry of Finance and the government, but these are not published for the public.  Significant events are included in the Annual Report of the NBK, but obviously transparency remains an issue.[57]

As noted above, the pursuit of the typical goals of saving current wealth for future generations, limiting the effects of resource price shocks and potential "Dutch Disease," and providing a smooth flow of funding for government needs must be consistent with the country's macroeconomic policies.  Because of the unusually large amount of resources at the disposal of the government the activities of the SWF impact both fiscal and monetary policy and the balance of payments.  Similarly, these resources can be and actually were used by SWFs to limit the effects of the global economic crisis of 2007-2009.  In general the impact of SWF activities on

---

[55]  Note though that contributions to the National Fund should be a residual – that amount of excess foreign exchange inflows from oil and natural resource flows, above that amount needed for development and non-inflationary development and macroeconomic policy goals.  This depends on global demand and world prices for these exports.

[56] Samruk Kazyna has acquired from 25% to 100% ownership of five banks. Three, BTA, Alliance and Temir were restructured at a cost of about US$6 billion to the government and about US$15 to foreign creditors, with original shareholders being wiped out. Halyk and KazKom received smaller capital injections in 2009.  Halyk is the only one emerging from state control, repurchasing its shares yielding a 14% return to the government.  KazKom may emerge, but not soon.  The other three have not yet recovered.

[57]  However, Truman does rank the NOF high on this account. Table 5.1 p 72-73 of Trueman (2010)

macro-financial balances must be evaluated in terms of long-run objectives, but more specifically the actions of SWFs during the financial crisis must be evaluated in terms of the immediate anti-crisis impact as well as long term costs and benefits.[58]

Certainly, in the case of Kazakhstan the government's use of the resources of the National Oil Fund was critical in limiting the impact of the global crisis on the domestic economy. The "bailout" operation illustrates how closely the government administration, the Ministry of Finance and the Ministry of Economic Development and Trade (formerly the Ministry of Economy and Budget Planning), the National Oil Fund, and Samruk Kazyna are intertwined, and will jointly serve as the primary means of achieving the 2020 Strategic Plan for the Development of Kazakhstan. In fact, the companies held by Samruk Kazyna are called on to implement about half (both in number and monetary value) of the projects to be implemented in the next five year program for accelerated industrialization and innovation. At the moment it is unlikely that the National Fund itself will be called upon to support these efforts, but in the future both political discipline and economic circumstances remain determining factors.

*Samruk Kazyna*

The National Oil Fund is the fund most comparable to other sovereign wealth funds around the world, but a second legal entity, Sovereign Wealth Fund Samruk Kazyna (S-K), a joint stock company with the government (Ministry of Finance) as the sole shareholder, is also officially labeled the Sovereign Wealth Fund. While the National Fund is often referred to as "the" SWF or "the" Fund, S-K is actually much larger and much more important in terms of its effect on the economy. The assets of Samruk Kazyna are difficult to value since many of the companies are not publicly traded, but estimates range from 50-80% of GDP, and sales or revenues of the companies is in the range of 20-30% of total GDP, perhaps higher.

The latest governing document is the Law of the Republic of Kazakhstan on Sovereign Wealth Fund No. 134 – IV, signed by the President Nazurbayev on February 13, 2009. "This Law determines legal status, operating procedures, tasks, objectives and scope of authority of the Sovereign Wealth Fund as well as special peculiarities of legal status of legal entities, shares (interests) of which are owned by Sovereign Wealth Fund and other organizations of the Fund." The founding Presidential Decree dated October 13, 2008, No. 669 created Samruk Kazyna Joint Stock Company by merging two existing JSCs, Joint Stock Company Kazakhstan Holding for the Management of State Assets SAMRUK and Joint Stock Company KAZYNA Sustainable Development Fund, under the guidance of the State Property and Privatization Committee of the Ministry of Finance. Samruk was a holding company of the five large state monopolies, KazTelecom, KazRail, Kazmunigas, KazPost and KeGok (electricity distribution). On the other hand, Kazyna JSC consisted mainly of regional Social-Entrepreneurship Companies focused on economic development issues and many were initially funded with resources from the National

---

[58]   See Lu, Mulder and Papaioannou (2010) for a brief discussion.

Oil Fund.  Now there are well over one hundred entities held by Samruk Kazyna, ranging from Air Astana to real estate ventures and newly acquired commercial banks.  The 36 largest companies are listed in Table 6 in the Appendix.  The total number of companies held is difficult to estimate because many of these companies have multiple subsidiaries.

There are several key, somewhat controversial issues concerning the operations of Samruk Kazyna that are a matter of continual public debate.  These range from corporate governance and transparency to ownership rights and claims on these assets and the income they produce to the legitimate roles of the state in directing the economic development of the country. Most of these issues are clearly recognized and are to some extent being addressed – e.g., every company now has an approved mission and a draft of strategic priorities, which are currently being updated.  Nonetheless, the political debate is ongoing.

The (draft) March/April statement of the government's strategic plan identifies three broad objectives for Samruk Kazyna.  First, it must play a leading role in the diversification of the economy, lessening its dependence on natural resources.  Yet, it is noted that to date there have been no major successes spawning from SK initiatives.  The Development Bank will play a larger role, investing in designated areas of the economy and "national" companies will also assist.  In this regard it is expected that the government, via Samruk Kazyna, then will have a significant role, if not the dominant role, in establishing the direction of growth at least through 2014, at which time the private sector should have fully recovered and market forces are expected to play a greater role.  Initially the national economic strategy focused on seven industries, but now there are eleven priority sectors earmarked for investment and development.  The debate on the proper role that a state-owned organization like Samruk Kazyna has in a market oriented economy lies at the heart of these objectives.  Those in favor of a continued strong role for the government and state owned entities argue for limited privatizations with the revenues retained by Samruk Kazyna for further directed investments.  Those favoring the role of markets expect privatizations to shrink Samruk Kazyna leading to a smaller role of the state.[59]  Many of the details of the  methods of privatization and the disposition of privatization revenues is an open question.

This debate also ties into the second goal, to increase the efficiency and performance of companies held by Samruk Kazyna, both in the real sector, like KazMuniGas, and in the monetary sector, the banks and funds for entrepreneurship.  The objective is to manage them effectively, making them "national champions" comparable to their large international counter parts.   To some participants of this debate Temasek of Singapore appears to be a model for Samruk Kazyna.  However, Temasek has more foreign investments and less of a development objective than Samruk Kazyna's stated objectives at the moment.  No doubt Samruk Kazyna will focus on the implementation of several large investment projects, taking measures to increase efficiency, and restructuring and privatization of the large state monopolies.  While these

---

[59] One of the difficulties in analyzing the direction of political discussions is that the actors are nearly constantly in motion, moving regularly from one ministerial appointment to another.  Thus, individuals in leadership positions at Samruk Kazyna and in the most important ministries may not be in place at the time actions are actually taken.

enterprises are to be privatized, the controlling interest will still be held by the state. It is hoped that the partial privatizations will lead to publicly traded shares that will then bring market pressures leading to an improvement in corporate governance and accountability.  In addition there is an ongoing rationalization of the structure of state holdings as various Samruk Kazyna holdings are transferred to other Ministries.  For example, the Damu Entrepreneurship Development Fund and the Distressed Assets Fund JSC were transferred to the Ministry of Economic Development and Trade:  The Kazakhstan Development Bank JSC, the Investment Fund of Kazakhstan JSC, Kazyna CapitalManagement JSC and KazExpoGarant Export and Credit Insurance Corporation were transferred to the Ministry of Trade and Industry; and the Kazakhstan Housing and Savings Bank, Kazakhstan Fund for Mortgage Guarantee and the Kazakhstan Mortgage Company were transferred to the Agency for Construction and Housing and Public Utilities Infrastructure.

