UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re Application of Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd. for an Order Directing Discovery from State Street Corporation Pursuant to 28 U.S.C. § 1782 | No. 1:15-mc-91059-LTS<br><br>Declaration of Nilufar R. Hossain in Support of Petitioners' Motion to Compel Discovery |

I, Nilufar R. Hossain, hereby state as follows:

1. I am an attorney duly admitted to practice in New York, New Jersey and California. I am associated with the law firm of King & Spalding LLP, attorneys of record for Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd. (collectively, "Petitioners") in this matter. The facts set forth herein are personally known to me, and, if called as a witness, I could and would testify competently thereto.

**I.   THE 1782 ORDER AND THE SUBPOENAS SERVED ON STATE STREET**

2. On February 25, 2015, Petitioners applied to this Court for an order authorizing Petitioners to issue subpoenas on State Street pursuant to 28 U.S.C. § 1782 (the "Subpoenas"). The Subpoenas requested various categories of documents and a deposition witness concerning assets belonging to the Republic of Kazakhstan (the "ROK") that are located in the United Kingdom and European Union and are managed by State Street Corporation ("State Street"). The Subpoenas include 14 document production requests and one deposition request. To comply with the geographic limitations set forth in Fed. R. Civ. P. 45, Petitioners designated Regus-TSG

1

Reporting, a Boston-based entity, to receive all documents produced by State Street. True and correct copy of the Subpoenas are attached hereto as Exhibit A.

3. This Court granted Petitioners § 1782 application and issued an order on March 2, 2015 authorizing Petitioners to serve the Subpoenas (the "1782 Order"). A true and correct copy of the 1782 Order is attached hereto as Exhibit B.

4. Petitioners served the Subpoenas on State Street on August 3, 2017.[1] A true and correct copy of the letter to State Street enclosing the Subpoenas is attached hereto as Exhibit C.

5. To date State Street has refused to comply with the Subpoenas.

## II.   THE EUROPEAN PROCEEDINGS

6. Petitioners hold judgments against the ROK in Sweden, Belgium, France, and the Netherlands; these judgments arise out of an arbitration award (the "ECT Award") rendered in Petitioners' favor and against the ROK by a Stockholm-based arbitral tribunal on December 19, 2013. The ECT Award ordered the ROK to pay Petitioners USD 497,685,101.00, plus interest.[2] The ROK has refused to satisfy the Award, or the judgments recognizing it.

7. Petitioners have sought and obtained recognition of the ECT Award pursuant to the Convention for the Recognition and Enforcement of Foreign Arbitral Awards (June 10, 1958), 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention") in Belgium, France, Luxembourg, and the Netherlands, and the ECT Award is directly enforceable in Sweden

---

[1] Owing to a miscommunication between Petitioners and the Court, and further as a result of the fact that the 1782 Order was not entered into the ECF docket, Petitioners did not receive notice of the fact that its application had been granted until July 31, 2017. The Subpoenas were served promptly upon Petitioners having learned that the 1782 Order had been granted.

[2] The Tribunal also ordered the ROK to pay USD 8,975,496.40 in legal fees as well as 802,103.24 EUR in arbitration costs.

because it was rendered in Stockholm, Sweden (the "Swedish Judgment"). Petitioners are now proceeding to enforce the resulting judgments under local law (such proceedings, the "European Proceedings").

### A. THE SWEDISH PROCEEDINGS

8. As part of these efforts, Petitioners have attached assets they believe to be owned by the ROK in several countries, including Sweden. Specifically, Petitioners have commenced an action (the "Swedish Proceedings") in the District Court of Stockholm, Division 3 (the "Stockholm Court") in connection with these attachments. The Swedish Proceedings are categorized as a "sequestration proceeding" under Swedish law. Based on the Stockholm Court's *ex parte* provisional sequestration order, the Swedish Enforcement Authority rendered a number of attachment decisions targeting specific property of the ROK. These decisions were appealed by the ROK and the National Bank of Kazakhstan ("NBK") to the District Court of Nacka (the "Nacka Court," collectively with the Stockholm Court, the "Swedish Courts") on October 13, 2017.

9. The ROK and the NBK have attempted to vacate the attachments granted in Sweden by claiming, *inter alia*, that the assets do not belong to the ROK, but instead are assets that comprise part of the ROK's National Fund (one of its sovereign wealth funds), which the ROK claims belong to the NBK, which it in turn claims to be a separate juridical entity whose assets may not be attached in aid of the Swedish Judgment against the ROK.

