**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

In re Application of Anatolie Stati, Gabriel Stati,
Ascom Group, S.A., and Terra Raf Trans Traiding
Ltd. for an Order Directing Discovery from State
Street Corporation Pursuant to 28 U.S.C. § 1782

No. 1:15-mc-91059-LTS

**MEMORANDUM OF LAW IN OPPOSITION TO THE NATIONAL BANK OF
REPUBLIC OF KAZAKHSTAN'S AND STATE STREET CORPORATION'S
MOTION TO INTERVENE AND VACATE THE EX PARTE ORDER ISSUED
PURSUANT TO 28 U.S.C. § 1782, OR TO STAY § 1782 DISCOVERY**

James E. Berger, *pro hac vice*
Charlene C. Sun, *pro hac vice*

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 556-2202
*jberger@kslaw.com*
*csun@kslaw.com*

*Attorneys for Petitioners Anatoli Stati, Gabriel
Stati, Ascom Group, S.A., and Terra Raf Traiding
Ltd.*

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................................1

Facts ..........................................................................................................................................3

1. The Award and Petitioners' Recognition Proceedings .............................................................3

2. The European Proceedings ........................................................................................................4

    a.   The Swedish Proceedings .....................................................................................................5

    b.   The Dutch Proceedings .........................................................................................................6

    c.   The Belgian Proceedings .......................................................................................................7

    d.   The Luxembourg Proceedings .............................................................................................7

3. State Street's Holdings..............................................................................................................7

4. The 1782 Proceeding and the Subpoena .................................................................................8

Argument ..................................................................................................................................8

    A.  The 1782 Order is Valid and the Motion to Vacate it Should be Denied...........................8

        1.   Section 1782 May be Used in Aid of Enforcement Proceedings So Long as the
            Proceedings are Adjudicative .........................................................................................8

        2.   Section 1782 May be Used to Compel Production of Evidence that is in the
            Possession, Custody, and Control of a U.S.-based Entity ...........................................12

        3.   Movants' Rule 69 Argument is Meritless...................................................................17

    B.  The 1782 Order is Valid and the Motion to Vacate it Should be Denied........................18

        1.   The London Proceeding and RICO Complaint are not "Dispositive" of the
            Matters in Connection with Which Petitioners Seek Discovery Under the 1782
            Order .............................................................................................................................19

Conclusion ...............................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addamax Corp. v. Open Software Found., Inc.*,
   148 F.R.D. 462 (D. Mass 1993) ............................................................................15

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*,
   No. M19-88 (BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ........................14

*In re Barnwell Ent., Ltd.*,
   ___ F. Supp. 3d ___, 2017 WL 2992074 (D.D.C. Jul. 13, 2017) ...........................14

*Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co.*,
   201 F.R.D. 33 (D. Mass. 2001) .....................................................................15, 20

*Haseotes v. Abacab Int'l Computers, Inc.*,
   120 F.R.D. 12 (D. Mass. 1988) .............................................................................15

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ..................................................................................12

*Minis v. Thomson*,
   No. MISC. 14-91050-DJC, 2014 WL 1599947 (D. Mass. Apr. 18, 2014) .............14

*Sergeeva v. Tripleton Int'l Ltd.*,
   834 F.3d 1194 (11th Cir. 2016) .......................................................................13, 14

*St. Jude Med. S.C., Inc. v. Janssen-Counotte*,
   305 F.R.D. 630 (D. Or. 2015) ...............................................................................15

**Statutes**

28 U.S.C. § 1782 ........................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 26 .....................................................................................................12

Fed. R. Civ. P. 30(b)(6) ............................................................................................17

Fed. R. Civ. P. 34 .....................................................................................................15

Fed. R. Civ. P. 69 ...........................................................................................8, 17, 18

**Preliminary Statement**

The motion recently filed by putative Intervenor National Bank of Kazakhstan ("NBK")

and State Street Corporation ("State Street") (collectively, "Movants") to intervene and quash the

order and subpoena at issue herein ("Motion") fails to mention several critical facts.  These

omissions are fundamentally misleading, and a full accounting of the relevant facts and

circumstances fatally undermines the Motion.  It should be denied.

**First**, while the Movants purport to describe, in considerable detail, the proceedings that

Petitioners commenced in the High Court of Justice in London (the "London Court"), the

Republic of Kazakhstan's ("ROK") allegations that the arbitration award underlying this petition

(the "Award") was "procured by fraud," and the London Court's decision to conduct a trial on

those allegations, they neglect to mention that those allegations have already been brought, fully

litigated, and **rejected thoroughly** by the court — the Svea Court of Appeal in Stockholm,

Sweden (the "Svea Court") — with primary jurisdiction over the arbitral award (the "Award")

that forms the root of this controversy.  *See* Dec. of James E. Berger, Dec. 4, 2017 ¶ 6 ("Berger

Dec.).  The Movants also neglect to mention that the U.S. court currently seized with jurisdiction

over Petitioners' action seeking recognition of the Award in the United States has refused to

permit the ROK to proffer evidence of this alleged "fraud," finding, based on a review of the

Award, that the ROK's allegation that the Award was procured by fraud lacked merit.  *Id.* ¶ 5.  In

sum, the only court to adjudicate the ROK's fraud case rejected it.

