EXHIBIT A

MANNHEIMER SWARTLING

20 October 2017

The Stockholm District Court, division 3

## KAZAKHSTAN'S REPLY TO THE INVESTORS' APPLICATION FOR PROVISIONAL SEQUESTRATION

### Case no. T 10498-17, division 3, *Anatolie Stati et al.* v. *The Republic of Kazakhstan*

Acting as counsel for The Republic of Kazakhstan ("**Kazakhstan**") we submit the following brief in case no. T 10498-17 against Anatolie Stati, Gabriel Stati, Terra Raf Trans Trading Ltd. and Ascom Group S.A. (the "**Investors**").

## A.      Position

1.      Firstly, Kazakhstan asks that the District Court rule the Investors' request inadmissible.

2.      Secondly, Kazakhstan asks that the District Court reject the Investors' request for sequestration.

3.      In the alternative, Kazakhstan asks that the District Court order that the Investors provide security for damages.

4.      Kazakhstan asks that the District Court order that the Investors compensate Kazakhstan for its litigation costs in an amount that will be specified at a later date.

## B.      Grounds

5.      Kazakhstan enjoys jurisdictional immunity in the present case. The District Court is thus not authorised to admit the present case.

6.      There is no risk of sabotage. Kazakhstan has neither the ability nor the intention to take any foreseen sabotage measure. The assigned property does not belong to Kazakhstan and is not located in Sweden. The property may thus not be executed for Kazakhstan's debts.

MANNHEIMER SWARTLING ADVOKATBYRÅ AB · NORRLANDSGATAN 21 · BOX 1711 · 111 87 STOCKHOLM, SWEDEN
TEL +46 8 595 06000 · FAX +46 8 595 06001 · WWW.MANNHEIMERSWARTLING.SE

STOCKHOLM · GÖTEBORG · MALMÖ · HELSINGBORG · MOSCOW · SHANGHAI · HONG KONG · BRUSSELS · NEW YORK

LEGAL#15565550v16

7.      The Investors do not lack the ability to provide security for damage. The conditions under which the Investors may be exempted for the obligation to provide security for damage in the event of a sequestration decision are thus not met.

## C.      Background

8.      In 2006, the Investors acquired companies that held the exploitation rights to two oil and gas fields in Kazakhstan. The Investors also initiated the building of a gas processing unit (an "**LPG Plant**", where LPG is an acronym for Liquefied Petroleum Gas). In March 2009, the Investors abandoned the LPG Plant which, at that time, was 80–90 per cent complete. In 2010, the Investors initiated arbitral proceedings under the Energy Charter Treaty against Kazakhstan (the "**ECT Arbitration**").

9.      The Investors alleged in the ECT Arbitration that the reason for abandoning the construction of the LPG Plant was that they were in dire financial straits because Kazakhstan had orchestrated a "*harassment campaign*" against them. In contrast, Kazakhstan argued that the Investors decided to abandon the unfinished construction in early 2009, some 16 months before the started the ECT Arbitration, for reasons within their own sphere and related to the worldwide financial crisis. This was also the reason given by the Investors at the time of the construction stop to the main contractor TGE. The alleged "*harrassment campaign*" formed the background of the Investors' claim in the ECT Arbitration, which resulted in an arbitral award on 19 Decemer 2013, corrected on 17 January 2014 (the "**ECT Award**").

10.     After the ECT Award had been rendered, Kazakhstan obtained access to a number of documents by way of discovery proceedings in the U.S. The Investors attempted to prevent Kazakhstan from obtaining these documents but these attempts were rejected by the U.S. courts. The documents had been filed in parallel arbitrations – previously unknown to Kazakhstan – that the Investors were part of and which partially overlapped the ECT Arbitration. To a large extent, the parallel arbitrations concerned the same subject matter as the ECT Arbitration, namely the valuation of the LPG Plant. The documents to which Kazakhstan gained access revealed that the alleged investment of USD 245 million (for which the Investors had requested and been granted damages in the ECT Arbitration) was the product of a comprehensive and advanced fraudulent scheme on the Investors' part:

11.    The Investors had inflated the construction costs recorded in the financial statements of Tolkynneftegaz LLP ("**TNG**"), the one of the Investors' companies which owned the LPG Plant and was responsible for the acquisition of equipment for the construction. The full extent and implications of this arrangement is known to the Investors only. Through this scheme, the Investors diverted funds from their Kazakh enterprises to Anatolie Stati's offshore companies through fictitious transactions and letterbox companies. Kazakhstan's review of the documents showed that a major part of the alleged investment – at least SEK 1 billion – was fabricated.

12.    In proceedings initiated on 19 March 2014, Kazakhstan requested that the Svea Court of Appeal annul or invalidate the ECT Award. Before the Court of Appeal, Kazakhstan alleged *inter alia* that the ECT Award was contrary to procedural *ordre public* because the Investors' fraudulent scheme and false evidence had affected the arbitral tribunal's assessments of the questions of (i) the arbitral tribunal's jurisdiction; (ii) Kazakhstan's potential liability for damages; and (iii) the quantum of damages; thereby affecting the outcome of the arbitration.