Corporate governance issues of public firms are being taken more seriously by the government but firms held by Samruk Kazyna are lagging behind.  In a recent study of transparency and disclosure by Standard and Poor's Governance Services division it is noted that transparency and disclosure standards are low, but gradually increasing.[60] In a recent study the "Standard and Poor's Kazakhstan Transparency Index" is calculated on the basis of 110 specific items, grouped into three categories: 1) ownership structure and share holder rights, 2) financial and operational information, and 3) board and management structure and process.   The overall score was 44% (out of 100%) for a sample of the 22 largest public firms (market capitalization of more than US$100 million) and 8 non-public firms. This compares to71% for the UK, 70% for the US (2003 survey), 58% for Russia and 46% for China (2008 survey).[61]  However, it is important to note that the average score for the sample of 8 firms held by Samruk Kazyna was 25% , which is much lower than average.  The highest score for these 8 was for the Kazakhstan Development Bank, at 53%. One important factor for public firms that scored high was the fact that several were listed on the London Stock Exchange, which has higher disclosure requirements. No such pressures exists for the non-public firms held by Samruk Kazyna, or only to a limited degree for those firms with large minority publicly held positions, quasi-public firms, like Air Astana.[62]

While privatization (and certainly listings on the Kazakhstan Stock Exchange or foreign exchanges) will likely increase the efficiency and improve corporate governance of the firms there is an even larger problem. There is not a clear common direction for all of the firms in Samruk Kazyna.  Some are potentially highly profitable commercial operations, like Air Astana. Others, coming from Kazyna JSC are non-profit, non-commercial organizations that are directly or indirectly subsidized from the earnings of other companies.  As a result it is difficult to

---

[60]  Pastoukhova, et al. (2009)
[61]   The initial score for Russia, from the 2003 survey, was 40%; less than this first measurement for Kazakhstan.
[62]  Another important issue that was highlighted was the concentration of ownership:  19 of the 22 public firms have at least one block owner of 25% or more of the shares.  11 of the 22 are majority owned by one shareholder.

measure the efficiency and overall profitability of the organization. The non-commercial operations, and in some cases the commercial operations, have social objectives rather than profit maximization alone as part of their responsibilities.  In addition, Samruk Kazyna itself has been assigned social responsibilities, such as the complete financing of the recent Asian Games.  This clearly limits the profit potential and efficiency of individual units. In addition the lack of transparency of transactions within Samruk Kazyna makes it difficult to evaluate the performance of individual units or the overall performance of Samruk Kazyna itself.  This is slowly improving, as the ten to fifteen largest companies have annual reports available for several years and SK for the last three years. Further, to improve operations and increase overall efficiency of the development companies and entrepreneurship funds, all will be amalgamated and placed under the control of the Development Bank, itself recently transferred to the Ministry of Trade and Industry.  The performance of the Development Bank will then be an indicator of the effectiveness of these smaller funds.  These activities will likely take place in a timeframe of 5-10 years.

The third goal deals with the anti-crisis activities of Samruk Kazyna. Samruk Kazyna was created on October 13, 2008 and it immediately focused on saving several failing banks.  These are now restructured and are operating more effectively. Samruk Kazyna's immediate goal now is to exit this sphere of activity.  Similarly, support for residential housing and construction was initiated to prevent the collapse of that sector.  The Property Fund of SK continued the financing of construction and the properties are now on the market.  The financial crisis nonetheless had a devastating impact on these sectors, but a 23% increase in agriculture resulted in a 1% increase in overall GDP for the time period rather than significant negative growth.

The importance of this third goal, effective anti-crisis measures, is expected to lessen over the next few years. While the future role of Samruk Kazyna in anti-crisis activities like those of 2008-2009 is expected to be less important, the specifics of unwinding the bank bailout, re-privatization via new IPOs, and the final disposition of the proceeds from the privatization are going be figured out over the next 2-3 years.[63]  Initially the proceeds of the re-privatization of the banks will be revenues for Samruk Kazyna and authorities at Samruk Kazyna argue that the next wave of privatization revenues should be retained by Samruk Kazyna for further economic development purposes.

A recent concern is the overall indebtedness of Samruk Kazyna, the individual companies' debts, the implicit guarantees of the government for Samruk Kazyna, which coupled with the lack of transparency and financing strategy, may threaten Kazakhstan's sovereign debt ratings, if not lead to another financial crisis.  To address this, in June/July 2011 the first overall report on debt is expected to be released.  When Samruk Kazyna borrowings are added to other direct

---

[63] The fiscal responsibility laws discussed in Ossoski, et al. (2008), like the "New Concept" governing the National Fund, do not apply to Samruk Kazyna, even though it is labeled the Sovereign Wealth Fund of Kazakhstan. However, many of the activities outlined in the Strategic Plan for 2020 are to be undertaken by organizations in Samruk Kazyna.

government borrowing it is unclear whether the level is sustainable or will affect the sovereign debt rankings of Kazakhstan.  What seems clear, however, is that the Kazakhstan government is taking international concerns about debt seriously.

IV. Summary and Conclusions

The two sovereign wealth funds of Kazakhstan, the National Oil Fund and Samruk Kazyna, have had a major role in short term stabilization programs and long term development programs for the country.  The National Oil Fund has a well defined mission, has been relatively well managed, has been relatively transparent, and has played a critical role in the government's response to the recent financial crisis. The "New Concept" for the Fund suggests that it will play a smaller role in the functioning of the economy now that the financial crisis has been resolved, and its "savings" function for intergenerational equity will expand. The government is clearly signaling that the Fund has two roles - stability and savings - and the stability role is reserved for one-time events like the financial crisis, not to be an ongoing continuing source of funding. Samruk Kazyna, with many more assets and income plays a larger role in the economy and has a larger role in terms of economic development.  The Strategic Plan for 2020 carefully defines the role of Samruk Kazyna as a major initiator of the economic development plan of the government. Whether this role expands, and Samruk Kazyna itself expands or whether it shrinks along with planned privatizations is a hotly debated issue and remains an open question.

The government appears serious in pushing Samruk Kazyna and its holdings to provide greater transparency and better corporate governance than in the past.  This is essential for planned privatizations and the participation of the international financial community.  Data is slowly becoming available and more detailed analyses of individual companies and Samruk Kazyna itself is now possible.  Given the role of both the National Oil Fund and Samruk Kazyna in the Kazakhstan economy more serious attention should be paid to the activities of both.

VI.  References

Aizenman, Joshua and Reuven Glick "Sovereign Wealth Funds:  Stylized Facts about their
    Determinants and Governance," NBER Working Paper 14562, December 2008.
    http://www.nber.org/papers/w14562

Aslund, Anders (2007) "The Truth about Sovereign Wealth Funds," *Foreign Affairs*, December
    2007.

Avendano, Rolando and Javier Santso (2009) "Are Sovereign Wealth Funds Politically Biased?
    A Comparison with Mutual Funds," OECD Development Centre, Working Paper No.
    283, December 2009.

Backer, Larry Cata, (2009)   "The Norwegian Sovereign Wealth Fund:  Between Private and
    Public," *Georgetown Journal of International Law*,   40:  1271- 1280.

_____ (2009) "Sovereign Wealth Funds as Regulatory Chameleons:  The Norwegian Sovereign
    Wealth Funds and Public Global Governance Through Private Global Investment,"
    *Georgetown Journal of International Law* 41

Bahgat, Gawdat (2010) "The USA's Policy on Sovereign Wealth Funds' Investments" in Yi-
    chong and Bahgat (2010) *The Political Economy of Sovereign Wealth Funds* (NY:
    Palgrave Macmillan, 2010).

Beck, Roland and Michael Fidora  (2008) "The Impact of Sovereign Wealth Funds on Global
    Financial Markets," *European Central Bank Occasional Paper* No. 91, July 2008.

Blundell-Wignall, Adrian, Yu-Wei Hu and Juam Yermo (2008)  *Sovereign Wealth and Pension
    Fund Issues*.  OECD Working Papers on Insurance and Private Pensions No. 14 OECD
    Publishing doi:10.1787/243287223503, available at www.oecd.org

Buiter,W. (2007), "Taming Sovereign Wealth Funds in Two Easy Steps," *Maverecon –
    Willem Buiter's Blog*, July 24. http://maverecon.blogspot.com

Chalamish, E. (2009), "Rethinking Global Investment Regulation in the SWFs Era". Asian
    Society of International Law and National University of Singapore (forthcoming).

"China Makes Stealth Investments in Japan," *The Wall Street Journal*, February 25-27, 2011.
    (Describes $19.4 billion investment in seven major Japanese companies by an "obscure
    shareholder by the name of 'SSBT OD05 Omnibus Account Treaty Clients' now listed as
    one of the top ten holders of these companies shares.  Sovereign wealth fund China
    Investment Corporation is one presence behind SSBT OD05 And The State

Administration of Foreign Exchange, SAFE, which manages approximately $3 trillion in foreign reserves is also behind SSBT OD05 according to Japan Shareholders Services.).

Curzio, Alberto Quadrio and Valeria Miceli (2010) *Sovereign Wealth Funds:  A Complete Guide to State-Owned Investment Funds* (Hampshire,UK: Harriman House, Ltd., 2010)

Das, Udaibir S., Adnan Mazarei and Han van der Hoorn Eds., *Economics of Sovereign Wealth Funds:  Issues for Policymakers* (Washington, D.C.:  International Monetary Fund, 2010).

Das, Udaibir S., Adnan Mazarei and Alison Stuart (2010) "Sovereign Wealth Funds and the Santiago Principles."  In Das, et al., Eds. *Economics of Sovereign Wealth  Funds:  Issues for Policymakers* (Washington, D.C.:  International Monetary Fund, 2010).