10. Specifically, on October 20, 2017, the ROK filed a "Reply to Investors' Application for Provisional Sequestration" (the "ROK Reply") in the Stockholm Court. A true and correct copy of the ROK Reply is attached hereto as Exhibit D.

3

11. Under the Swedish Code of Judicial Procedure, in order to issue a sequestration order, the Swedish Court must find that there is a risk of "sabotage," *i.e.*, that there is a danger that the respondent will seek to transfer assets out of the jurisdiction and/or take other measures to render itself judgment-proof in Sweden. The ROK Reply notes that the "risk of sabotage should be objectively provable," and asserts that "[a] fundamental condition is that the respondent … have any ability at all to take the foreseen sabotage measure. **Kazakhstan does not have such an ability.**" Ex. D, at 11 ¶ 54 (Emphasis added).

12. In sum, the ROK thus claims that it lacks the ability to engage in sabotage because the assets at issue are owned and controlled by the NBK, and that it accordingly cannot dispose of National Fund assets.   Ex. D, at 11-12 ¶¶ 54-60.

13. Petitioners intend to challenge the ROK's claims concerning its ability to dispose, transfer, or otherwise dispose of the attached assets in the Swedish Proceedings. The question of whether, and how, the ROK can do so is a disputed factual issue that the Swedish Courts will be required to adjudicate based on the parties' respective proffers of evidence.

14. While the ROK has not yet filed papers opposing the attachments that have occurred in the European Proceedings outside Sweden, Petitioners expect that it will do so, and that to the extent the assets at issue are held in the name of the NBK, the National Fund, or another of the ROK's sovereign wealth funds, the ROK will make similar claims to the ones it has made in Sweden, *i.e.*, claims that the assets are not owned, controlled, or transferable by the ROK and/or are otherwise not available for purposes of enforcing any of the relevant judgments.

15. Each of the European Proceedings will, therefore, require an adjudication of contested propositions of fact and disputed contentions of local law.  The discovery materials sought by the Subpoenas will be of use to Petitioners in litigating these proceedings.

    **B.**    **STATE STREET'S RELATIONSHIP WITH THE NATIONAL FUND**

16. As provided in the Declaration of Charlene C. Sun dated February 25, 2015, documents published by the NBK show that one or more State Street entities manages or has managed assets of the National Fund.  This information suggests that State Street is a custodian bank that manages the National Fund's assets which are held by the NBK as a trustee, though the ROK retains sole ownership of those assets.  State Street is likely in possession of unique documentation concerning the ownership and use of the National Fund assets it manages as a custodian bank.  This ownership evidence is critical to Petitioners to address the contested ownership claims of the ROK and the NBK in the European and Swedish Proceedings.

17. Petitioners believe that, because State Street holds National Fund assets, its records are likely to contain information that is probative concerning the legal and beneficial ownership of those assets, and that information will be of use to Petitioners in contesting the claims the ROK has made, and is likely to continue to make, in the Swedish Proceedings and the European Proceedings.

**III.   PETITIONERS' REPEATED ATTEMPTS TO CONFER WITH STATE STREET**

18. Over the course of the past three months, Petitioners have attempted to have a meaningful discussion with State Street regarding the nature, scope and timing of the discovery requests contained in the Subpoenas.  These attempts have been routinely met with delay and obfuscation, and to date, State Street has not produced any documents or a deposition witness.

19. On August 11, 2017, Petitioners and State Street, via their respective counsel, conferred via telephone regarding the Subpoenas (the "August 11 Discovery Conference Request"). Counsel for both parties agreed that State Street would receive a two-week extension "for its responses and/or objections" to the Subpoenas, until August 31st. During the teleconference, Petitioners' counsel emphasized Petitioners' willingness to work with State Street's counsel to minimize the burden of complying with the request. A true and correct copy of the email exchange dated August 16, 2017 is attached hereto as Exhibit E.

20. On August 31, 2017, Petitioners' counsel received a set of "responses" to the Subpoenas that objected to the Subpoenas in their entirety (the "August 31 Objections") and categorically refused to provide any of the requested documents or information. A true and correct copy of State Street's August 31 Objections is attached hereto as Exhibit F.