**Second**, while the Movants assert that "enforcement of the Award is effectively stayed

pending resolution" of the London Court's proceedings, *see* Mem., at 9, that is simply not true.

The Award and/or judgments recognizing it are currently being enforced in four European

nations — Sweden (the jurisdiction where the underlying arbitration took place, and where the

Award, following the Svea Court's rejection of the ROK's fraud allegations and other challenges

to the Award, has the status of a lawful and unappealable court judgment), the Netherlands, Luxembourg, and Belgium (collectively, the "European Proceedings").  Petitioners have attached assets belonging to the ROK in each of these jurisdictions, with leave of the relevant authorities. Enforcement proceedings are not "effectively stayed" — they are being prosecuted and actively litigated **right now**, and the discovery that Petitioners seek through the subpoena at issue is critical to Petitioners' ability to rebut factual and legal claims that the ROK and the NBK have made in those proceedings.

**Third**, while the Movants assert that the European Proceedings are "not adjudicative," they neglect to mention that the NBK has itself claimed, in proceedings it has commenced in the District Court of Stockholm (the "Stockholm Court") to dissolve Petitioners' attachment of assets in that country, that the Stockholm Court proceedings are "not enforcement proceedings" and that they will require a trial.  Berger Dec., ¶ 7 & Ex. A at ¶ 28.  The NBK also neglects to mention that it has proffered extensive documentary evidence in support of its arguments in the Stockholm Court, and done so while simultaneously telling this Court that there is "nothing to adjudicate."  The inconsistency is breathtaking.

The ROK's allegations of "fraud" notwithstanding, the Award is valid, and its validity, having been established by the Svea Court (whose rulings were, despite the ROK's efforts to the contrary, left undisturbed by the Supreme Court of Sweden), is not subject to any further judicial challenge.  That Award is thus now being enforced throughout Europe, and judicial proceedings are ongoing in which the ROK and the NBK have challenged the factual bases for Petitioners' enforcement attempts with substantial evidentiary proffers.  These challenges raise complex questions of fact and law related to the management and use of the ROK's various sovereign wealth funds — a significant portion of which are being managed by State Street — and the

relationship between the ROK, the NBK, and various other state entities.  The evidence sought in the Subpoena is unquestionably relevant to these contested issues, and the Court should deny the Motion, grant Petitioners' pending motion to compel, and order State Street to comply with the Subpoenas forthwith.

**Facts**

**1.      The Award and Petitioners' Recognition Proceedings**

This proceeding arises out of the ROK's continuing refusal to satisfy the Award, which was rendered by a Stockholm-based tribunal as a result of the ROK's expropriation of Petitioners' business in Kazakhstan and totals over $500 million.  Berger Dec., ¶ 2.  Following the tribunal's issuance of the Award, the ROK commenced a proceeding in the Svea Court seeking to have the Award set aside on a number of grounds.  The ROK ultimately amended its set-aside claim in the Svea Court to allege that Petitioners had obtained the Award by fraud; the Svea Court rejected this claim in its entirety.  *See* Berger Dec. ¶  3.  The Svea Court also denied the ROK leave to appeal its ruling and awarded Petitioners over $3 million based on its legal costs in the Svea Court proceedings.  *Id.*  Despite the Svea Court's refusal to grant the ROK leave to appeal its judgment, the ROK nonetheless attempted to bring the matter before the Supreme Court of Sweden through a motion for extraordinary review; that motion was also denied.  *Id.* ¶ 4.  The Award is thus final, valid, and not subject to any further appeal or judicial review.  *Id.*  Petitioners have, for their part, commenced proceedings in the U.S. District Court for the District of Columbia (the "DC Court") seeking recognition of the Award in the United States.  *Id.* ¶ 5.  After that proceeding was fully briefed, the ROK requested leave of the DC Court to amend its defense and to introduce its fraud defense and related evidence in that proceeding; the DC Court, in a ruling dated May 11, 2016, rejected the ROK's request.  *Id.*

3

Petitioners sought and obtained recognition of the Award on an *ex parte* basis in the London Court on February 28, 2014.  The ROK subsequently sought to vacate the London Court's recognition order, and sought leave to amend its claim before the London Court to include its fraud allegations.  Unlike the DC Court, the London Court allowed the ROK to introduce its fraud-based defenses, and ruled on June 6, 2017  that the ROK's fraud allegations should be tried.  The trial in the London Court will be held beginning in November 2018. Because the London Court sits as a court of secondary jurisdiction under the New York Convention, its ruling will be limited to whether the Award may be enforced **in England** as a matter of English law, will have no effect on the validity of the Award (which was rendered under Swedish law, and has been held to be valid by the Swedish courts), and will have no effect outside the United Kingdom.  *Id.* ¶ 6.