13.    The Court of Appeal however only tried whether the fraudulent scheme and false evidence had affected the arbitral tribunal's assessment of the quantum of damages, finding that even if the fraud had occurred it was not contrary to Swedish procedural *ordre public*. The Court of Appeal did not try whether the false evidence and the fraudulent scheme had affected the tribunal's assessment of its jurisdiction and of Kazakhstan's potential liability for damages. The fact that the Court of Appeal omitted trying these two questions made the Court of Appeal erroneously reject Kazakhstan's claim. Accordingly, the outcome in the Court of Appeal forced Kazakhstan to file an application to the Supreme Court, requesting that the Court of Appeal's judgment be quashed due to a grave procedural error under Ch. 59, section 1, para. 1, item 4 of the Code of Judicial Procedure (SFS 1942:740). The application was filed on 3 February 2017. The case before the Supreme Court (case no. Ö 613-17), which is yet pending, is further outlined in section E.2 below.

14.      Kazakhstan will not repeat all circumstances that constitute the fraudulent scheme in this submission, but instead refers principally to pages 8–14 of the Court of Appeal's judgment.[1]

15.      In summary, the fraudulent scheme was systematic, advanced and conducted for a number of years. Despite knowing that the investment in the LPG Plant was only a fraction of the USD 245 million stated in TNG's annual accounts, the Investors submitted those, and other accounts setting forth the same inflated investment costs, as evidence in the ECT Arbitration.

16.      The Investors provided their quantum expert witnesses with the inflated investment costs, which formed the basis of the expert witnesses' reports and testimonies. Further, the Investors' two most important witnesses to be heard – Anatolie Stati and Artur Lungu – lied in their respective witness statements and their testimonies when stating that the investment cost was USD 245 million.

17.      Finally, the Investors relied upon an indicative bid of USD 199 million that had previously been made for the LPG Plant (the value of which the arbitral tribunal ultimately relied on in the ECT Arbitration) and argued that it was an accurate and true reflection of the LPG Plant's value. The Investors did this despite knowing that the indicative bid was directly based on the inflated investment cost in TNG's annual accounts and that the bid should have been at least SEK 500 million lower had it been based on the real investment cost.

## D.     Kazakhstan enjoys jurisdictional immunity

18.      Under customary international law, states enjoy immunity in respect of themselves and of their property from the jurisdiction of the courts of other states. The principles governing state immunity are to a large extent codified in the United Nations Convention of Jurisdictional Immunities of States and Their Property of 2004 (the "**Convention**"). The Convention has not yet entered into force, but has been ratified by Sweden. Also, the Supreme Court has confirmed in NJA 2011 p. 475 that the Convention to a large extent represents a codification of

---

[1] File appendix 9.

customary international law. The question of jurisdictional immunity must thus be answered in light of the provisions in the Convention.

19.      Article 5 of the Convention codifies the principle mentioned in the previous paragraph. In accordance with Article 6 of the Convention, a Swedish court, such as the Stockholm District Court, must give effect to state immunity by refraining from exercising jurisdiction in proceedings brought before it against another state.

20.      Article 5 of the Convention states that this general rule is subject to the other provisions of that Convention. Under Article 7, Kazakhstan would not be able to invoke state immunity if it had expressly consented to the exercise of Swedish jurisdiction with regard to the case by international agreement, in a written contract or by a declaration before the court or by a written communication in a specific proceeding. However, Kazakhstan has not done so.

21.      Under Article 8(1), Kazakhstan would also not be able to invoke immunity if it had itself instituted the proceeding or intervened in the proceedings or taken any other step relating to the merits. Kazakhstan has not done that. Article 8(2) states that a state shall not be considered to have consented to the exercise of jurisdiction by a court of another state if it takes any other step for the purpose of asserting a right or interest in property at issue in the proceedings. In the present case, the purpose of Kazakhstan's participation is firstly to invoke jurisdictional immunity, and secondly to make evident that property identified by the Investors does not belong to Kazakhstan.

22.      Articles 10–16 specify certain proceedings in which state immunity cannot be invoked. Under Article 10, if a state engages in a commercial transaction with a foreign natural or legal ("*juridical*") person and, by virtue of the applicable rules of private international law, differences relating to the commercial transaction fall within the jurisdiction of a court of another state, the state cannot invoke immunity from that jurisdiction in a proceeding arising out of that commercial transaction.

23.      Article 2(1)(c) of the Convention defines a commercial transaction as (i) any commercial contract or transaction for the sale of goods or supply of services; (ii) any contract for a loan or other transaction of a financial nature, including any obligation of guarantee or indemnity in respect of any such loan or transaction; or

(iii) any other contract or transaction of a commercial, industrial, trading or professional nature, but not including a contract of employment of persons.

24.    In the present case, private international law does not indicate that "*differences relating to the commercial transaction*" fall within Swedish jurisdiction. The current proceedings have not arisen out of a commercial transaction as defined in the Convention.