Drezner, D. (2008) "Sovereign Wealth Funds and the (In)Security of Global Finance," *Journal of International Affairs*, Fall/Winter 62,1:  115-130.

El-Erian, Mohamed A. (2010) "Sovereign Wealth Funds ub the New Normal."  In Das, Udaibir S., Adnan Mazarei and Han van der Hoorn Eds., *Economics of Sovereign Wealth Funds:  Issues for Policymakers* (Washington, D.C.:  International Monetary Fund, 2010).

Epstein, R. and A. Rose (2009) "The Regulation of Sovereign Wealth Funds:  The Virtues of Going Slow," *The University of Chicago Law Review*," 76,1:  111-134.

Fotak, Veljko, Bernardo Bortolotti and Willaim Megginson (2008) "Financial Impact of Sovereign Wealth Fund Investments in Listed Companies," Working Paper, June, 2008.

Gilson, Ronald and Curtis J. Milhaupt (nd) Sovereign Wealth Funds and Corporate Governance:  A Minimalist Response to the New Mercantilism," Rock Center for Corporate Governance, Stanford Univerfsity Working Paper Series No. 26.

Gordon, Kathryn (2010) "Sovereign Wealth Funds and Recipient-Country Investment Policies:  OECD Perspectives."  In Das, et al., Eds., *Economics of Sovereign Wealth Funds:  Issues for Policymakers* (Washington, D.C.:  International Monetary Fund, 2010).

Hermalin, B. and M. Weisbach (2007), "Transparency and Corporate Governance," NBER Working Paper No. 12875

Hill & Knolton and Penn Schoen Berland (2010) "Sovereign Brands Survey 2010, Key Results," Downloaded via SlideShare May 22, 2011.

IMF (2008), "Sovereign Wealth Funds—A Work Agenda," February 29, 2008, available at http://www.imf.org/external/np/pp/eng/2008/022908.pdf.

IMF (2010) "Republic of Kazakhstan: 2010 Article IV Consultation – Staff Report," *IMF Country Report* No. 10/241.

IWG (International Working Group of Sovereign Wealth Funds) (2008) *Sovereign Wealth Funds:  Generally Accepted Principles and Practices  -- 'Santiago Principles'* (Washington, D.C.:  IWG).

Jen, Steven (2007) "G10: A 25:45:30 Long-Term Model Portfolio for SWFs," Morgan Stanley Fixed Income Research, October 11, 2007.

Jen, Steven (2010) "Sovereign Wealth Fund Investment Strategies:  Complementing Central Bank Investment Strategies". In  Das, Udaibir S., Adnan Mazarei and Han van der Hoorn Eds., *Economics of Sovereign Wealth Funds:  Issues for Policymakers* (Washington, D.C.:  International Monetary Fund, 2010).

Johnson, S. (2007), "The Rise of Sovereign Wealth Funds," *Finance and Development*, 44-3.

Kalyuzhnova, Yelena (2006) "Overcoming the Curse of Hydrocarbon:  Goals and Governance in the Oil Funds of Kazakhstan and Azerbaijan," *Comparative Economic Studies* 48, 583-613. doi:10.1057/palgrave.ces.8100160

Kaufmann, Daniel, Aart Kraay, and Massimo Mastruzzi (2007), "Governance Matters VI: Aggregate and Individual Governance Indicators, 1996–2006," World Bank Working Paper WPS4280.

Kimmitt, Robert M. (2008), "Public Footprints in Private Markets: Sovereign Wealth Funds and the World Economy," *Foreign Affairs* 87, no.1 (January–February): 119–30.

Kotter, J. and U. Lel (2008) "Friends or Foes?  The Stock Price Impact of Sovereign Wealth Fund Investments and the Price of Keeping Secrets," *International Finance Discussion Papers*, #940, Board of Governors of the Federal Reserve System, August, 2008.

"Kuwait and Singapore Acquire Slice of TPG," *The Wall Street Journal*, April 2, 2011 (Relates that Kuwait Investment Authority and Government of Singapore Investment Corporation paid several hundred million dollars for a 4.5% staje in TPG Holdings, a private-equity "powerhouse.")

Lee, Yvonne C. (2009)  "A Reversal of Neo-Colonialism:  The Pitfalls and Prospects of Sovereign Wealth Funds,"  *Georgetown Journal of International Law*, 40:  1103- 1149.

Loh, Lixia (2010) *Sovereign Wealth Funds:  States Buying the World* (Kent, UK: Global Professional Publishing, 2010)

Lu, Yinqiu, Christian Mulder and Michael Papaioannou (2010) "From Reserve Accumulation to Sovereign Wealth Fund:  Policy and Macrofinancial Considerations,"  In Das, Udaibir S., Adnan Mazarei and Han van der Hoorn Eds., *Economics of Sovereign Wealth Funds: Issues for Policymakers* (Washington, D.C.:  International Monetary Fund, 2010).

Lundell-Wignall, A., Y. Hu and J. Yermo (2008) "Sovereign Wealth and Pension Fund Issues,: OECD Working Papers on Insurance and Private Pensions, No. 14, OECD Publishing. doi: 10.1787/243287223503.

Ministry of Foreign Affairs (2010).*Critical Financial Mechanism Receives New Goals, Guidelines.* http://portal.mfa.kz/portal/page/portal/mfa/en/content/news/ASTANA%20CALLING?2010-3-26. Retrieved October 21, 2010.

Moran, Theodore (2009) Three Threats: An Analytical Framework for the CFIUS Process," *Policy Analyses in International Economics* #89, (Washington, D.C.: Peterson Institute of International Economics, 2009).

OECD (2008a) *Declaration On Sovereign Wealth Funds and Recipient Country Policies.* (Paris: OECD).

OECD (2009a) "Foreign Government-Controlled Investors and Recipient Country Investment Policies: A Scoping Paper" January 2009. Available at www.oecd.org?dataoecd/1/21/42022469.pdf

_____ (2009b) *Guidelines for Recipient Country Investment Policies Relating to National Security,* (OECD: Paris) Internet: www.oecd/dataoecd/11/35/43384486.pdf

OECD (2008b) "Proportionality of Security-Related Investment Instruments: A Survey of Practices." Investment Division, Directorate for Financial and Enterprise Affairs Organization for Economic Co-operation and Development.

OECD (2008c) "Sovereign Wealth Funds and Recipient Country Policies," Report of the OECD Investment Committee.

Ossowski, Rolando, Mauricio Villafuerte, Paolo A. Medas and Theo Thomas (2008) *Managing the Oil Revenue Boom: The Role of Fiscal Institutions*, Occasional Paper 260, International Monetary Fund (Washington, D.C.: 2008).

Otto, Samuel, Nina Budina and Pedro Rodriguez (2003) "Getting Competitive, Staying Competitive: The Challenge of Managing Kazakhstan's Oil Boom," Background Paper #3: Selected Issues on the Management of Oil Windfalls, Joint Economic Research Program of the Ministry of Economy and Budget Planning and the World Bank, December, 2003.

Pastoukhova, Elena, Oleg Shvyrkov, Ekaterina Kudyukina and Anton Onishchuk (2009) *Transparency and Disclosure by Kazakhstani Companies 2009: A Low Start a Great Promise.* Standard & Poor's Governance Services, October 14, 2009.

*Preqin Sovereign Wealth Fund Review* (2010)

Rigobon, Roberto (2004) "Getting Competitive, Staying Competitive:  The Challenge of
    Managing Kazakhstan's Oil Boom," Background Paper #7:  Improving the Investment
    Strategy for the National Fund of the Republic of Kazakhstan, Joint Economic Research
    Program of the Ministry of Economy and Budget Planning and the World Bank, October,
    2004.

Rose, Paul (2008a) "Sovereign Wealth Funds:  Active or Passive Investors?",  Yale L.J. Pocket
    Part 104, http://thepocketpart.org/2008/11/24.html

Rose, Paul (2008b) "Sovereigns as Share Holders," *North Carolina Law Review* 87:101-166.

Slawotsky, Joel (2009) "Sovereign Wealth Funds as Emerging Financial Superpowers:  How
    U.S. Regulators Should Respond," *Georgetown Journal of International Law*, 40:1239-
    1269.

*Strategic Plan for the Development of the Republic of Kazakhstan till 2020* February, 2011
    DRAFT of Decree to be approved by the President.

Sun, Tao and Heiko Hesse (2009) "Sovereign Wealth Funds and Financial Stability – An Event
    Study Analysis," *IMF Working Paper* 09/239, IMF, Monetary and Capital Markets.

Truman, E. (2008a), "A Blueprint for Sovereign Wealth Fund Best Practices," Peterson
    Institute for International Economics, Policy Brief No. PB08-3, Washington, DC.