21. In its objections, State Street counsel's primary contention was that since the relevant State Street entities were "located outside of the United States," and that the Subpoenas were "[in]appropriately directed to State Street Corporation [a Massachusetts-corporation which] is not a party to the . . . action," State Street was not obligated to comply. In its August 31 Objections, State Street contends that the State Street entities with the relevant records are "located outside of the United States" such that the Subpoenas were "[in]appropriately directed to State Street Corporation." State Street identified these other entities as State Street Global Advisors Limited, State Street Europe Limited and State Street Bank & Trust Company – London Branch (the "Foreign State Street Entities"). After asserting that these entities hold the relevant documents in their physical possession, State Street cites Fed. R. Civ. P. 45 to contend

6

that it is a non-party protected "from being conscripted into service by litigants issuing, broad overreaching subpoenas." Ex. F.

22. Specifically, State Street stated that it objected to the Subpoenas on the grounds that they:

>(i) fail to comply with the geographic limitations set forth in F.R.C.P. 45(c);
>
>(ii) seek discovery that is not permissible under 28 U.S.C. § 1782 (citing *Kestrel Coal Pty. Ltd. v. Joy Global, Inc.*, 362 F.3d 401, 404 (7th Cir. 2004);
>
>(iii) fail to specify the person who is being subpoenaed, as required by F.R.C.P. 45(a)(1)(A)(iii), but rather purport to require State Street to identify a corporate designee (citing *Hill v. Homeward Residential*, 799 F.3d 544 (6th Cir. 2015);
>
>(iv) impose undue burden and expense on State Street;
>
>(v) are overbroad, insofar as they seek documents and information that is outside the scope of and/or not relevant to the above-referenced action, nor reasonably calculated to lead to the discovery of admissible evidence;
>
>(vi) contain definitions, instructions, and requests that they are vague and/or ambiguous;
>
>(vii) seek confidential and proprietary financial information;
>
>(viii) require disclosure [of] confidential commercial information;
>
>(ix) seek information that may be discovered from the parties to this action, or from another third party, or by less intrusive means;
>
>(x) seek information that is more readily available from sources other than State Street;
>
>(xi) call for information already in your possession, custody or control; and/or

        (xii) seek information protected by the attorney-client privilege, the attorney work product doctrine and/or any other applicable privilege, doctrine or immunity."

Ex. F.

    23.    On September 11, 2017, Petitioners' counsel responded via letter that each of the August 31 Objections lacked any basis in the applicable law and reemphasized Petitioners' willingness to confer further (the "September 11 Letter") in an attempt to reach an agreeable scope of production. Specifically, Petitioners emphasized that under the relevant law, "the location of documents abroad [does] not preclude the production of documents which are under the possession, custody, or control of Massachusetts residents" and that the relevant test is legal "control" over documents, and not location or physical control. A true and correct copy of the letter dated September 11, 2017 is attached hereto as Exhibit G.

    24.    Petitioners' counsel also noted in the September 11 Letter that pursuant to Fed. R. Civ. P. 30(b)(6), the Stati Group was "entitled to depose State Street Corporation on its corporate knowledge about the Kazakhstan National Fund via a representative designated by State Street Corporation." Petitioners' counsel again re-stated its willingness to work together to "find an agreeable solution" thereby avoiding the "need to seek the Court's intervention." Exhibit G.

    25.    On September 19, 2017, State Street's responded via email that it acknowledged receipt of the September 11 Letter and would review it internally. A true and correct copy of the email dated September 19, 2017 is attached hereto as Exhibit H.

    26.    State Street never provided any response to the legal arguments raised by Petitioners in their September 11 letter. Having heard nothing further from State Street, on

September 29, 2017, counsel for Petitioners requested an update from State Street's counsel. A true and correct copy of the emails dated September 29, 2017 is attached hereto as Exhibit H.

27.     Counsel for State Street responded on the same day stating that, "We are still evaluating the subpoena and your response to our objections. We will be back in touch." Ex. H.

28.     Petitioners' counsel responded promptly that they were willing "to be flexible concerning timing" but that it would be preferable to set a deadline. Ex. H.

29.     A week later, on October 6, 2017, State Street's counsel stated in an email that:

> I have heard from our client, the National Bank of Kazakhstan, that they will be intervening in this matter. I expect for them to be in touch with you shortly. In light of this development, I do not have a date at this time.

Ex. H.

30.     Approximately two weeks later, on October 17, 2017, Petitioners' counsel received a letter from Reed Smith LLP (a) indicating that Reed Smith LLP would represent the interests of NBK, and (b) requesting that Petitioners agree, no later than October 20, 2017, to stay the Subpoenas pending the completion of several litigation proceedings in the United States and elsewhere concerning the Award. A true and correct copy of the letter dated October 20, 2017 is attached hereto as Exhibit I.