**2.      The European Proceedings**

Following the Svea Court's refusal to set aside the Award, Petitioners began taking steps to enforce the Award in Sweden, the Netherlands, Belgium and Luxembourg.  Petitioners' enforcement efforts have focused in part on assets believed to form part of the ROK's "National Fund," an unincorporated agglomeration of sovereign assets, which Petitioners believe are held by the NBK as a custodian or trustee, but which are ultimately owned, legally and beneficially, by the ROK, and thus subject to attachment and execution in aid of the Award and the judgments rendered on it.

The ROK, often acting in tandem with the NBK, has contested Petitioners' enforcement efforts, and has filed voluminous submissions in both Swedish, Dutch, and Belgian courts in which they have claimed, *inter alia*, that the assets attached by Petitioners are not owned by the ROK and that the ROK lacks the ability to dispose of the attached assets (thus making negating a legal prerequisite for attachment).  The ROK and NBK have sought to buttress these claims with

4

documentary evidence – including the management and custodianship agreements that
Petitioners believe govern State Street's management of certain assets that Petitioners believe to
be beneficially owned by the ROK – that Petitioners do not, absent judicial assistance, have the
ability to obtain.  Ultimately, the courts presiding over the European Proceedings will be
required to make rulings concerning the beneficial and legal ownership of the assets comprising
the National Fund (as well as of Samruk-Kazyna JSC ("Samruk"), another of the ROK's
sovereign wealth funds), and those rulings are expected to turn on factual findings pertaining to
the legal and actual relationship between the ROK and NBK, the management and use of
National Fund and Samruk assets, the legal independence of the NBK, and the manner in which
foreign financial institutions – including State Street – interact with the ROK and its various
instrumentalities.  Berger Dec., ¶ 7.

      a.     The Swedish Proceedings

On the basis of an *ex parte* judgment rendered by Stockholm Court on August 21, 2017
(allowing enforcement of the Award and attachment of all and any of the ROK's property in
Sweden up to the full value of the Award), the Swedish state bailiff attached shares owned by the
ROK in 33 publicly traded Swedish companies (with a current market value of about $96.5
million). These shares form part of the portfolio of the National Fund, and are held by the
Swedish bank SEB as a custodian on behalf of Bank of New York Mellon Corporation ("BNY")
(which acts as global custodian for the ROK).  Berger Dec. ¶ 7(a).  The Swedish bailiff has also
attached certain subscription rights, dividend payments and tax refund receivables with respect to
some of the said shares. The ROK, together with the NBK as an intervening party, have filed
numerous appeals, each accompanied by documentary evidence, against the the bailiff's
decisions, and these appeals are currently being considered by the Nacka District Court in
Stockholm (the "Nacka Court").  A decision from the Nacka Court is expected by the end of

December 2017.  The ROK and NBK have separately filed various stay applications with respect to the bailiff's attachment decisions, but these applications have been dismissed by Nacka Court. *Id.*

Most recently, on October 20, 2017, ROK filed a reply to Petitioners' motion for provisional sequestration (or attachment), a true and correct copy of which is attached hereto as Exhibit A.   In its reply, the ROK argued, *inter alia*, that the shares in question are owned by the NBK, rather than the ROK itself.  *Id.*; Ex. A at ¶¶ 6, 55-61.  The ROK acknowledged the adjudicative nature of the sequestration proceedings, asserting that "the proceedings regarding sequestration before the District Court **are not enforcement proceedings** …. An application for sequestration is filed with a court, which **has to try it if there is a legal basis for the requested action**."  *Id.*; Ex. A at ¶ 28 (emphasis supplied).  Petitioners filed a response to the ROK's October 20, 2017 reply on November 13, 2017, and the ROK is entitled to file another responsive submission on December 4, 2017.  The Nacka Court will be required to adjudicate this dispute.

### b.      The Dutch Proceedings

On September 8, 2017, the Amsterdam District Court ("Amsterdam Court") issued an *ex parte* judgment allowing attachment of certain property owned by the ROK in the Netherlands, including, *inter alia*, certain assets held by the Amsterdam branch of BNY's Belgian subsidiary, BNY Mellon SA/NV, concerning the savings portfolio of the National Fund, as well as certain shares held by Samruk in Dutch entity KMG Kashagan BV, respectively.  The Dutch bailiff thereafter levied a number attachments in execution of the said *ex parte* judgment of the Amsterdam Court.  Consequently, both Samruk and NBK (as an intervening third party) have contested these attachments with submissions and evidence they claim establish that Samruk is juridically independent from the ROK, and that prohibits the attachment of its assets in aid of the

judgment against the ROK.  The Amsterdam Court will be required to adjudicate this dispute.