25.    It is also obvious that Articles 11–16 do not apply to the present case. Neither of those provisions preclude Kazakhstan from invoking jurisdictional immunity.

26.    Under Article 17, if a state enters into an agreement in writing with a foreign natural or legal person to submit to arbitration differences relating to a commercial transaction, that state cannot invoke immunity from jurisdiction before a court of another state which is otherwise competent in proceedings which relate to: (a) the validity, interpretation or application of the arbitration agreement; (b) the arbitration procedure; or (c) the confirmation or the setting aside of the award, unless the arbitration agreement provides otherwise. The present proceeding in the District Court does not relate to the validity, interpretation or application of the arbitration agreement; nor the arbitration procedure; nor the confirmation or setting aside of the award. Nor is the District Court otherwise competent in such proceedings. [2]

27.    The question of immunity of enforcement does not arise until the question on jurisdictional immunity has been answered.[3] First and foremost, the District Court therefore has to assess the question of jurisdictional immunity.

28.    In this regard, it should be noted that the proceedings regarding sequestration before the District Court are not enforcement proceedings. The sequestration proceedings take place in two stages and are administered by two separate authorities. An application for sequestration is filed with a court, which has to try it if there is a legal basis for the requested action. The court then either issues a sequestration order or dismisses the request of the applicant. If the court grants the applicant's request, it

---

[2] Cf. Wrange, P., JT 2011–12, p. 819, note 69: "*If a state has entered into an arbitration agreement it is considered to have restrained from immunity in any challenge proceedings. Furthermore, a state has refrained from immunity if it has itself initiated the proceedings. See articles 8 and 17 of the UN Convention.*"

[3] Prop. 2008/09:204, p. 80.

will be upon the applicant to request that the Swedish Enforcement Authority (Sw. *Kronofogdemyndigheten*) enforce the order, see Ch. 16, sections 13–15 of the Enforcement Code. Although sequestration is generally considered to be one and the same legal institution, it is in fact a matter of both a judicial proceeding and an enforcement proceeding. Those two proceedings have the same relationship as a trial and the execution of judgment given therein.[4]

29.     In NJA 2011 p. 475, the Supreme Court held that the question of jurisdictional immunity is not to be tried separately in enforcement proceedings relating to the property of a foreign state.[5] In that case, the Supreme Court examined an enforcement decision by the Svea Court of Appeal which had been appealed from the Nacka District Court and which had originally been rendered by the Swedish Enforcement Agency. The present proceedings however do not concern an enforcement decision. The question on jurisdictional immunity must thus be tried in the present proceeding.

30.     Pursuant to the general principle expressed in Article 5 of the Convention, Kazakhstan enjoys jurisdictional immunity in the present proceedings before the District Court. The District Court must thus refrain from exercising jurisdiction over Kazakhstan and rule the Investor's request to be inadmissible.

# E.      The pending proceedings

## E.1     The pending proceedings shed light on Kazakhstan's conduct

31.     Even if the Court were to exercise jurisdiction, the Investors' request for sequestration must still be rejected since there is no risk of sabotage. One of several reasons therefor is that Kazakhstan's conduct must be seen in light of the pending proceedings outlined in section E.2–E.4 below, as further explained section F.

## E.2     The case before The Supreme Court

32.     As explained in para. 13 above, Kazakhstan filed an application on grave procedural error with the Supreme Court on 3 February 2017 (case no. Ö 613-17). Kazakhstan

---

[4] See Ekelöf, P. O., *et al.*, *Rättegång III*, p. 15–16.
[5] NJA 2011 p. 475, para. 6.

has requested that the Supreme Court quash the Svea Court of Appeal's judgment dated 9 December 2016 in case no. T 2675-14 and remand the case to the Court of Appeal for continued proceedings.

33.      In the case before the Svea Court of Appeal, Kazakhstan argued that the Investors' fraudulent scheme and false evidence invoked by the Investors before the arbitral tribunal in the ECT Arbitration affected the arbitral tribunal's jurisdiction in such a way that the fraudulent scheme and the false evidence prevented the arbitral tribunal's from having jurisdiction. Kazakhstan also claimed that the arbitral tribunal's assessment of Kazakhstan's potential liability for damages and the quantum of damages were affected. Against that backdrop, Kazakhstan's position in the case was that the ECT Award was to be invalidated under section 33, para. 1, item 2 of the Arbitration Act (SFS 1999:116).

34.      In its judgment of 9 December 2016, the Court of Appeal rejected Kazakhstan's claim to this end without having tried the issue of whether the Investors' fraudulent scheme and the false evidence invoked by the Investors before the arbitral tribunal in the ECT Arbitration had affected the arbitral tribunal's assessment of the questions of its jurisdiction and of Kazakhstan's potential liability for damages. In the Supreme Court case, Kazakhstan contends that the Court of Appeal's omission has, or may in any event be assumed to have, affected the substantive outcome of the case.