Truman, Edwin M. (2008b) "Four Myths about Sovereign Wealth Funds," *VoxEU* August 14,
    2008.

Truman, Edwin M. (2010) *Sovereign Wealth Funds:  Threat or Salvation?* (Washington, D.C.:
    Peterson Institute for International Economics, 2010).

Truman, E. (2007), "Sovereign Wealth Funds: The Need for Greater Transparency and
    Accountability," Peterson Institute for International Economics, Policy Brief No. PB07-6,
    Washington DC.

 "Uncommon Deal Battle Ends, Sovereign-Wealth Fund's Hostile Move Prompts India's Fortis
    to Relent,"  *The Wall Street Journal*, July 27, 2010.  (A hostile move by SWF, Malaysia's
    Khazanah Holdings offered $US2.6 billion to buy the stake in Singapore hospital  operator
    Parkway Holdings Ltd. It doesn't already own, prompting India's Fortis Healthcare Ltd. to
    abandon its own takeover efforts and relinquish control of the company.)

Winder, B. Philip (2010) "Sovereign Wealth Funds:  Challenges and Opportunities," *Middle
    East Policy*, 17,2:  31-37

Yi-chong, Xu and Gawdat Bahgat (2010) *The Political Economy of Sovereign Wealth Funds*
    (NY: Palgrave Macmillan, 2010)

Additional References not cited in text.

Anderlini J. (2008) "Beijing Uses Forex Reserves to Target Taiwan," *Financial Times* September 12, 2008.

Behrendt, S. (2010)  "Sovereign Wealth Funds:  The Governance Challenge," Carnegie Endowment for International Peace, International Economic Bulletin, January.  Available at www.carnegieendowment.org/publications/index?fa=view&id=24757

Brown, Aaron, Michael G. Papiaoannou and Iva Petrova (2010) "Macro-financial Linkages of the Strategic Asset Allocation of Commodity-Based Sovereign Wealth Funds."  IMF Working Paper 10/9 (Washington, D.C.:  International Monetary Fund).

Chhaochharia, V. and L. Laeven (2008) "Sovereign Wealth Funds:  Their Investment Strategies and Performance," CEPR Discussion Paper # DP6959.

Chevrier, C. (2009) "Sovereign Wealth Funds in Russia," Revue d'Economie Financiere, special issue 2009:  Sovereign Wealth Funds, pp.75-83.

Clark, G. and A. Monk (2009) Government of Singapore Investment Corporation (GIC): Insurer of Last Resort and Bulwark of Nation-state Legitimacy,"  SSRN

Demage, J. M. (2009)  "SWFs in South East Asia," Revue d'Economie Financiere, special issue 2009:  Sovereign Wealth Funds, pp.85-98.

Gelpern, Anna, "A Sovereign Wealth Turn" (September 23, 2008). Rutgers School of Law-Newark Research Papers No. 025. Available at SSRN: http://ssrn.com/abstract=1272395

Gieve, J. (2008) "Sovereign Wealth Funds and Global Imbalances," *Bank of England Quarterly Bulletin*, Q2, 2008.

Keller, A. (2009) "Sovereign Wealth Funds:  Trustworthy Investors or Vehicles of Strategic Ambition?  An Assessment of the Benefits, Risks and Possible Regulation of Sovereign Wealth Funds," SSRN.

Marin, Y. (2009) "Chinese Sovereign Wealth Fund:  Past, Present and Future," *Revue d'Economie Financiere*, special issue Sovereign Wealth Funds, pp. 109-119.

Oritz, Guillermo (2007), "A Coordinated Strategy for Assets and Liabilities:  The Mexican Experience."  In Johnson-Calari, J. and M. Rietveld, Eds., *Sovereign Wealth Management,* (London:  Central Banking Publications).

Roller, L. H. and N. Vernon (2008) "Safe and Sound: an EU Approach to Sovereign Investment," *Bruegel Policy Brief*, Issue 8, November 2008.

**VIII.   Appendix:  Figures and Tables to be inserted in the text.**
**All figures and associated tables for Kazakhstan are author's calculations.**

**Table 1: Largest Sovereign Wealth Funds**
**(c. 2008, US $'s Billions)**

| Country | Fund | Assets in US$ Billion | Foreign Investment | Equity Investment |
|---|---|---|---|---|
| Oil Exporting countries | Total | 1240-2220 | | |
| United Arab Emirates | Abu Dhabi Investment Council | 400-800 | high | high |
| Norway | Government Pension Fund - Global | 373 | high | medium |
| Saudi Arabia | SAMA | 300 | high | low |
| Kuwait | Kuwait Investment Authority | 213 | high | high |
| UAE | Investment Corporation of Dubai | 20-80 | high | high |
| Qatar | Qatar Investment Authority | 20-60 | high | high |
| Libya | Libya Investment Authority | 20-60 | high | high |
| Brunei | Brunei Investment Agency | 10-50 | high | high |
| Norway | Government Pension Fund - Norway | 20 | low | medium |
| Russia | Future Generations Fund | 24 | high | high |
| Kazakhstan | National Oil Fund | 22 | high | low |
| Malaysia | Khazanah Nasional Berhad | 18 | low | high |
| East Asia | Total | 585 | | |
| China | China Investment Corporation | 200 | high | high |
| Singapore | Government Investment Company | 130 | high | high |
| Hong Kong | Exchange Fund Investment Portfolio | 112 | high | low |
| Singapore | Temasek Holdings | 108 | medium | high |
| Korea | Korea Investment Corporation | 20 | high | high |
| Taiwan | National Stabilisation Fund | 15 | low | high |
| Others | Total | 138 | | |
| Australia | Government Future Fund | 49 | medium | medium |
| United States | Alaska Permanent Fund | 38 | medium | medium |
| United States | Permanent University Fund | 20 | medium | medium |
| United States | New Mexico State Investment | 16 | medium | medium |
| Canada | Alberta Heritage | 15 | medium | medium |
| Grand Total | | 1963-2943 | | |

**Source**: Beck and Fidora (2008), Table 1

Notes: Figures are only rough approximations. "High" and "low" refer to shares above two-thirds and below one-third, respectively

## Table 2: SWF's major cross-border equity investments
### 2007-2008 Q1

| Sovereign Wealth Fund | Acquired Companies | Transaction Value (In US$ Billions) | (In % of firm value) |
|---|---|---|---|
| GIC of Singapore | UBS | 9.8 | 8.6 |
| Abu Dhabi Investment Council | Citigroup | 7.6 | 4.9 |
| GIC of Singapore | Citigroup | 6.9 | 4.4 |
| Investment Corporation of Dubai | MGM Mirage | 5.1 | 9.5 |
| China Investment Company | Morgan Stanley | 5.0 | 9.9 |
| Temasek (Singapore) | Merril Lynch | 5.0 | 11.3 |
| Qatar Investment Authority | Sainsbury | 3.7 | 25.0 |
| KIA (Kuwait) | Merril Lynch | 3.4 | 7.0 |
| China Development Bank | Barclays | 3.0 | 3.1 |
| China Investment Company | Blackstone | 3.0 | 10.0 |
| Investment Corporation of Dubai | London Stock Exchange | 3.0 | 28.0 |
| Temasek (Singapore) | China Eastern Air | 2.8 | 8.3 |
| SAFE (China) | Total | 2.8 | 1.6 |
| SAFE (China) | British Petroleum | 2.0 | 1.0 |
| KIC (Korea) | Merril Lynch | 2.0 | 4.3 |
| Temasek (Singapore) | Barclays | 2.0 | 1.8 |
| Qatar Investment Authority | London Stock Exchange | 2.0 | 20.0 |
| Temasek (Singapore) | Standard Chartered | 2.0 | 5.4 |
| undisclosed "Middle East investor" | UBS | 1.8 | 1.6 |
| Abu Dhabi Investment Council | Carlyle Group | 1.4 | 7.5 |
| Investment Corporation of Dubai | Och-Ziff Capital Management | 1.3 | 9.9 |
| Investment Corporation of Dubai | Mauser Group | 1.2 | 100.0 |
| Investment Corporation of Dubai | Alliance Medical | 1.2 | 100.0 |
| GIC of Singapore | Myer Melbourne | 1.0 | 100.0 |
| China Citic Securities | Bear Stearns | 1.0 | 6.0 |
| Borse Dubai | Nasdaq | 1.0 | 19.9 |
| Investment Corporation of Dubai | Standard Chartered | 1.0 | 2.7 |
| Investment Corporation of Dubai | Almatis | 1.0 | 100.0 |
| GIC of Singapore | Merrill Lynch Financial Centre | 1.0 | 100.0 |
| Investment Corporation of Dubai | Barney's New York | 0.9 | 100.0 |
| Investment Corporation of Dubai | EADS | 0.8 | 3.1 |
| GIC of Singapore | Hawks Town | 0.8 | 100.0 |
| Investment Corporation of Dubai | ICICI Bank Ltd | 0.8 | 2.9 |