31.     Petitioners declined this request via email dated October 20, 2017. A true and correct copy of the email dated October 20, 2017 is attached hereto as Exhibit J.[3]

---

[3] None of the other ROK-related entities about whose finances the Subpoenas seek information have made any outreach to Petitioners concerning the Subpoenas.

32. On October 19, 2017, Petitioners' counsel made one final attempt to schedule a discovery conference with State Street's counsel. Via email, Petitioners' counsel stated that:

> We will address any objections raised by the NBK in due course if and when it intervenes in the case. As of now, it has not done so, and in the interim, however, we would like to clarify and address State Street's position with respect to the subpoenas, as the objections you have asserted on behalf of State Street are distinct from the ones the NBK has suggested it may assert, and we believe they may and should be addressed independently of each other. I note that we wrote to you on September 11, 2017 setting forth our position with respect to your objections and inviting a dialogue to discuss our disagreements. In the intervening month, State Street has not provided us with any substantive response, noting only that it was "reviewing" our letter and, on October 6, stating in an email that because the NBK had informed State Street that it planned to intervene, State Street could not provide us with an estimated time that it would respond to our September 11 letter.
>
> Based on your October 6 email to me (immediately below) and our prior correspondence (in the course of which you, in your letter dated August 31, 2017, indicated that State Street considered the subpoenas to be ineffective and unenforceable, views that we, in our response of September 11, 2017, have contested), it is our understanding that State Street is unwilling at this time to comply in any manner with either of the subpoenas. If that is correct, we would appreciate your confirming that for us. If it is not, and State Street is willing to discuss its objections with the objective of reaching agreement on the subpoenas, we hereby request a conference with you as soon as possible to discuss your objections and any steps that might suffice to overcome them and enable State Street to comply with the subpoenas.

A true and correct copy of the email dated October 19, 2017 is attached hereto as Exhibit K.

33. On October 20, 2017, counsel for State Street indicated it was willing to hold a discovery conference, though it did not express any willingness to provide any of the requested discovery or suggest that it would be willing to do so following a conference. A true and correct copy of the email dated October 20, 2017 is attached hereto as Exhibit L.

34. That discovery conference was initially scheduled, at State Street's request (Petitioners had sought an earlier conference), for October 27, 2017. Ex. L.

35. State Street did not respond to Petitioners' request to confirm a time on October 27 for the conference, prompting several follow up emails from Petitioners that went unanswered until the morning of the scheduled conference. A true and correct copy of the email dated October 26, 2017 is attached hereto as Exhibit M; *see also* Ex. L.

36. Early in the morning on October 27, 2017, State Street notified Petitioners that it could not participate in a discovery conference that day and asked to reschedule. A true and correct copy of the email dated October 27, 2017 is attached hereto as Exhibit N.

37. Petitioners agreed to reschedule the discovery conference for October 30, 2017. Ex. N.

38. On the morning of October 30, 2017, State Street **again** requested that the discovery conference be postponed. Specifically, State Street indicated that it had decided to retain counsel, and that counsel would reach out on its behalf. Ex. N.

39. As of the time this motion was filed, Petitioners have not heard from State Street or any attorney claiming to represent it in connection with this matter.

**IV.   STATE STREET LIKELY HAS POSSESSION, CUSTODY AND CONTROL OF RESPONSIVE DOCUMENTS LOCATED ABROAD**

40. Publicly available information demonstrates that several U.S.-based executives of State Street serve a dual role as executives with the Foreign State Street Entities. For example:

    a. Mr. Ronald P. O'Hanley serves as Vice Chairman of State Street and as President and CEO of State Street Global Advisors. True and correct copies of Mr. O'Hanley's public profile identifying his position at State Street and his location in Massachusetts are attached hereto as Exhibit O.

    b. Mr. Joseph Hooley is both the Chairman and CEO of State Street and a Director of State Street Bank & Trust. True and correct copies of Mr. Hooley's public profile identifying his position at State Street and his location in Massachusetts is attached hereto as Exhibit P.

    c. Ms. Karen Keenan serves as Executive Vice President of State Street and as Chairman of State Street Europe. True and correct copies of Ms. Keenan's public profile identifying her position at State Street and her location in Massachusetts is attached hereto as Exhibit Q.

41. On information and belief, each of these individuals maintains his or her office in Massachusetts. Ex O, P, and Q.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 6, 2017 in New York, New York

*Nilufar Hossain*

Nilufar R. Hossain