Berger Dec. ¶ 7(b) & Ex. B.

       c.     The Belgian Proceedings

On October 11, 2017, the Brussels Court of First Instance ("Brussels Court") issued an *ex*

*parte* judgment, allowing attachment of certain assets held by BNY's Belgian subsidiary, BNY

Mellon SA/NV, concerning the savings portfolio of the National Fund.  The NBK has moved to

intervene in the Belgian Proceedings, and claimed in support of its petition for intervention, *inter*

*alia*, that it is juridically separate from the ROK, that the attached assets belong to it as opposed

to the ROK, and thus cannot be executed in aid of a judgment against the ROK, and that it has

been prejudiced by the attachment.  Petitioners contest each of these claims.  See Berger Dec. ¶

7(c) & Ex. C.  The ROK has separately opposed recognition of the Award in Belgium.  Berger

Dec. ¶ 7(c).

       d.     The Luxembourg Proceedings

On August 30, 2017, Luxembourg District Court ("Luxembourg Court") made an *ex*

*parte* order recognizing and enforcing the Award in Luxembourg.  In the meantime, in August

2017, a Luxembourg bailiff levied attachments on the ROK's property in Luxembourg, including

certain receivables due to the ROK from four Luxembourg incorporated companies, as well as

certain shares owned by the ROK in one of those companies (which shares are not related to the

National Fund).  None of the third parties has yet filed any oppositions or motions with respect to

these attachments, though Petitioners expect that, as in the European Proceedings described

above, the ROK, NBK, Samruk, or some combination of them, will do so.  Berger Dec. ¶ 7(d).

   **3.**     **State Street's Holdings**

As noted in the November 20, 2017 Declaration of Jodi Luster Brueggeman

("Brueggeman Dec.), State Street and certain of its offshore affiliates and entities provide

services and maintain accounts for the NBK.  Neither State Street nor the NBK has denied, and

publicly-available information strongly suggests, that the Kazakh assets held by State Street

include National Fund assets.  *See* Declaration of Charlene C. Sun, Feb. 25, 2015, ¶ 8 ("Sun

Dec.).

> **4.** **The 1782 Proceeding and the Subpoena**

On February 25, 2015, Petitioners applied to this Court for an order authorizing them to

obtain discovery from State Street pursuant to 28 U.S.C. § 1782.  The application was granted,

and the Court issued an order (the "1782 Order") granting Petitioners' application on March 2,

2015.  The order is docketed herein as Document No. 11.

The 1782 Order authorized Petitioners to serve the Subpoenas, as well as additional

subpoenas as necessary.  The Subpoenas were served on August 3, 2017.[1]  The Subpoenas

requested documents and a deposition witness concerning the ROK's assets in the United

Kingdom and European Union that are managed by State Street.

## Argument

> **A.** **The 1782 Order is Valid and the Motion to Vacate it Should be Denied**

NBK and State Street challenge the 1782 Order on four grounds: (1) that Section 1782

discovery may not be used "to support the enforcement and collection of judgments," (2) that

such discovery cannot be employed to obtain documents maintained outside the United States,

(3) that discovery may not be obtained from a subpoenaed party's corporate affiliates, and (4)

that the discovery is not authorized by Fed. R. Civ. P. 69.  Each of these arguments lacks merit.

> **1.** **Section 1782 May be Used in Aid of Enforcement Proceedings So Long as the Proceedings are Adjudicative**

---

[1]  Owing to a miscommunication between Petitioners and the Court, and further as a result of the fact that the 1782 Order was not entered into the ECF docket, Petitioners did not receive notice of the fact that its application had been granted until July 31, 2017.  The Subpoenas were served promptly upon Petitioners having learned that the 1782 Order had been granted.

Movants assert that the 1782 Order is improper because Section 1782 cannot be employed to "collect on a judgment." Mem., at 11. There is no such restriction included in the statute, however. As Movants note, Section 1782 merely requires that the discovery sought be "for use in a proceeding before a foreign tribunal." *Id.* (citation omitted). Movants note further that this requirement is evaluated by determining whether the tribunal before which the evidence sought it to be used is acting as a "first-instance adjudicative decision-maker." *Id.* (citations omitted). As demonstrated above, it is clear that the European Proceedings will culminate in first-instance adjudications concerning the legal and beneficial ownership of billions of dollars' worth of assets, and those adjudications will themselves require factual findings concerning the use and management of those assets. There simply can be no serious dispute that the European Proceedings are "adjudicative" in nature, and that they constitute "foreign proceedings" within the meaning of Section 1782.