35.      Kazakhstan has requested that the Supreme Court case be administered promptly. On 7 April 2017, the Investors filed a request for declaration of precedence. The request was denied on 11 April 2017. The trial on grave procedural error is still pending.

### E.3      The case before The High Court of Justice of England and Wales

36.      The ECT Award is the subject of ongoing proceedings commenced by the Investors in England before the High Court of Justice, Queen's Bench Division, Commercial Court (the "**English Court**") [No. CL-2014-000079] (the "**English Proceedings**").

37.      On 28 February 2014, the Investors were granted permission to enforce the ECT Award by the English Court. On 7 April 2015, Kazakhstan applied to set aside the permission to enforce the ECT Award in England.

38.    The English Proceedings were stayed on 3 September 2015, pending the Svea Court of Appeal's judgment in case no. T 2675-14. The proceedings were continued following the Svea Court of Appeal's judgment on 9 December 2016.

39.    On 6–7 February 2017, a few days after Kazakhstan filed its application on grave procedural error before the Supreme Court, a hearing took place in the English Proceedings. Kazakhstan contended enforcement of the ECT Award would be contrary to the English public policy, as the ECT Award had been procured by fraud, as a result of the Investors' fraudulent deception of the tribunal in the ECT Arbitration.

40.    At the hearing, the Investors requested that the English Court dismiss the English Application. Kazakhstan requested that the English Court allow the English Application (duly amended) to proceed to a trial on the issue of whether the ECT Award was procured by fraud.

41.    On 6 June 2017, the English Court delivered judgment, finding that (i) the decision of the Swedish Court does not create an estoppel, (ii) Kazakhstan is entitled to rely on the evidence obtained since the ECT Award, and (iii) there is a sufficient *prima facie* case that the ECT Award was obtained by fraud.[6]

42.    Furthermore, the English Court held that the interests of justice require that the alleged fraud be examined at a trial and decided on its merits, including the question of the effect of the fraud where found.

43.    By order dated 27 June 2017, the English Court gave detailed directions for the trial of the fraud issue. The hearing is scheduled to take place on 31 October 2018.

44.    The Investors were refused permission to appeal the English decision at first instance. However, the Investors have applied for permission to appeal the English Court's judgment to the Court of Appeal, but their application has not yet been determined.

45.    Kazakhstan is due to file its Points of Reply on 7 November 2017.

---

[6] Exhibit 1, para. 92.

**E.4**      **The case before The United States District Court, District of Columbia**

46.      On 30 September 2014, the Investors commenced proceedings in the United States District Court for the District of Columbia (the "**U.S. Court**") to enforce the ECT Award in the United States. On 5 August 2016, the U.S. Court *sua sponte* stayed the case pending the Court of Appeal's judgment.

47.      On 3 February 2017 – after the decision of the Svea Court of Appeal had been rendered – the Investors requested that the stay of proceedings be lifted. On 3 April 2017, the U.S. Court denied the Investors' request to lift the stay.

48.      The Investors once more requested that the stay of proceedings be lifted on 31 May 2017. On 15 August 2017, the U.S. Court denied this request, and held that the proceedings should remain stayed until the Swedish Supreme Court proceedings have concluded.

49.      The parties have filed a further status report to the U.S. Court on 29 September 2017.

## F.      Kazakhstan's conduct must be seen in light of the Investors' fraudulent scheme and the pending proceedings

50.      The Investors inflated the investment costs for the LPG Plant, and asserted that the indicative bid of USD 199 million, based on the inflated costs in TNG's annual accounts, was a valid, independent basis for the Tribunal to Award damages. damages awarded by the tribunal in the ECT Arbitration were therefore based on false information and thus unjustified.

51.      Contrary to what the Investors suggest, the pending proceedings are not the fruits of obstruction on Kazakhstan's part. Rather, the pending proceedings show that Kazakhstan is working vigorously to fight off the unwarranted claims of the Investors. To this end, Kazakhstan makes use of all legal remedies.

52.      The recent developments of the English Proceedings mean that Kazakhstan's case on the Investors' fraudulent scheme will be properly heard and addressed, which Kazakhstan contends will ultimately result in the English Court refusing enforcement. Similarly, Kazakhstan contends that the Supreme Court will quash the

Svea Court of Appeal's judgment and remand the case to the Court of Appeal for continued proceedings.

53.    The pending proceedings shed light on Kazakhstan's conduct after the ECT Award. A brief examination should lead the District Court to conclude that Kazakhstan's conduct is the result not of obstruction, as suggested by the Investors, but of utilising its judicial rights to protect itself from the Investors' fraud. If Kazakhstan's conduct were pure obstruction, which it is not, the state would hardly seek to exhaust all legal remedies available to correct the outcome of the ECT Arbitration. Pursuing one's legal rights is not obstruction.