| | | | |
|---|---|---|---|
| Temasek (Singapore) | Tokyo Westin | 0.7 | 100.0 |
| Mubadala Development Comp. (UAE) | Advanced Micro Devices | 0.6 | 8.0 |
| GIC of Singapore | WestQuay Shopping Centre | 0.6 | 50.0 |
| Investment Corporation of Dubai | Sony | 0.5 | 1.0 |
| Qatar Investment Authority | OMX | 0.5 | 10.0 |
| GIC of Singapore | British Land | 0.3 | 3.0 |
| Investment Corporation of Dubai | Metropole Hotel | 0.3 | 100.0 |
| GIC of Singapore | Kungshuset | 0.2 | 100.0 |
| SAFE (China) | Commonwealth Bank of Australia | 0.2 | 0.3 |
| SAFE (China) | Australia and New Zealand Banking Group | 0.2 | 0.3 |
| SAFE (China) | National Australia Bank | 0.2 | 0.3 |
| GIC of Singapore | Roma Est Shopping Centre | 0.1 | 50.0 |
| Temasek (Singapore) | 9You Online Games | 0.1 | 9.4 |
| Total | | 91.5 | |

**Source:** Beck and Fidora (2008)

**Table 3a: Sovereign Wealth Funds: L-M Transparency Index and the Truman Score**

| Country | Fund Name | Asset holdings (in Billions of USD) | Linaburg-Maduell Transparency Index | Truman Score |
|---|---|---|---|---|
| UAE – Abu Dhabi | Abu Dhabi Investment Authority | 627.0 | 3 | 11 |
| Norway | Government Pension Fund – Global | 571.5 | 10 | 97 |
| China | SAFE Investment Company | 567.9 | 2 | |
| Saudi Arabia | SAMA Foreign Holdings | 472.5 | 2 | |
| China | China Investment Corporation | 409.6 | 7 | 57 |
| Kuwait | Kuwait Investment Authority | 296.0 | 6 | 63 |
| China – Hong Kong | Hong Kong Monetary Authority Investment Portfolio | 292.3 | 8 | |
| Singapore | Government of Singapore Investment Corporation | 247.5 | 6 | 65 |
| Singapore | Temasek Holdings | 157.2 | 10 | 73 |
| China | National Social Security Fund | 146.5 | 5 | 70 |
| Russia | National Welfare Fund | 142.5 | 5 | |
| Qatar | Qatar Investment Authority | 85.0 | 5 | 15 |
| Australia | Australian Future Fund | 72.9 | 10 | 80 |
| Libya | Libyan Investment Authority | 70.0 | 2 | |
| UAE - Abu Dhabi | International Petroleum Investment Company | 58.0 | n/a | 26 |
| Algeria | Revenue Regulation Fund | 56.7 | 1 | 29 |
| US – Alaska | Alaska Permanent Fund | 40.3 | 10 | 92 |
| Kazakhstan | Kazakhstan National Fund | 38.6 | 6 | 65 |
| South Korea | Korea Investment Corporation | 37.0 | 9 | 60 |
| Malaysia | Khazanah Nasional | 36.8 | 4 | 44 |
| Azerbaijan | State Oil Fund | 30.2 | 10 | 76 |
| Ireland | National Pensions Reserve Fund | 30.0 | 10 | 86 |
| Brunei | Brunei Investment Agency | 30.0 | 1 | 23 |
| France | Strategic Investment Fund | 28.0 | n/a | 89 |
| US - Texas | Texas Permanent School Fund | 24.4 | n/a | |
| Iran | Oil Stabilisation Fund | 23.0 | 1 | 29 |
| Chile | Social and Economic Stabilization Fund | 21.8 | 10 | 71 |
| UAE – Abu Dhabi | Investment Corporation of Dubai | 19.6 | 4 | 55 |
| New Zealand | New Zealand Superannuation Fund | 15.6 | 10 | 94 |
| Canada | Alberta's Heritage Fund | 15.1 | 9 | 74 |
| US - New Mexico | New Mexico State Investment Council | 14.3 | 9 | 80 |
| UAE – Abu Dhabi | Mubadala Development Company | 13.3 | 10 | 59 |
| Brazil | Sovereign Fund of Brazil | 11.3 | new | |
| Bahrain | Mumtalakat Holding Company | 9.1 | 9 | 30 |
| Oman | State General Reserve Fund | 8.2 | 1 | 23 |
| Botswana | Pula Fund | 6.9 | 6 | 56 |
| East Timor | Timor-Leste Petroleum Fund | 6.3 | 6 | 85 |
| Mexico | Oil Revenues Stabilization Fund of Mexico | 6.0 | n/a | 44 |
| Saudi Arabia | Public Investment Fund | 5.3 | 3 | |
| China | China-Africa Development Fund | 5.0 | 4 | |
| US - Wyoming | Permanent Wyoming Mineral Trust Fund | 4.7 | 9 | 91 |
| Trinidad & Tobago | Heritage and Stabilization Fund | 2.9 | 8 | 83 |
| Italy | Italian Strategic Fund | 1.4 | n/a | |
| UAE - Ras Al Khaimah | RAK Investment Authority | 1.2 | 3 | |
| Nigeria | Nigerian Sovereign Investment Authority | 1.0 | n/a | |
| Venezuela | FEM | 0.8 | 1 | |
| Vietnam | State Capital Investment Corporation | 0.5 | 4 | 35 |
| Kiribati | Revenue Equalization Reserve Fund | 0.4 | 1 | 35 |
| Indonesia | Government Investment Unit | 0.3 | new | |
| Mauritania | National Fund for Hydrocarbon Reserves | 0.3 | 1 | |
| UAE - Federal | Emirates Investment Authority | n/a | 2 | |
| Oman | Oman Investment Fund | n/a | new | |
| UAE – Abu Dhabi | Abu Dhabi Investment Council | n/a | new | |
| | Total Oil & Gas Related | 2,645.7 | | |
| | Total Other | 2,117.0 | | |
| | TOTAL | 4,762.7 | | |
| | Average SWF | 95.3 | 5.7 | 59.0 |

Source: http://www.swfinstitute.org/fund-rankings/ and Truman (2010, Table 5.1)
Updated October 2011

**Table 3b: Sovereign Wealth Funds as a Share of the World's 30 Largest Stock Markets**

| Country Name | Stock Market Capitalization: 5-yr avg (In Billions of USD) | Abu Dhabi % of total | Kazakh NFK % of total | 10 Largest SWF Average size % of total |
|---|---|---|---|---|
| World | 257,731.412 | 0.243% | 0.015% | 0.147% |
| United States | 83,327.048 | 0.752% | 0.046% | 0.455% |
| European Union | 57,087.018 | 1.098% | 0.068% | 0.664% |
| China | 21,216.727 | 2.955% | 0.182% | 1.785% |
| Japan | 19,877.712 | 3.154% | 0.194% | 1.906% |
| United Kingdom | 15,408.251 | 4.069% | 0.251% | 2.458% |
| France | 10,590.645 | 5.920% | 0.364% | 3.577% |
| Canada | 8,730.660 | 7.182% | 0.442% | 4.339% |
| Hong Kong SAR, China | 8,389.564 | 7.474% | 0.460% | 4.515% |
| Germany | 7,578.563 | 8.273% | 0.509% | 4.998% |
| Spain | 6,538.142 | 9.590% | 0.590% | 5.794% |
| India | 6,078.552 | 10.315% | 0.635% | 6.232% |
| Australia | 5,782.908 | 10.842% | 0.667% | 6.550% |
| Switzerland | 5,649.737 | 11.098% | 0.683% | 6.705% |
| Brazil | 5,383.761 | 11.646% | 0.717% | 7.036% |
| South Africa | 3,757.215 | 16.688% | 1.027% | 10.082% |
| Netherlands | 3,327.757 | 18.842% | 1.160% | 11.383% |
| Italy | 3,255.643 | 19.259% | 1.186% | 11.635% |
| Sweden | 2,451.760 | 25.573% | 1.574% | 15.450% |
| Mexico | 1,773.561 | 35.353% | 2.176% | 21.358% |
| Saudi Arabia | 1,760.496 | 35.615% | 2.193% | 21.517% |
| Singapore | 1,490.696 | 42.061% | 2.589% | 25.411% |
| Belgium | 1,480.799 | 42.342% | 2.607% | 25.581% |
| Malaysia | 1,414.571 | 44.324% | 2.729% | 26.778% |
| Norway | 1,242.576 | 50.460% | 3.106% | 30.485% |
| Turkey | 1,099.298 | 57.036% | 3.511% | 34.458% |
| Chile | 1,070.954 | 58.546% | 3.604% | 35.370% |
| Denmark | 1,058.885 | 59.213% | 3.645% | 35.773% |
| Finland | 998.193 | 62.814% | 3.867% | 37.949% |
| Indonesia | 987.919 | 63.467% | 3.907% | 38.343% |