For example, in Sweden, Petitioners have commenced an action in the Stockholm Court to sequester assets it believes are owned by the National Fund. Berger Dec. ¶ 7(a). The ROK, on October 20, 2017, filed an opposition to Petitioners' sequestration application, in which it contended that the National Fund's assets "do not belong" to the ROK, but rather to the NBK. As a result of this claimed distinction, the ROK claimed that (a) the National Fund's assets cannot be executed in aid of a judgment against the ROK, and (b) that there is no risk of "sabotage" (*i.e.*, disposition of the assets), since "Kazakhstan cannot dispose of the property." *Id*., Ex. A. The ROK's brief to the Stockholm Court contains thirteen exhibits and lists twelve sources of documentary evidence to support its claims. Included among that evidence are various documents evidencing the global custodianship of the National Fund's assets, a custodianship in which State Street plays a significant role. Notably, in its brief to the

Stockholm Court, the ROK asserted that the proceeding was "not an enforcement proceeding" –

a statement that directly contradicts the claims the NBK has made to this Court – and that the

Court would be obligated to conduct a trial to resolve the contested claims of law and fact.  *Id.*

The Stockholm Court will need to conduct that trial, and it will adjudicate the issues raised by

the parties, which will include complex factual and legal questions involving the ownership and

use of property and the relationship between NBK, the ROK, and the National Fund, based on

the evidentiary submissions that they make.

Likewise, in the Netherlands and Belgium, where Petitioners have also attached

significant ROK assets, the ROK and NBK have contested Petitioners' attachments, again by

disputing the ROK's ownership of the attached assets and claiming that the NBK is the true and

beneficial owner.  In these proceedings as well, the parties will be required to make significant

evidentiary submissions to the Amsterdam and Brussels Courts, which will make one or more

first instance decisions concerning the relationship between Samruk, the NBK, and the ROK, and

render a judgment concerning the ownership and use of the attached property under applicable

law in order to determine whether that property can be executed in satisfaction of the Award, or

whether it must be left in place and the attachment lifted.  Berger Dec. ¶ 7(b)-(c) & Exs. B-C.

Movants rely on the Second Circuit's decision in *Euromepa S.A. v. Esmerian*, Inc., 154

F.3d 24 (2d Cir. 1998) and a string of district court decisions in support of its argument that these

proceedings are, **solely** because they arise in connection with the enforcement of a judgment, not

"adjudicative proceedings" for which Section 1782 may be invoked.  But as demonstrated above,

Movants' argument is belied by the facts and circumstances surrounding the European

proceedings, and a review of *Euromepa* demonstrates that Movants have significantly overstated

its holding.

*Euromepa* did **not** hold that enforcement proceedings can never be "adjudicative" in nature or Section 1782 can never be provided in aid of such proceedings.  Far from it.  In *Euromepa*, the Second Circuit held that Section 1782 could not be invoked in order to obtain discovery for use in specific French bankruptcy proceedings which related to the enforcement of a French judgment.  Key to the Second Circuit's holding was its finding that a previous ruling of the French Supreme Court – **which had already ruled on the case** – was entitled to res judicata effect and thus preclusive on the French Bankruptcy Court, and that as a result, nothing was being adjudicated.  The Court held:

> The merits of the dispute between Esmerian and Euromepa have already been adjudicated and will not be considered in the French Bankruptcy Proceeding. As a matter of French law, the judgment of the French Supreme Court acts as *res judicata* with respect to the merits of the dispute in the French Bankruptcy Proceeding. Thus, in the French Bankruptcy Proceeding, nothing is being adjudicated; the already extant judgment is merely being enforced (to the extent permitted by the assets of the bankruptcy estate).

*Euromepa*, 154 F.3d at 28.

This case is not *Euromepa*.  Unlike in *Euromepa*, the Stockholm, Amsterdam, and Brussels Courts (and, almost just as surely, the Luxembourg Court, once issue is joined in that jurisdiction) will be required to adjudicate a series of contested issues – the actual and beneficial ownership of the property that Petitioners have sought to sequester/attach, and the ability of the ROK to "sabotage" the assets by directing their disposition.  There have been no prior rulings on these issues in these jurisdictions, and thus no issue of preclusion as there was in *Euromepa*.  Given that State Street acts as a manager and/or custodian for the National Fund's assets, the information sought from it through the 1782 Order undoubtedly be "of use" (and will be used)

directly in the European Proceedings, and the courts presiding over those proceedings will be required to render judgments based on the evidence presented to them.[2]

In sum, unlike in *Euromepa*, Petitioners will use the evidence sought herein in contested, evidentiary proceedings before a first instance court, and that first instance court will render legal rulings and a judgment, based on evidentiary submissions, concerning the ownership of certain property and the ROK's ability to dispose (or direct the disposition of) that property. That is an adjudication by any standard, and one that plainly qualifies for the judicial assistance that Section 1782 is designed to provide. *Euromepa* does not say or hold otherwise.