# G.    There is no risk of sabotage

## G.1    Kazakhstan lacks the ability to take the foreseen sabotage measure

54.    Under Ch. 15, section 1 of the Code of Judicial Procedure, sequestration requires that a risk of sabotage is at hand. The risk of sabotage should be objectively provable (Sw. *objektivt fastställbar*). A fundamental condition for objective danger is that the respondent (*i.e.* Kazakhstan in the present case) have any ability at all to take the foreseen sabotage measure.[7] Kazakhstan does not have such an ability.

55.    The foreseen sabotage measure refers to certain property identified by the Investors.[8] However, the property identified by the Investors forms part of The National Fund of the Republic of Kazakhstan (the "**National Fund**"). The National Fund is managed by Kazakhstan's central bank, The National Bank of the Republic of Kazakhstan (the "**National Bank**"), which is a legal entity separate from Kazakhstan.[9]

56.    The task of managing the National Fund is regulated in Presidential decree no. 402 of 23 August 2000 and Ch. 5 of the Budget Code of Kazakhstan.[10] Besides, the task

---

[7] Westberg, P., *Det provisoriska rättsskyddet i tvistemål*, book 3, p. 89.
[8] The Investors' application for provisional sequestration dated 18 August 2017, para. 38–44.
[9] Article 6 in the Law on the National Bank, Exhibit 2.
[10] Presidential decree no. 402 of 23 August 2000, Exhibit 3, and extract from the Budget Code of Kazakhstan, Exhibit 4.

is governed by an agreement between Kazakhstan and the National Bank (the "**National Fund Agreement**").[11]

57.     Under Article 1.1 of the National Fund Agreement, the means of the National Fund have been transferred to the National Bank, for it to manage. Under Article 2.1.1 of the National Fund Agreement, the National Bank has the right to assign external managers with the management responsibility.

58.     The National Bank has transferred part of the assets in the National Fund to the external party The Bank of New York Mellon ("**BNY Mellon**"). This is stipulated in a so called Global Custody Agreement originally entered into by the National Bank, BNY Mellon and Boston Safe Deposit and Trust Company.[12] Boston Safe Deposit and Trust Company's rights and obligations according to the agreement were transferred to BNY Mellon on 6 April 2016. BNY Mellon is since the sole contracting party in relation to the National Bank.

59.     BNY Mellon and Kazakhstan does not have any contractual relationship which concerns the property identified by the Investors. BNY Mellon does not take any instructions from Kazakhstan with regards to the property.[13] Since Kazakhstan cannot dispose of the property, no sabotage measure may be taken.

60.     For the reasons stated above, the alleged risk of sabotage is hypothetical. The purpose of the sequestration instrument, however, is not to provide a court-sanctioned protection against every eventuality.[14] A hypothetical danger may not constitute a risk of sabotage.[15]

**G.2     The foreseen sabotage measure does not refer to executable property in Sweden**

61.     A fundamental condition for a risk of sabotage to be at hand is that the foreseen sabotage measure refers to property which may be executed.[16] The identified

---

[11] National Fund Agreement, Exhibit 5, with Supplementary Agreement, Exhibit 6.
[12] Global Custody Agreement, Exhibit 7.
[13] Letter from BNY Mellon of 13 October 2017, Exhibit 8.
[14] Westberg, P., *Det provisoriska rättsskyddet i tvistemål*, book 1, p. 90.
[15] Westberg, P., *Det provisoriska rättsskyddet i tvistemål*, book 3, pp. 90–91.
[16] Fitger, P., et al., Rättegångsbalken. En kommentar, comment on Ch. 15, section 1 (Zeteo, 20 June 2017).

property does not belong to Kazakhstan – it belongs to the National Bank – and may therefore not be executed for Kazakhstan's debts.

62.   For property to be executed, it is required that the property is located in Sweden.[17] The property identified by the Investors is not located in Sweden.

63.   The identified property are nominee registered shares in Euroclear. These are no physical shares, but electronic shares. The shares are held by BNY Mellon's London branch ("*SANVLON*" in Euroclear stands for SA/NV London). The National Bank is the registered owner of the shares on BNY Mellon's books.[18]

64.   With regards to the disposition of non-physical financial instruments according to Ch. 5, section 3 of the Swedish law on trade with financial instruments (SFS 1991:980), it is stated that the legal consequences in relation to other than the parties shall be determined in accordance with the law of the jurisdiction where the register is kept, in particular where the nominee (custodian) is located.[19] In the present case, the register is kept by BNY Mellon's London branch.[20] English law shall therefore be applied in relation to the legal effects of dispositions.[21]

65.   Financial instruments which are registered in accordance with the Accounting Financial Instruments Act (SFS 1998:1479) and which are registered by a foreign nominee are considered to be located where the nominee is.[22] In Ds 2003:38 it is stated that "[i]*t should, die to practical reasons, not be possible to come to any other conclusion than that the asset is located where the intermediary is, or rather, where his account is (PRIMA rule), regardless if the registration constitutes a claim or a*

---

[17] See, inter alia, Bogdan, M., *Svensk internationell privaträtt*, 2014, 8 ed., p. 128, and the Enforcement Authority's *Handbok Internationell Verkställighet*, p. 30.
[18] Letter from BNY Mellon on 13 October 2017, Exhibit 8, cf. file appendix 7.
[19] Prop 1999/2000:18, p. 110–111.
[20] Letter from BNY Mellon on 13 October 2017, Exhibit 8.
[21] Prop. 1999/2000:18, p. 111.
[22] Prop. 1999/2000:18, p. 94–95.