Source:
http://data.worldbank.org/indicator/CM.MKT.LCAP.CD/countries?display=default

Updated November 23, 2011

**Table 3c: Sovereign Wealth Funds as a Share of Domestic Debt Securities by Sector and Residence of Issuer (Total Debt)**

| Country | Total (In Billions of USD) | Government (In Billions of USD) | Financial Institutions (In Billions of USD) | Corporate (In Billions of USD) | Abu Dhabi % of total | Kazakh NOF % of total | 10 Largest SWF Average size % of total |
|---|---|---|---|---|---|---|---|
| All issuers | 68,716.7 | 40,015.5 | 21,822.8 | 6,878.5 | 0.91% | 0.06% | 0.55% |
| Argentina | 60.4 | 51.3 | 2.8 | 6.4 | 1038.08% | 63.91% | 627.15% |
| Australia | 1,084.9 | 369.7 | 669.3 | 45.9 | 57.79% | 3.56% | 34.92% |
| Austria | 383.1 | 145.1 | 191.9 | 46.1 | 163.66% | 10.08% | 98.88% |
| Belgium | 575.8 | 301.0 | 250.0 | 24.8 | 108.89% | 6.70% | 65.79% |
| Brazil | 1,527.7 | 983.1 | 534.2 | 10.4 | 41.04% | 2.53% | 24.80% |
| Canada | 1,534.7 | 1,068.5 | 288.4 | 177.8 | 40.85% | 2.52% | 24.68% |
| China | 3,047.7 | 1,500.8 | 974.6 | 572.2 | 20.57% | 1.27% | 12.43% |
| Czech Republic | 87.6 | 59.9 | 17.7 | 10.0 | 715.75% | 44.06% | 432.42% |
| Denmark | 613.2 | 106.4 | 505.4 | 1.4 | 102.25% | 6.29% | 61.77% |
| Finland | 88.5 | 26.2 | 45.0 | 13.3 | 708.47% | 43.62% | 428.02% |
| France | 3,421.5 | 1,834.0 | 1,300.6 | 286.9 | 18.33% | 1.13% | 11.07% |
| Germany | 2,814.6 | 1,817.7 | 593.6 | 403.3 | 22.28% | 1.37% | 13.46% |
| Greece | 275.0 | 164.7 | 110.2 | 0.1 | 228.00% | 14.04% | 137.75% |
| Hong Kong SAR | 64.7 | 30.2 | 24.6 | 10.0 | 969.09% | 59.66% | 585.47% |
| India | 711.1 | 610.4 | 75.5 | 25.1 | 88.17% | 5.43% | 53.27% |
| Indonesia | 96.7 | 84.4 | 5.7 | 6.7 | 648.40% | 39.92% | 391.73% |
| Ireland | 344.6 | 65.4 | 276.4 | 2.8 | 181.95% | 11.20% | 109.92% |
| Italy | 3,236.4 | 2,094.2 | 761.7 | 380.5 | 19.37% | 1.19% | 11.70% |
| Japan | 13,575.1 | 11,579.9 | 1,127.5 | 867.7 | 4.62% | 0.28% | 2.79% |
| Malaysia | 277.8 | 131.3 | 59.8 | 86.7 | 225.70% | 13.89% | 136.36% |
| Mexico | 451.2 | 261.1 | 152.2 | 38.0 | 138.96% | 8.55% | 83.95% |
| Netherlands | 1,048.6 | 416.7 | 507.0 | 124.9 | 59.79% | 3.68% | 36.12% |
| Norway | 259.6 | 101.2 | 129.5 | 28.8 | 241.53% | 14.87% | 145.92% |
| Poland | 230.1 | 220.5 | 9.7 | 0.0 | 272.49% | 16.78% | 164.62% |
| Portugal | 275.9 | 104.5 | 119.3 | 52.1 | 227.26% | 13.99% | 137.30% |
| Singapore | 130.7 | 105.5 | 23.2 | 2.0 | 479.72% | 29.53% | 289.82% |
| South Africa | 185.6 | 122.6 | 35.1 | 27.9 | 337.82% | 20.80% | 204.09% |
| South Korea | 1,175.0 | 512.8 | 257.7 | 404.6 | 53.36% | 3.29% | 32.24% |
| Spain | 1,576.1 | 707.0 | 844.8 | 24.2 | 39.78% | 2.45% | 24.03% |
| Sweden | 444.9 | 136.0 | 273.2 | 35.7 | 140.93% | 8.68% | 85.14% |
| Switzerland | 292.1 | 126.9 | 135.2 | 30.1 | 214.65% | 13.21% | 129.68% |
| Thailand | 228.1 | 164.9 | 3.2 | 60.1 | 274.88% | 16.92% | 166.07% |
| Turkey | 232.5 | 229.4 | 0.0 | 3.1 | 269.68% | 16.60% | 162.92% |
| United Kingdom | 1,727.1 | 1,394.8 | 311.6 | 20.7 | 36.30% | 2.23% | 21.93% |
| United States | 25,475.3 | 11,403.4 | 11,134.7 | 2,937.2 | 2.46% | 0.15% | 1.49% |

Source: http://www.bis.org/statistics/secstats.htm
(Table 16A) Updated March 2011

**Table 3d: Sovereign Wealth Funds as a Share of Domestic Debt Securities by Sector and Residence of Issuer (Debt Issued by Corporations)**

| Country | Total (In Billions of USD) | Corporate (In Billions of USD) | Abu Dhabi % of total | Kazakh NOF % of total | 10 Largest SWF Average size % of total |
|---|---|---|---|---|---|
| All issuers | 68,716.7 | 6,878.5 | 9.12% | 0.56% | 5.51% |
| Argentina | 60.4 | 6.4 | 9796.88% | 603.13% | 5918.75% |
| Australia | 1,084.9 | 45.9 | 1366.01% | 84.10% | 825.27% |
| Austria | 383.1 | 46.1 | 1360.09% | 83.73% | 821.69% |
| Belgium | 575.8 | 24.8 | 2528.23% | 155.65% | 1527.42% |
| Brazil | 1,527.7 | 10.4 | 6028.85% | 371.15% | 3642.31% |
| Canada | 1,534.7 | 177.8 | 352.64% | 21.71% | 213.05% |
| China | 3,047.7 | 572.2 | 109.58% | 6.75% | 66.20% |
| Czech Republic | 87.6 | 10.0 | 6270.00% | 386.00% | 3788.00% |
| Denmark | 613.2 | 1.4 | 44785.71% | 2757.14% | 27057.14% |
| Finland | 88.5 | 13.3 | 4714.29% | 290.23% | 2848.12% |
| France | 3,421.5 | 286.9 | 218.54% | 13.45% | 132.03% |
| Germany | 2,814.6 | 403.3 | 155.47% | 9.57% | 93.93% |
| Greece | 275.0 | 0.1 | 627000.00% | 38600.00% | 378800.00% |
| Hong Kong SAR | 64.7 | 10.0 | 6270.00% | 386.00% | 3788.00% |
| India | 711.1 | 25.1 | 2498.01% | 153.78% | 1509.16% |
| Indonesia | 96.7 | 6.7 | 9358.21% | 576.12% | 5653.73% |
| Ireland | 344.6 | 2.8 | 22392.86% | 1378.57% | 13528.57% |
| Italy | 3,236.4 | 380.5 | 164.78% | 10.14% | 99.55% |
| Japan | 13,575.1 | 867.7 | 72.26% | 4.45% | 43.66% |
| Malaysia | 277.8 | 86.7 | 723.18% | 44.52% | 436.91% |
| Mexico | 451.2 | 38.0 | 1650.00% | 101.58% | 996.84% |
| Netherlands | 1,048.6 | 124.9 | 502.00% | 30.90% | 303.28% |
| Norway | 259.6 | 28.8 | 2177.08% | 134.03% | 1315.28% |
| Poland | 230.1 | 0.0 | 0.0% | 0.0% | 0.0% |
| Portugal | 275.9 | 52.1 | 1203.45% | 74.09% | 727.06% |
| Singapore | 130.7 | 2.0 | 31350.00% | 1930.00% | 18940.00% |
| South Africa | 185.6 | 27.9 | 2247.31% | 138.35% | 1357.71% |
| South Korea | 1,175.0 | 404.6 | 154.97% | 9.54% | 93.62% |
| Spain | 1,576.1 | 24.2 | 2590.91% | 159.50% | 1565.29% |
| Sweden | 444.9 | 35.7 | 1756.30% | 108.12% | 1061.06% |
| Switzerland | 292.1 | 30.1 | 2083.06% | 128.24% | 1258.47% |
| Thailand | 228.1 | 60.1 | 1043.26% | 64.23% | 630.28% |
| Turkey | 232.5 | 3.1 | 20225.81% | 1245.16% | 12219.35% |
| United Kingdom | 1,727.1 | 20.7 | 3028.99% | 186.47% | 1829.95% |
| United States | 25,475.3 | 2,937.2 | 21.35% | 1.31% | 12.90% |

Source: http://www.bis.org/statistics/secstats.htm
(Table 16B) Updated March 2011

**Table 4: Generally Accepted Principles and Practices (GAPP)—Santiago Principles, IWG (2008)**

In furtherance of the "Objective and Purpose," the IWG members either have implemented or intend to implement the following principles and practices, on a voluntary basis, *each of which is subject to* home country laws, regulations, requirements and obligations. This paragraph is an integral part of the GAPP.