### 2.   Section 1782 May be Used to Compel Production of Evidence that is in the Possession, Custody, and Control of a U.S.-based Entity

Movants argue next that the 1782 Order must be quashed because it may result in the production of documents held outside the United States and/or that are in the possession of one of State Street's subsidiaries. These arguments reflect a fundamental misunderstanding of the relevant law concerning the discoverability of documents, and that misunderstanding ultimately undermines those objections and renders them meritless. The simple fact is that State Street has **never disputed** that one or more of its executives who are based in Massachusetts have access to the data and documents sought by the 1782 Order and the Subpoena, and that fact renders their arguments about the documents being outside the United States completely beside the point.[3]

Movants assert that the entities in possession of responsive documents are State Street Global Advisors Limited, State Street Europe Limited and State Street Bank & Trust Company –

---

[2]   For example, information showing the flow of funds into and out of the ROK's sovereign wealth accounts at State Street will demonstrate whether, and to what extent, the ROK is using these sovereign wealth assets to pay its own obligations, transferring the funds to itself, or otherwise using those funds in a way that may be contrary to, and thus tend to disprove, the claims it has made in the other European Proceedings. Particularly where Section 1782 discovery is ultimately guided by the broad discovery principles underlying Rule 26, *see Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015) ("[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."), Petitioners submit that there can be little question of this information's relevance to the issues being litigated in Sweden.

[3]   Petitioners remind the Court that one of the Subpoenas requires State Street to produce a deposition witness, and that the Movants' arguments concerning the location of documents has no bearing on the appropriateness of the deposition subpoena, which seeks the deposition testimony of a representative of State Street.

London Branch (the "Foreign State Street Entities"), each of which is incorporated and located abroad, and assert further that courts have imposed a categorical bar on any use of the statute that would require a U.S. corporation to produce documents held by offshore subsidiaries.  The decisional law, however, is not as clear as Movants claim.

This Court and others have rejected the arguments put forth by Movants and compelled parties to produce, pursuant to subpoenas issued under Section 1782, documents located overseas.  The U.S. Court of Appeals for the Eleventh Circuit, in *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194 (11th Cir. 2016), expressly rejected any geographic limitations in 1782 cases.  In *Sergeeva*, the petitioner sought documents from a U.S.-based company and several of its overseas affiliates.  The respondent U.S. company objected, arguing, as Movants do here, that 1782 did not permit the district court to order the production of documents held by its affiliates and/or outside the United States.  The district court disagreed, holding that because Section 1782 discovery is conducted pursuant to the Federal Rules of Civil Procedure, and because the those rules clearly authorize extraterritorial document production, that Section 1782 authorized it to order the U.S.-based respondent to produce documents in its possession, custody, and control, even if those documents were in the physical possession of overseas affiliates.  The Eleventh Circuit, applying a de novo review of the district court's analysis, agreed.  *Id.* at 1199-1200. The court held:

> … discovery pursuant to the Federal Rules of Civil Procedure is broad and covers materials outside of the United States.  Further, we note that: (1) Federal Rule of Civil Procedure 45 requires that subpoenaed parties "produce designated documents, electronically stored information, or tangible things in the parties' possession, custody, or control … and (2) the only geographical limitation provided by Rule 45 concerns the location for the *act of production* – not the location of the documents or information to be produced….  Thus, the District Court could require that Trident Atlanta produce responsive documents and information located

> outside the United States – so long as Trident Atlanta had
> possession, custody, or control of such responsive material[.]

*Id.* at 1200 (italics original).

The Eleventh Circuit also found that the court below had properly found that the U.S.-based respondent had possession, custody, and control of the documents possessed by the foreign affiliates, which requirement it found was satisfied where the subpoenaed entity has "the legal right to obtain documents requested upon demand." *Id*. at 1201. Notably, the Eleventh Circuit also affirmed the district court's order sanctioning the respondent and holding it in civil contempt for refusing to produce the documents, which the respondent had justified by claiming the production requirement was based on "unlawful orders." *Id.*

A recent decision of the U.S. District Court for the District of Columbia applied the *Sergeeva* analysis and reached the same result, finding that it possessed authority under Section 1782 to compel a U.S. company to produce documents in the possession of its employees in France and Kenya, and finding further that because "employers have control over their employees and can be required to produce documents in their employees' possession," that the U.S.-based respondent had possession, custody, and control of the documents located abroad and could be compelled to produce them. *In re Barnwell Ent., Ltd.*, ___ F. Supp. 3d ___, 2017 WL 2992074, at *9 (D.D.C. Jul. 13, 2017). Additional decisions, including at least one decision from this Court, are in accord. *See, e.g., Minis v. Thomson*, No. MISC. 14-91050-DJC, 2014 WL 1599947, at *5 (D. Mass. Apr. 18, 2014) (granting Section 1782 request despite location of documents outside the United States, and observing that "[d]iscovery under § 1782 is in accordance with the Federal Rules of Civil Procedure, 28 U.S.C. § 1782(a), **and will entail production of all that is under the possession, custody, or control of Massachusetts residents** . . .") (emphasis added);   *In re Application of Gemeinshcaftspraxis Dr. Med.*

14

*Schottdorf*, No. M19-88 (BSJ), 2006 WL 3844464, at *5 (S.D.N.Y. Dec. 29, 2006) (rejecting motion to quash Section 1782 subpoena on ground that it sought documents located abroad, and holding that "[t]here is no such express restriction in the statute, and the Court is unwilling to engraft one onto it," and finding that "Section 1782 requires only that the party from whom discovery is sought be 'found' here; not that the documents be found here.").