> *joint ownership. It becomes extremely complicated if the country of origin of the financial instruments is of relevance.*"[23]

66.  The question of where a financial instrument is located has been regulated in article 2(9)(ii) in regulation (EU) 2015/848 of the European Parliament and of the Council of 20 May 2015 on insolvency proceedings. It is there stated that "*'the Member State in which assets are situated' means, in the case of [...] financial instruments, the title to which is evidenced by entries in a register or account managed by or on behalf of an intermediary ('book entry securities'), the Member State in which the register or account in which the entries are made is maintained.*"

67.  The ownership of the shares is not evidenced by the Euroclear register since the shares are registered by a nominee. As explained in section 63, the National Bank is the registered owner at BNY Mellon. BNY Mellon manage accounts in which the ownership of the identified property is evidenced. The accounts are managed from London by BNY Mellon's London branch.[24]

68.  In summary, the identified property is located in England. It may not be executed in Sweden. There may be no risk of sabotage with regards to property which may not be executed in Sweden.

69.  It may be noted in this regard that a risk of sabotage according to the wording of Ch. 15, section 1 of the Code of Judicial Procedure requires that the debtor may be foreseen to evade from paying a debt, by acting in certain manners. If the assets may not be taken to pay the debt, a disposition of those assets may not result in a risk of sabotage. To dispose of assets not located in Sweden – which in the present case is purely hypothetical since Kazakhstan has no ability to dispose of the identified property – does not reasonably indicate an evasion from paying a debt in Sweden.

---

[23] Ds 2003:38, p. 143. Cf. Afrell, L., & Bogdan, M., *Något om lagvalsregler vid pantsättning av dokumentlösa finansiella instrument*, JT 2001/02, p. 517, Millqvist, G., *Ny Haagkonvention om tillämplig lag för vissa rättigheter i fråga om finansiella instrument som är registrerade på en förvaltare*, JT 2002/03, p. 855 and Hanqvist, D., *Var finns de finansiella instrumenten? Lex rei sitae i modern rätt*, JT 2003/04, p. 456.

[24] Letter from BNY Mellon on 13 October 2017, Exhibit 8.

### G.3      Kazakhstan has no intention of taking any sabotage measure

70.     Even if Kazakhstan would have had the ability to take any alleged foreseen sabotage measure, the mere ability of a debtor to evade property is, as also highlighted by the Investors, not sufficient to conclude that there is a risk of sabotage. However, a risk of sabotage may be deducted not only from concrete evidence but also from the debtor's person.

71.     The Investors allege that the risk of sabotage is evidenced mainly by the actions taken by Kazakhstan to date, most of which are procedural. The Investors contend that Kazakhstan has *"evaded all its payment obligations"* and that it thus appears highly unlikely that Kazakhstan would allow enforcement measures pertaining to the property at issue or other fleeting property if such measures can be avoided.[25]

72.     As outlined above, Kazakhstan is not guilty of obstruction or any other such behaviour. On the contrary, Kazakhstan currently engages in the use of established legal remedies to protect its rights. As evidenced by the recent developments of the English Proceedings, Kazakhstan's conduct is entirely reasonable and in no way a manifestation of disloyalty as implied by the Investors. A thorough judicial disposal of one's rights under Swedish and international law cannot be viewed as evidence of conduct which may indicate a risk of sabotage.

73.     In regards to procedural actions in particular, parties must enjoy a large degree of freedom of action. A court must be particularly restrictive in taking into account the respondent's procedural conduct.[26] In NJA 1986 p. 450, the Supreme Court held that the use of security measures on the mere basis that the respondent uses normal legal remedies to defend itself against the applicant's claim would be contrary to the function of the institute of sequestration according to the Code of Judicial Procedure. In this regard, normal legal remedies should not be contrasted with extraordinary remedies, but to flagrant cases of procedural abuse.[27]

---

[25] The Investors' application for provisional sequestration dated 18 August 2017, para. 41.

[26] Westberg, P., *Det provisoriska rättsskyddet i tvistemål*, book 3, p. 131. See also Gregow, T., *Kvarstad och andra säkerhetsåtgärder enligt 15 kap. rättegångsbalken*, p. 79: "[T]*he procedural conduct should in principle* [not] *form the basis of an assumption of a risk of sabotage.*"

[27] Westberg, P., *Det provisoriska rättsskyddet i tvistemål*, book 3, p. 137.

74.     In sum, Kazakhstan's conduct does not indicate a risk of sabotage. Absent such risk, the Investors' request for sequestration must be rejected.