**GAPP 1. Principle**
The legal framework for the SWF should be sound and support its effective operation and the achievement of its stated objective(s).
> *GAPP 1.1. Subprinciple.* The legal framework for the SWF should ensure legal soundness of the SWF and its transactions.
> *GAPP 1.2. Subprinciple.* The key features of the SWF's legal basis and structure, as well as the legal relationship between the SWF and other state bodies, should be publicly disclosed.

**GAPP 2. Principle**
The policy purpose of the SWF should be clearly defined and publicly disclosed.

**GAPP 3. Principle**
Where the SWF's activities have significant direct domestic macroeconomic implications, those activities should be closely coordinated with the domestic fiscal and monetary authorities, so as to ensure consistency with the overall macroeconomic policies.

**GAPP 4. Principle**
There should be clear and publicly disclosed policies, rules, procedures, or arrangements in relation to the SWF's general approach to funding, withdrawal, and spending operations.
> *GAPP 4.1. Subprinciple.* The source of SWF funding should be publicly disclosed.
> *GAPP 4.2. Subprinciple.* The general approach to withdrawals from the SWF and spending on behalf of the government should be publicly disclosed.

**GAPP 5. Principle**
The relevant statistical data pertaining to the SWF should be reported on a timely basis to the owner, or as otherwise required, for inclusion where appropriate in macroeconomic data sets.

**GAPP 6. Principle**
The governance framework for the SWF should be sound and establish a clear and effective division of roles and responsibilities in order to facilitate accountability and operational independence in the management of the SWF to pursue its objectives.

**GAPP 7. Principle**
The owner should set the objectives of the SWF, appoint the members of its governing body(ies) in accordance with clearly defined procedures, and exercise oversight over the SWF's operations.

**GAPP 8. Principle**

The governing body(ies) should act in the best interests of the SWF, and have a clear mandate and adequate authority and competency to carry out its functions.

## GAPP 9. Principle
The operational management of the SWF should implement the SWF's strategies in an independent manner and in accordance with clearly defined responsibilities.

## GAPP 10. Principle
The accountability framework for the SWF's operations should be clearly defined in the relevant legislation, charter, other constitutive documents, or management agreement.

## GAPP 11. Principle
An annual report and accompanying financial statements on the SWF's operations and performance should be prepared in a timely fashion and in accordance with recognized international or national accounting standards in a consistent manner.

## GAPP 12. Principle
The SWF's operations and financial statements should be audited annually in accordance with recognized international or national auditing standards in a consistent manner.

## GAPP 13. Principle
Professional and ethical standards should be clearly defined and made known to the members of the SWF's governing body(ies), management, and staff.

## GAPP 14. Principle
Dealing with third parties for the purpose of the SWF's operational management should be based on economic and financial grounds, and follow clear rules and procedures.

## GAPP 15. Principle
SWF operations and activities in host countries should be conducted in compliance with all applicable regulatory and disclosure requirements of the countries in which they operate.

## GAPP 16. Principle
The governance framework and objectives, as well as the manner in which the SWF's management is operationally independent from the owner, should be publicly disclosed.

## GAPP 17. Principle
Relevant financial information regarding the SWF should be publicly disclosed to demonstrate its economic and financial orientation, so as to contribute to stability in international financial markets and enhance trust in recipient countries.

## GAPP 18. Principle
The SWF's investment policy should be clear and consistent with its defined objectives, risk tolerance, and investment strategy, as set by the owner or the governing body(ies), and be based on sound portfolio management principles.

    *GAPP 18.1. Subprinciple.* The investment policy should guide the SWF's financial risk

exposures and the possible use of leverage.

*GAPP 18.2. Subprinciple.* The investment policy should address the extent to which internal and/or external investment managers are used, the range of their activities and authority, and the process by which they are selected and their performance monitored.

*GAPP 18.3. Subprinciple.* A description of the investment policy of the SWF should be publicly disclosed.

## GAPP 19. Principle

The SWF's investment decisions should aim to maximize risk-adjusted financial returns in a manner consistent with its investment policy, and based on economic and financial grounds.

*GAPP 19.1. Subprinciple.* If investment decisions are subject to *other than* economic and financial considerations, these should be clearly set out in the investment policy and be publicly disclosed.

*GAPP 19.2. Subprinciple.* The management of an SWF's assets should be consistent with what is generally accepted as sound asset management principles.

## GAPP 20. Principle

The SWF should not seek or take advantage of privileged information or inappropriate influence by the broader government in competing with private entities.

## GAPP 21. Principle

SWFs view shareholder ownership rights as a fundamental element of their equity investments' value. If an SWF chooses to exercise its ownership rights, it should do so in a manner that is consistent with its investment policy and protects the financial value of its investments. The  SWF should publicly disclose its general approach to voting securities of listed entities,  including the key factors guiding its exercise of ownership rights.

## GAPP 22. Principle

The SWF should have a framework that identifies, assesses, and manages the risks of its operations.

*GAPP 22.1. Subprinciple.* The risk management framework should include reliable information and timely reporting systems, which should enable the adequate monitoring and management of relevant risks within acceptable parameters and levels, control and incentive mechanisms, codes of conduct, business continuity planning, and an independent audit function.

*GAPP 22.2. Subprinciple.* The general approach to the SWF's risk management framework should be publicly disclosed.

## GAPP 23. Principle

The assets and investment performance (absolute and relative to benchmarks, if any) of the SWF should be measured and reported to the owner according to clearly defined principles or standards.

## GAPP 24. Principle

A process of regular review of the implementation of the GAPP should be engaged in by or on behalf of the SWF.

**Table 5: Management Council of the National Oil Fund**

1. The President of the Republic of Kazakhstan
2. The Prime-Minister
3. The Chairman of the Senate of the Parliament
4. The Chairman of the  Mazhilis (Lower Chamber) of the Parliament
5. Head of the Administration of the President
6. Governor of the National Bank
7. The First Deputy of the Prime-Minister
8. Chairman of the Accounting Committee
9. The Minister of Finance
10. The Minister of Economy and Budget Planning

## Table 6: Largest Organizations of Samruk Kazyna

| | | Доля |
|---|---|---|
| 1 | АО "Казмунайгаз" | 100% |
| 2 | АО «ҚАЗАҚСТАН ТЕМІР ЖОЛЫ» | 100% |
| 3 | АО "KEGOC" | 100% |
| 4 | АО "Казахтелеком" | 45,90% |
| 5 | АО "Казпочта" | 100% |
| 6 | АО "Эйр Астана" | 51% |
| 7 | АО "Национальная морская судоходная компания "Казмортрансфлот" | 50% |
| 8 | АО "Самрук-Энерго" | 93,42% |
| 9 | АО "Казахский научно-исследовательский институт энергетики имени академика Ш.Ч. Чокина" | 50% |
| 10 | АО "Казахстанский оператор рынка электрической энергии и мощности" | 100% |
| 11 | АО "Аэропорт Павлодар" | 100% |
| 12 | АО "Международный аэропорт Актобе" | 100% |
| 13 | ТОО "Ремонтная корпорация "Камкор" | 100% |
| 14 | ТОО "Самрук Инвест" | 100% |
| 15 | ТОО "Телеком Самрук Инвест" | 100% |

| | | |
|---|---|---|
| 16 | АО "Банк развития Казахстана" | 100% |
| 17 | АО "Kazyna Capital Management" | 100% |
| 18 | АО "Фонд развития предпринимательства "Даму" | 100% |
| 19 | АО "Национальный инновационный фонд" | 100% |
| 20 | АО "Государственная страховая корпорация по страхованию экспортных кредитов и инвестиций" | 100% |
| 21 | АО "Инвестиционный фонд Казахстана" | 100% |
| 22 | АО "Корпорация по развитию и продвижению экспорта "Kaznex" | 100% |
| 23 | АО "Центр инжиниринга и трансферта технологий" | Дов.управление |
| 24 | АО "Астана-Финанс" | 26% |
| 25 | АО "Казахстанская ипотечная компания" | 91% |
| 26 | АО "Казахстанский фонд гарантирования ипотечных кредитов" | 89% |
| 27 | АО "Жилищный строительный сберегательный банк Казахстана" | 100% |
| 28 | АО "Майкаинзолото" | 25% |
| 29 | АО "Казатомпром" | 100% |
| 30 | «Kazakhmys PLC» (Великобритания) | 14,99% |
| 31 | «Eurasian Natural Resources Corporation PLC» (Великобритания) | 11,65% |
| 32 | Joint Stock Company «Real estate fund «Samruk-Kazyna» | |
| 33 | «United chemical company» Limited Liability Partnership | 100% |

| 34 | «SK-Pharmaceuticals» Limited Liability Partnership | 100% |
|----|---------------------------------------------------|------|
| 35 | joint-stock company «Tau-Ken Samruk» National Mining Company | 100% |
| 36 | "D.V. Sokolsky Institute for Organic Catalysis and Electrochemistry" JSC | 100% |