As these cases illustrate, the key concept in federal discovery (the principles of which govern discovery under § 1782, as in all other discovery cases, *see Addamax Corp. v. Open Software Found., Inc.*, 148 F.R.D. 462, 464-69 (D. Mass 1993)), is "control." Federal courts have routinely recognized that a corporation has "control" of documents when it has "the legal right to obtain [the] documents [at issue]." *Haseotes v. Abacab Int'l Computers, Inc.*, 120 F.R.D. 12, 14 (D. Mass. 1988) ("individual defendants, as officers, directors, and shareholders . . . can be required to produce documents that are in the possession of the corporations.")*; see also Calzaturficio S.C.A.R.P.A. v. Fabiano Shoe Co*., 201 F.R.D. 33, 38 (D. Mass. 2001) ("[For] the production of documents pursuant to Fed. R. Civ. P. 34[,] responding parties are required to produce all documents that are in their control. Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand.") (citations and quotation marks omitted); *Addamax Corp.*, 148 F.R.D. at 467-69 (compelling production of documents from U.S. subsidiary deemed to have "control" of documents in actual possession of German parent corporation). It is well-settled that a party may not hide behind the corporate form of its foreign subsidiaries in order to avoid producing documents that are in fact within its actual possession, custody, or control. *See, e.g.*, *Addamax Corp.*, 148 F.R.D. at 468-69 (ordering corporation to produce documents in possession of a related German corporation); *St. Jude Med. S.C., Inc. v.*

15

*Janssen-Counotte*, 305 F.R.D. 630, 638-39 (D. Or. 2015) (ordering corporation to search for responsive documents and electronically-stored information held by affiliated entities overseas).

State Street has not disputed that it has possession, custody, and control of the documents sought by the Document Subpoena, and the evidence proffered by Petitioners – which demonstrates that several Boston-based State Street executives hold managerial positions with the Foreign State Street Entities – suggests strongly that it does.  Publicly available information demonstrates that several U.S.-based executives of State Street serve a dual role as senior executives with the Foreign State Street Entities.  On information and belief, each of these individuals maintains his or her office in Massachusetts.  *See* Declaration of Nilufar R. Hossain, Nov. 7, 2017,  ¶¶ 40-41; Ex. O, P and Q ("Hossain Dec.) (ECF No. 16).  Specifically:

    (a) Mr. Ronald P. O'Hanley serves as Vice Chairman of State Street and as President and CEO of State Street Global Advisors.  Hossain Decl. ¶ 40; Ex. O.

    (b) Mr. Joseph Hooley is both the Chairman and CEO of State Street and a Director of State Street Bank & Trust.  Hossain Decl. ¶ 40; Ex. P.

    (c) Ms. Karen Keenan serves as Executive Vice President of State Street and as Chairman of State Street Europe.  Hossain Decl. ¶ 40; Ex. Q.

Based on their high-ranking positions within State Street and the Foreign State Street Entities, these Massachusetts-based executives likely have access – from their computers in the United States or upon demand – to documents that are held by the Foreign State Street Entities in order to execute fully their duties.  Accordingly, Petitioners believe that each of these individuals likely has possession, custody, or control of documents concerning their work for the Foreign State Street Entities within the meaning of governing law, and that each can likely access, while present in his / her respective office in Massachusetts, information they require or wish to access in connection with their work for the Foreign State Street Entities.  Given the prevailing caselaw

16

and the location of these executives in Massachusetts, State Street's arguments concerning the location of documents abroad lacks any colorable legal basis.[4]

### 3.      Movants' Rule 69 Argument is Meritless

Finally, the Movants argue that the 1782 Order is invalid "because the Stati Parties do not have an enforceable judgment in the United Kingdom." Mem., at 18.  This argument lacks merit, for several reasons.

**First**, Movants fail to identify a single authority holding or even suggesting that Rule 69 in any way limits a court's authority under Section 1782.  Rule 69, entitled "Execution," governs the enforcement of U.S. federal court judgments.  While subsection (b) of the rule authorizes a judgment creditor to utilize the full range of federal discovery tools in connection with its effort to enforce a judgment, this is a supplementary provision, the clear purpose of which is to clarify that discovery remains available to a judgment creditor following the entry of judgment (an occurrence that, of course, typically ends the case and terminates the court's jurisdiction).  Rule 69 is not, however, primarily a discovery rule, and Movants' suggestion that discovery under Section 1782 must somehow "comply" with Rule 69 has no basis in the rule itself or any of the caselaw that Movants have cited.