75.     In NJA 2007 p. 690, the Supreme Court held that the general rule is that there has to be a concrete risk of sabotage. The Supreme Court further held that the fact that an applicant's claim is substantial in relation to the debtor's net assets does not suffice to conclude that a risk of sabotage is at hand.

76.     As previously explained, there are good reasons for Kazakhstan's conduct to date. Kazakhstan has not taken (and could not have taken) any measure to prepare for sabotage. The value of the now sequestered assets have decreased with approximately SEK 30 million from 30 November 2016 to 31 August 2017. This is not due to any sabotage measure. The Investors have in their application mentioned a sale of shares in Electrolux AB, which Kazakhstan understands to be an alleged indication that Kazakhstan evades enforcement. It is correct that a sale has taken place. The decision to sell was made by an external asset manager assigned by the National Bank on financial grounds.[28]

77.     Kazakhstan has neither had the ability nor the intention to take any measure with regards to the identified property. If the Court should still find that Kazakhstan has had the ability to take any foreseen sabotage measure, Kazakhstan's conduct to date does in no way indicate that there is any intention to take sabotage measures with regards to the identified property.

## H.     The Court must order that the Investors' provide security for damages should the Court uphold the sequestration

78.     The point of departure under Ch. 15, section 6 of the Code of Judicial Procedure is that the Investors must provide security for damages.

79.     In NJA 1979 p. 317, the Supreme Court granted the applicant exemption from the duty to provide security only after the applicant had provided a detailed inventory of its assets, thereby proving its inability to provide security. This judgment still has

---

[28] Letter on 20 October 2017 from the National Bank, Exhibit 9.

precedence as to the evidentiary requirement with regard to exemptions from the obligation to provide security.[29]

80.      Anatolie Stati and Gabriel Stati own an international conglomerate of companies. Anatolie Stati is one of Moldova's richest persons.[30] In the witness statement submitted by the Investors and signed by Anatolie Stati (file appendix 17), it is stated that Anatolie Stati's "*personal bank accounts are in overdraft*".[31] Besides the information concerning Ascom Group S.A. and Terra Raf Trans Traiding Ltd., nothing is said on Anatolie Stati's other assets. A notice that an applicant's personal bank accounts are in overdraft cannot form the basis of a relief from the obligation to provide security.

81.      Besides in the companies which are applicants in the present case, Anatolie Stati has, as Kazakhstan understands it, participating interests in at least the following companies. Snarbrook Limited, Cardhall Services Ltd, Westemer Enterprises Ltd, Casco Petroleum Middle East, Tristan World Energy Ltd, Tristan Energy Ltd, Terranova Worldwide S.A., Montvale Invest Ltd, Ascom Oil Company Ltd, Tristan Energy Solutions Ltd, Lorrin Invest Limited, Pellat International Ltd, Tristan Energy Overseas Ltd, Gast Geophysical Ltd, Bronti Group Ltd, Tristan World Gas & Oil Ltd, Tristan Gas Energy Ltd, Komet Group SA, Oil Technology Global Ltd, Tristan Oil Ltd, World & Gas Ltd, Tristan Gas & Oil Ltd, Hayden Intervest Limited, Energy Global Ventures Ltd, Ascom Sudd Operating Company Limited, CrossLines Ltd, Petrostar Oil Ltd, Melvin Production Inc och Ascom Group Ltd.[32]

82.      In the same file appendix, it is stated that Gabriel Stati "*is not in a position to raise the necessary funding*".[33] It is not explained what is this means. An assertion made by one applicant about another applicant (which, moreover, could inform on his own

---

[29] See Fitger, P., *et al.*, *Rättegångsbalken. En kommentar*, comment on Ch. 15, section 6 (Zeteo, 20 June 2017).

[30] Sanduta, I. & Dumitru, L., *Stati secrets and the bribes from Africa*, article from RISE Moldova on 7 April 2016, retrieved on 19 October 2017, Exhibit 10. See also extract from the webpage http://independent.md on 19 October 2917, article published on 23 April 2017, Exhibit 11.

[31] File appendix 17, para. 8.

[32] Extract from RISE Moldova, published on 7 April 2017, retrieved on 19 October 2017, Exhibit 12, and extract from ICIJ Offshore Leaks Database, retrieved on 19 October 2017, Exhibit 13.

[33] File appendix 17, para. 13.

financial situation himself) is not in a position to raise the necessary funding also cannot be accepted as a reason for a relief from the obligation to provide security.

83.     In summary, the witness statement does not meet the standard of proof established by the Supreme Court in NJA 1979 p. 317.

84.     Nor does the fact that the Investors according to themselves has arranged third party funding and that the Investors have agreed with the third party that it shall not have to provide security for damage relief the Investors from the obligation to provide such security.

## I.      Preliminary statement of evidence

85.     Kazakhstan presently relies on the following evidence.

86.     Judgment [2017] EWHC (1348) of 6 June 2017 of The High Court of Justice of England and Wales, Queen's Bench Division, Commercial Court (Mr Justice Knowles CBE) in case no. CL-2014-000070, Exhibit 1, to prove *that* Kazakhstan's alleged obstruction is constituted in Kazakhstan's use of its legal rights and *that* the English Court has held that there are circumstances that *prima facie* indicate that the ECT Award was obtained by fraud.