**Table 7:  Members of the Boards of Directors of Major Companies of Samruk Kazyna**
On umdrive and available upon request.



| Fund's Assets at the End of the Reporting Period, Total in Millions USD | | | | | | |
|---|---|---|---|---|---|---|
| Y2005 | Y2006 | Y2007 | Y2008 | Y2009 | Y2010 | 1-Apr-11 |
| 8,061.1 | 14,190.4 | 22,809.9 | 27,114.8 | 30,789.4 | 38,622.5 | 41,675.2 |



| Uses of Funds by the End of the Reporting Period, Total in Millions USD | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Y2005 | Y2006 | Y2007 | Y2008 | Y2009 | Y2010 | 1-Apr-11 |
| *Uses of Funds, Total* | 5.5 | 7.3 | 2,116.6 | 8,934.6 | 7,506.2 | 8,170.6 | 1,025.7 |
| *Including:* | | | | | | | |
| *Guaranteed Transfers* | 0 | 0 | 2,105.9 | 3,863.7 | 5,714.2 | 8,143.6 | 1,024.6 |
| *Targeted Transfers* | 0 | 0 | 0 | 5,048.6 | 1,772.4 | 0 | 0 |
| *Mgt and External Audit Expenses* | 5.5 | 7.3 | 10.8 | 22.2 | 19.6 | 27.0 | 1.1 |



| Fund Receipts by Major Category in Millions USD | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Y2005 | Y2006 | Y2007 | Y2008 | Y2009 | Y2010 | 1-Apr-11 |
| ***Receipts, Total*** | 3,047.0 | 5,627.9 | 9,798.6 | 15,233.7 | 15,856.3 | 16,250.0 | 3,735.4 |
| *Including:* | | | | | | | |
| *Budget Transfers I* | 2,578.4 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Direct Taxes* | 0 | 5,333.1 | 8,472.0 | 14,131.8 | 9,294.6 | 15,312.3 | 3,731.6 |
| *Other Oil Sector Receipts* | 0 | 0 | 0 | 138.6 | 41.2 | 113.2 | 2.7 |
| *From Privatization* | 73.7 | 99.7 | 0.0 | 0 | 0.0 | 0 | 0 |
| *From Sales of Land* | 16.3 | 31.5 | 44.1 | 13.4 | 4.4 | 3.6 | 1.1 |
| *Investment Income* | 268.2 | 79.3 | 1,282.5 | 949.9 | 6,516.0 | 821.0 | 0 |
| *Budget Transfers II* | 102.8 | 84.2 | 0 | 0 | 0.0 | 0 | 0 |



| Receipts and Uses of Funds, Total in Millions of USD | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Y2005 | Y2006 | Y2007 | Y2008 | Y2009 | Y2010 | 1-Apr-11 |
| *Receipts* | 3,047 | 5,628 | 9,799 | 15,234 | 15,856 | 16,250 | 3,735 |
| *Uses of Funds* | 5 | 7 | 2,117 | 8,935 | 7,506 | 8,171 | 1,026 |





Figure 6:  Direct Taxes by Category, 2010

$3.2 B
20.9%

$.64 B
4.2%

$5.5 B
35.8%

$5.3 B
34.3%

$.024 B
0.2%

$.72 B
4.7%

- Corporate Income Tax
- Excess Profit Tax
- Bonuses
- Royalties
- Production Sharing
- Oil and Gas Rent Tax

**Figure 7: Organizational Structure of Samruk Kazyna**



# DAVIDSON INSTITUTE WORKING PAPER SERIES - Most Recent Papers
### The entire Working Paper Series may be downloaded free of charge at: www.wdi.umich.edu

CURRENT AS OF  8/30/12

| Publication | Authors | Date |
|---|---|---|
| No. 1036: Sovereign Wealth Fund Issues and The National Fund(s) of Kazakhstan | David Kemme | August 2012 |
| No. 1035: Stock Market Comovements in Central Europe: Evidence from Asymmetric DCC Model | Dritan Gjika and Roman Horvath | August 2012 |
| No. 1034: Regional Motives for Post-Entry Subsidiary Development: The Case of Poland | Agnieszka Chidlow, Christine Holmstrom-Lind, Ulf Holm & Heinz Tuselmann | June 2012 |
| No. 1033: The Effects Of Network's Structural Holes: Polycentric Institutions, Product Portfolio, And New Venture Growth In China And Russia | Bat Batjargal | May 2012 |
| No. 1032: The Bulgarian Foreign and Domestic Debt – A No-Arbitrage Macrofinancial View | Vilimir Yordanov | March 2012 |
| No. 1031: Macroeconomic Shock Synchronization in the East African Community | Albert Mafusire & Zuzana Brixiova | March 2012 |
| No. 1030: Does Human Capital Endowment of FDI Recipient Countries Really Matter? Evidence from Cross-Country Firm Level Data | Sumon K. Bhaumik & Ralitza Dimova | Feb 2012 |
| No. 1029: Does institutional quality affect firm performance? Insights from a semiparametric approach | Sumon K. Bhaumik, Ralitza Dimova, Subal C. Kumbhakar & Kai Sun | Feb 2012 |
| No. 1028:  International Stock Market Integration: Central and South Eastern Europe Compared | Roman Horvath & Dragan Petrovski | Feb 2012 |
| No. 1027: LABOUR MARKET REFORMS AND OUTCOMES IN ESTONIA | Zuzana Brixiova and Balazs Egert | Feb 2012 |
| No. 1026: The Impact Of Capital Measurement Error Correction On Firm-Level Production Function Estimation | Lubomir Lizal & Kamil Galuscak | Jan 2012 |
| No. 1025: CREDIT CONSTRAINTS AND PRODUCTIVE ENTREPRENEURSHIP IN AFRICA | Mina Baliamoune-Lutz, Zuzana Brixiová & Léonce Ndikumana | Dec 2011 |
| No. 1024: Entry Costs and Increasing Trade | William F. Lincoln and Andrew McCallum | Nov 2011 |
| No. 1023: The Dependence Of CEECs On Foreign Bank Claims: Direct And Indirect Risks Of Capital Withdrawal | Sophie Brana and Delphine Lahet | Nov 2011 |
| No.1022: The Development Effects Of Natural Resources: A Geographical Dimension | Fabrizio Carmignani & Abdur Chowdhury | Nov 2011 |
| No. 1021: How to Stir Up FDI Spillovers: Evidence from a Large Meta-Analysis | Tomas Havranek & Zuzana Irsova | Nov 2011 |
| No. 1020: Volatility transmission in emerging European foreign exchange markets | Evzen Kocenda, Vit Bubak & Filip Zikes | July 2011 |
| No. 1019: Whither human capital? The woeful tale of transition to tertiary education in India | Sumon Bhaumik and Manisha Chakrabarty | July 2011 |
| No. 1018: From Prosperity to Depression: Bulgaria and Romania (1996/97 – 2010) | Nikolay Nenovsky, Kiril Tochkov and Camelia Turcu | May 2011 |
| No. 1017: Institutions, Governance and Technology catch-up in North Africa | Imed Drine | May 2011 |
| No. 1016: Financial Efficiency and the Ownership of Czech Firms | Evzen Kocenda, Jan Hanousek and Michal Masika | May 2011 |
| No. 1015: Default Predictors in Retail Credit Scoring: Evidence from Czech Banking Data | Evzen Kocenda & Martin Vojtek | April 2011 |
| No. 1014: Exchange Rate Pass-Through in Transition Economies: The Case of Republic of Macedonia | Besnik Fetai | April 2011 |