**Second**, Movants' assertion that the discovery sought by the 1782 Order is "to locate assets in the United Kingdom" represents a significant oversimplification (if not a misrepresentation) of the use to which Petitioners intend to put the discovery.  The discovery sought by Petitioners is not designed to "locate assets."  Petitioners have already located and

---

[4]      State Street has not disputed that these individuals have control of the documents sought by the Subpoenas.  Should State Street later dispute this, or should the Court find that the inference presented by Petitioners is not strong enough, Petitioners respectfully request leave to conduct a deposition pursuant to Fed. R. Civ. P. 30(b)(6) to investigate the issue of whether any State Street personnel based in Massachusetts has possession, custody, or control of documents responsive to the Subpoenas.  Petitioners will, if preferable to the Court, make a formal motion to this effect, though Petitioners respectfully submit that the Court's initial order authorizes Petitioners to serve supplemental subpoenas, and that a subpoena intended to investigate the location of documents is contemplated by and should be authorized under that order.  *See* Hossain Decl. ¶ 2, Ex. A.

attached over $20 billion worth of Kazakh state assets throughout Europe.  The ROK and NBK, however, have contested those attachments by claiming that the ROK does not own or control them within the meaning of Kazakh and/or local law.  The discovery that Petitioners seek from State Street will be used to investigate and contest those claims, which raise complex issues of juridical independence, the organization of a foreign government, corporate authority, and beneficial ownership.  The discovery is not, on any realistic view, an effort to "locate assets."

**Third**, while Movants are correct that Petitioners have not obtained an enforceable judgment in the United Kingdom, they neglect to mention that (a) Petitioners' application clearly disclosed Petitioners' intention to use the discovery sought in connection with proceedings in other European Union jurisdictions (*see* Petition; Sun Dec. ¶ 2), and (b) that Petitioners have now obtained enforceable judgments, and are have commenced proceedings to enforce those judgments, in Sweden, the Netherlands, Belgium, and Luxembourg.  Thus, even if the Court were to accept Movants' argument that Rule 69 tempers its authority to authorize the discovery sought hereby — and it should not — it is undisputed that Petitioners have obtained several enforceable court judgments in the European Union, and that those judgments are being enforced.  Under the terms of Movants' Rule 69 argument, the rule would not prevent Petitioners from obtaining the discovery they have sought.

### B.      The 1782 Order is Valid and the Motion to Vacate it Should be Denied

Finally, Movants have asked for a stay of this petition pending the completion of "related proceedings."  One of the foundations of Movants' request for a stay is simply wrong – the proceedings before the London Court are not "dispositive" of anything arising out of this motion – and the other is grossly inequitable, in that it effectively asks this Court to sit on Petitioners' application for several years – notwithstanding the fact that the litigation proceedings are being litigated right now – based on allegations that have already been rejected by two courts.

> **1.     The London Proceeding and RICO Complaint are not "Dispositive"
> of the Matters in Connection with Which Petitioners Seek Discovery
> Under the 1782 Order**

Movants contend that the Court should stay these proceedings pending the resolution of

the London Court proceedings and the ROK's recently-filed RICO case against Petitioners,

which alleges, in substance, that Petitioners' efforts to enforce the Award amount to a

"racketeering enterprise."  As to the London proceedings, Movants claim that because "the stated

purpose" of Petitioners' 1782 proceeding was to "enforce the Award in the United Kingdom," a

finding by the London Court refusing to recognize the Award would render the 1782 Petition

"moot."  This argument, however, simply ignores the fact – discussed at length above and clearly

referenced in the Petition – that the discovery sought by Petitioners under the 1782 Order is for

use in the other European Proceedings, none of which will be affected in any way by the London

Court's proceedings.  The London Court proceedings are not "dispositive" of anything except the

enforceability of the Award **in England**, and thus have no bearing on the enforcement of the

Award outside that nation.

Neither is the RICO Complaint dispositive of the European Proceedings.  And while

Petitioners do not intend to address the merits of the RICO Complaint here, it will suffice to state

here that Petitioners consider the RICO Complaint to be completely meritless, particularly in

view of the fact that the DC Court in which the RICO Complaint was filed has already, based on

its view of the merits of the ROK's fraud claim, refused to consider it.  Lack of merit aside, the

RICO Complaint was filed only recently, and has not even been served on any of the defendants

named therein.  While Movants note that the RICO Complaint seeks, as part of the relief sought,

a permanent injunction prohibiting Petitioners from seeking Section 1782 relief, the ROK has

**not** sought that relief on an emergency or interlocutory basis.  Berger Dec. ¶ 8.  Given that the

ROK has not even served the RICO Complaint and that all defendants will need to be served via

a valid method of international service of process, *id.* ¶ 9, any prospect of its obtaining such an injunction is, by any realistic standard, several years away.  But granting the stay sought by Movants would effectively afford the ROK that relief **now**, despite the fact that it has not even served its complaint or sought interlocutory relief.  Granting such a stay would, particularly where this action has already been filed and is ripe for adjudication, be grossly inequitable.


**Conclusion**

For all of the foregoing reasons, Petitioners respectfully request that the Court deny the ROK's Motion.


Dated: New York, New York
       December 4, 2017

Respectfully submitted,


James E. Berger
Charlene C. Sun

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 556-2202
*jberger@kslaw.com*
*csun@kslaw.com*

*Attorneys for Petitioners Anatoli Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Traiding Ltd.*