87.     Extract from Kazakhstan's law on the National Bank of 30 March 1995 in translation, Exhibit 2, to prove *that* the National Bank is a legal entity separate from Kazakhstan.

88.     Presidential decree no. 402 of 23 August 2000 in translation, Exhibit 3, to prove *that* the assets in the National Fund have been transferred to the National Bank and *that* the National Bank manages the National Fund.

89.     Extract from Kazakhstan's Budget Code of 4 December 2008 in translation, Exhibit 4, to prove *that* the assets in the National Fund have been transferred to the National Bank and *that* the National Bank manages the National Fund.

90.     The Asset Management Agreement of the National Oil Fund of the Republic of Kazakhstan, Exhibit 5, to prove *that* the National Bank has the right to possess, use and manage the assets in the National Fund, *that* Kazakhstan has no ability to

dispose of the assets in the National Fund and *that* the assets in the National Fund belongs to the National Bank.

91.    Supplementary Agreement to The Asset Management Agreement of the National Oil Fund of the Republic of Kazakhstan, Exhibit 6, to prove *that* the assets in the National Fund have been transferred from Kazakhstan to the National Bank, *that* Kazakhstan has no ability to dispose of the assets in the National Fund and *that* the assets in the National Fund belongs to the National Bank.

92.    Global Custody Agreement of 24 December 2001, Exhibit 7, to prove *that* Kazakhstan has no ability to dispose of the assets in the National Fund, *that* Kazakhstan has no right of insight into the management of the assets in the National Fund and *that* the assets in the National Fund belongs to the National Bank.

93.    Letter from BNY Mellon of 13 October 2017, Exhibit 8, to prove *that* BNY Mellon does not take any instructions from Kazakhstan regarding the property identified by the Investors, *that* Kazakhstan has no ability to dispose of the property identified by the Investors, *that* the National Bank is the registered owner of the property identified by the Investors on BNY Mellon's books, *that* the register is kept by BNY Mellon's London branch and *that* the property identified by the Investors is located in England and not in Sweden.

94.    Letter from the National Bank of 20 October 2017, Exhibit 9, to prove *that* the sale of the shares in Electrolux AB was initiated by an external asset manager assigned by the National Bank and *that* the same sale was carried out financial grounds.

95.    Sanduta, I., & Dumitru, L., *Stati secrets and the bribes from Africa*, article from RISE Moldova on 7 April 2017 (retrieved on 19 October 2017), Exhibit 10, to prove *that* Anatolie Stati is one of Moldova's richest persons and therefore does not lack means to provide security for damage.

96.    Extract from the webpage http://independent.md, article published on 23 April 2017 (retrieved on 19 October 2017), Exhibit 11, to prove *that* Anatolie Stati is one of Moldova's richest persons and therefore does not lack means to provide security for damage.

97.    Extract from RISE Moldova, published on 7 April 2017 (retrieved on 19 October 2017), Exhibit 12, to prove *that* Anatolie Stati has participating interests in a large

number of companies and therefore does not lack means to provide security for damage.

98.       Extract from ICIJ Offshore Leaks Database (retrieved on 19 October 2017), Exhibit 13, to prove *that* Anatolie Stati participating interests in a large number of companies and therefore does not lack means to provide security for damage.

_____

Stockholm on 20 October 2017

Alexander Foerster                              Ludwig Metz

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Judgment [2017] EWHC (1348) of 6 June 2017 of The High Court of Justice of England and Wales, Queen's Bench Division, Commercial Court (Mr Justice Knowles CBE) in case no. CL-2014-000070 |
| 2 | Extract from Kazakhstan's law on the National Bank of 30 March 1995 in translation |
| 3 | Presidential decree no. 402 of 23 August 2000 in translation |
| 4 | Extract from Kazakhstan's Budget Code of 4 December 2008 in translation |
| 5 | The Asset Management Agreement of the National Oil Fund of the Republic of Kazakhstan |
| 6 | Supplementary Agreement to The Asset Management Agreement of the National Oil Fund of the Republic of Kazakhstan |
| 7 | Global Custody Agreement of 24 December 2001 |
| 8 | Letter from BNY Mellon of 13 October 2017 |
| 9 | Letter from the National Bank of 20 October 2017 |
| 10 | Sanduta, I., & Dumitru, L., Stati secrets and the bribes from Africa, article from RISE Moldova on 7 April 2017 (retrieved on 19 October 2017) |
| 11 | Extract from the webpage http://independent.md, article published on 23 April 2017 (retrieved on 19 October 2017) |
| 12 | Extract from RISE Moldova, published on 7 April 2017 (retrieved on 19 October 2017) |
| 13 | Extract from ICIJ Offshore Leaks Database (retrieved on 19 October 2017) |